UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

AIRPRO DIAGNOSTICS, LLC, a
Florida limited liability company,

   Plaintiff,

v.

DREW TECHNOLOGIES, INC., a
Michigan corporation, OPUS IVS,
INC., a Delaware corporation,
AUTOENGINUITY, LLC, an Arizona
limited liability corporation, and
BRIAN HERRON, an individual,

   Defendants.

Case No. 22-_____

Hon. _____

**COMPLAINT AND JURY DEMAND**

---

## COMPLAINT

NOW COMES Plaintiff, AirPro Diagnostics, LLC ("AirPro"), by and through its attorneys, Varnum LLP, and for its Complaint against Defendants states as follows:

### PARTIES AND JURISDICTION

1. AirPro is a Florida limited liability company with its principal place of business located at 11737 Central Parkway, Jacksonville, Florida 32224.

2. Upon information and belief, Defendant Drew Technologies, Inc. ("Drew Technologies"), is a Michigan corporation with its principal place of

business located at 3915 Research Park Drive, Suite A10, Ann Arbor, Michigan 48108.

3. Upon information and belief, Defendant Opus IVS, Inc. ("Opus IVS") is a Delaware corporation with its principal place of business located at 3915 Research Park Drive, Suite A8, Ann Arbor, Michigan 48108.

4. Upon information and belief, Defendant AutoEnginuity, LLC ("AutoEnginuity") is an Arizona limited liability company with its principal place of business located at 1819 N Rosemont Ste 101, Mesa, Arizona 85205. Upon information and belief, the sole member of AutoEnginuity is Drew Technologies.

5. Upon information and belief, Defendant Brian Herron resides at 6620 Dexter Ann Road, Dexter, Michigan 48130.

6. None of AirPro's members are citizens of Michigan, Delaware or Arizona.

7. The amount in controversy exceeds Seventy-Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest, fees, and costs, and complete diversity of the parties exists. Subject matter jurisdiction is therefore proper under 28 U.S.C. §1332.

8. All Defendants are subject to personal jurisdiction in this Court.

9. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## GENERAL ALLEGATIONS

10. In 2013, the State of Massachusetts passed right to repair, or "R2R," legislation. The overarching purpose of this legislation was to give consumers choices about where and how to have their vehicle serviced, rather than being forced to take it to an OEM dealership. In other words, the legislation was intended in large part to create a competitive market between OEM dealerships and non-OEM affiliated repair shops, in which consumers could obtain OEM-level services without having an OEM dealership visit as their only option.

11. In 2014, a Memorandum of Understanding ("MOU") related to the R2R legislation was executed by the OEMs, including Ford Motor Company ("Ford"). The effect of this agreement was to extend the scope of the R2R legislation beyond Massachusetts and make it national.

12. The express purpose of the R2R legislation and the MOU was to promote competition and provide consumers with more options through increased access to OEM equivalent software by, among others, independent collision repair shops.

13. The Equipment and Tool Institute ("ETI") is the leading trade association in the scan tool aftermarket and is the intended depository of the R2R information from all OEMs, including Ford.

14. In the 2014-2015 time frame, two individuals – Steve Casella and Scotty West – formed an entity known as CompuFlash, LLC (CompuFlash"), and developed a device that could be used to effectuate the express purpose of the R2R legislation and the MOU, known as the CompuFlash device.

15. Specifically, the CompuFlash device was a product that independent collision repair shops could use to perform vehicle module programming, whereas prior to that time consumers were essentially forced to take their vehicles to OEM dealerships to have module programming performed.

16. Shortly after CompuFlash was formed, Mr. Casella and Mr. West sought out the assistance of Lonnie Margol, a well-known pioneer in the industry and a named inventor of an innovative, multi-vehicle remote scan tool device.

17. Mr. Margol, Mr. Casella, and Mr. West collaborated on the development of a new device, which would combine the module programming features of the original CompuFlash device with the multi-vehicle, remote diagnostic and calibration capabilities of Mr. Margol's invention, and which would be marketed to collision and mechanical repair shops throughout North America.

18. AirPro was formed in 2016 to serve as the distributor of the new device to primarily collision repair shops, with offerings to mechanical or other specialty repair shops, and also to provide skilled remote diagnostic and calibration services to those shops.

19. Under the arrangement between the two companies, CompuFlash would manufacture the device itself, and then sell the device to AirPro. AirPro would then distribute the devices to its customers and organize its service centers to provide remote services to those customers.

20. The CompuFlash device utilized an interface known as the "Cardaq" J2534, which was in turn produced and distributed by Drew Technologies.

21. CompuFlash and AirPro still needed to decide which aftermarket scan tool diagnostic software to incorporate into its new device to compliment the OEM-specific applications.

22. After extensive investigation and evaluation, they selected a product known as "Giotto," which was created and licensed by AutoEnginuity.

23. They selected the Giotto product in large part because of its wider vehicle coverage and the fact that it had been derived directly from the OEM data and instructions contained in ETI's Tek-Net library, as specifically contemplated by the R2R legislation and the MOU.

24. AirPro and AutoEnginuity developed a working relationship by which AirPro would acquire VCI interfaces from AutoEnginuity known as Pro-line, in addition to the Giotto diagnostic software referenced above.

25. At the same time, AirPro and Drew Technologies developed a working relationship that resulted in AirPro's continued acquisition of Cardaq interfaces from Drew Technologies.

26. The end result of these relationships was that AutoEnginuity and Drew Technologies created a situation in which AirPro was reliant on those entities for its continued operation.

27. Opus IVS is a conglomerate of various entities in the field of automotive repair, which now includes both Drew Technologies and AutoEnginuity.

28. Mr. Herron is the President of Opus IVS, and he has also been affiliated with AutoEnginuity and Drew Technologies for years.

29. From the beginning, AirPro licensed the AutoEnginuity Giotto product pursuant to a license agreement, which contained no restrictions on where the services could be performed using the software or the manner in which AirPro marketed its services. *See* License Agreement, attached as **Exhibit A**.

30. One of the key aspects of the Giotto product, just as with any automotive diagnostic software, is its ability to be updated as new vehicles are manufactured and sold.

31. Without those updates, the diagnostic software becomes functionally obsolete over time.

32. In 2016, Drew Technologies began to try to compete with CompuFlash via its "Remote Assistance Program" ("RAP"), which used the same technical concept that CompuFlash and Mr. Margol had pioneered previously.

33. In January 2017, Mr. Herron contacted Chuck Olsen of AirPro to explore potential partnership or acquisition opportunities between AirPro, CompuFlash, and Drew Technologies.

34. These discussions led to the execution of a Mutual Party Agreement between Drew Technologies and AirPro, as well as an identical agreement between Drew Technologies and CompuFlash. A copy of the Drew Technologies-AirPro Mutual Party Agreement is attached as **Exhibit B**, and a copy of the Drew Technologies-CompuFlash Mutual Party Agreement is attached as **Exhibit C**.

35. Under the terms of that agreement, the parties agreed to exchange information to one another, including "business strategies, pricing, techniques, computer programs, methods, drawings, formulas, specifications, software, or other data of a business or technical nature[.]" Mutual Party Agreement at ¶ 2.

36. The parties further agreed that the information disclosed pursuant to that agreement would be used only for the purpose of evaluation, discussion, and potential partnerships between Drew Technologies, on the one hand, and either AirPro or CompuFlash, on the other.

7

37. Each Mutual Party Agreement had a one-year term, but also imposed restrictions on the parties for a period of three years following expiration of the agreement. Specifically, for that period of time, the parties were prevented from disclosing any information received under the Mutual Party Agreement, and further agreed "not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information Received from the Disclosure without the prior written consent of the Disclosure." *Id*. at ¶ 9.

38. Each Mutual Party Agreement also placed the burden of proving independent development of works on the party that had received confidential information under the agreement. *See id*.

39. Despite these restrictions, upon information and belief, Drew Technologies took information obtained from AirPro under the Mutual Party Agreement and wrongfully exploited it for its own benefit.

40. Specifically, as part of its performance under the Mutual Party Agreement, AirPro disclosed to Drew Technologies significant detail regarding all components of AirPro's operation.

41. Specifically, AirPro disclosed its business model and pricing structure, and it further disclosed details regarding how its use of the AutoEnginuity Giotto product in conjunction with the Cardaq interface allowed AirPro to successfully

8

provide remote diagnostic services to collision repair shops for a wide range of vehicles.

42. At that time, this proprietary combination of hardware and software was not generally known in the industry, and Drew Technologies did not have any ability to service collision repair shops or successfully provide remote diagnostic services.

43. Upon information and belief, shortly after obtaining the foregoing information and technical knowledge from AirPro, and certainly within the three year window contemplated by the Mutual Party Agreement, Drew Technologies wrongfully used that information and technical knowledge to enhance its RAP product in an effort to directly compete with AirPro in the field of remote diagnostic services.

44. In fact, Drew Technologies went as far as to use the very same software vendor, AutoEnginuity, in an effort to replicate AirPro's successful business model.

45. As a result of its wrongful conduct, Drew Technologies is now a direct competitor of AirPro, as is Opus IVS by virtue of its ownership of Drew Technologies and other related entities, such as AutoLogic Diagnostics, Blue Link Diagnostic Solutions, and Farsight.

46. In connection with its licensing of the Giotto product, AirPro worked closely with AutoEnginuity, providing information and recommendations to

9

AutoEnginuity to allow AutoEnginuity to continuously improve the Giotto product's capabilities and performance.

47. AirPro was never compensated in any way for its efforts in that regard.

48. In January 2020, Opus IVS, via Drew Technologies, reached an agreement to acquire AutoEnginuity.

49. At that time, Mr. Herron contacted Mr. Olsen at AirPro and informed Mr. Olsen that the acquisition would not change AirPro's relationship with AutoEnginuity in any way and that AirPro should continue to conduct business with AutoEnginuity as usual.

50. Mr. Herron also told Mr. Olsen that he appreciated AirPro's business, as well as AirPro's continued assistance with functionality improvements for both the AutoEnginuity product and the Drew Technologies J2534 interface.

51. Despite Mr. Herron's repeated assurances, Opus IVS/Drew Technologies' acquisition of AutoEnginuity meant that AutoEnginuity (along with Opus IVS and Drew Technologies) was now a direct competitor of AirPro with respect to the provision of remote diagnostic services.

52. Unbeknownst to AirPro, and likely seeing an opportunity to harm what was now a direct competitor, AutoEnginuity implemented a new End User License Agreement in December 2020.

53. AirPro was never provided a copy of this New End User License Agreement, nor was AirPro informed by anyone at AutoEnginuity, Drew Technologies or Opus IVS that the change had been made.

54. The new End User License Agreement now specifically prohibited AirPro's entire business model for providing remote diagnostic services, and it further placed restrictions on the manner in which the services provided using the AutoEnginuity Giotto product could be marketed. *See* End User License Agreement, attached as **Exhibit D**.

55. Defendants took these actions despite the fact that AirPro had already expended millions of dollars on equipment for the specific purpose of licensing and using the Giotto product, and despite all of the assistance that AirPro had provided to AutoEnginuity over the years to refine and improve that product.

56. On or about February 27, 2020, Ford and a related entity filed a lawsuit in this Court against AirPro, asserting various claims, including with respect to the manner in which AirPro operated its remote diagnostic business, as well as the manner in which AirPro marketed its services.

57. One primary complaint lodged by Ford related to AirPro's description of the Giotto product in relation to OEM software.

58. In May 2021, Ford submitted as an exhibit to a filing a letter purportedly sent by Mr. Herron to AirPro on March 11, 2020. *See* Correspondence attached as **Exhibit E**.

59. That letter was never actually sent by Mr. Herron to AirPro, in March 2020 or at any other point in time.

60. Upon information and belief, the purported March 11, 2020 letter was fabricated by Mr. Herron in an attempt to help Ford in its lawsuit against AirPro, and to harm AirPro as a result.

61. Ford has, in fact, attempted to use the purported March 11, 2020 letter against AirPro in the lawsuit between Ford and AirPro.

62. Mr. Herron also provided a letter directly to Ford in May 2021 in which he, among other things, criticized the manner in which AirPro marketed its services, and in which he again reiterated the false claim that he had sent the purported March 11, 2020 letter to AirPro on that date. *See* May 24, 2021 Letter, attached as **Exhibit F**.

63. On August 25, 2021, Mr. Herron sent a letter to AirPro claiming that it was in violation of the supposedly then-applicable End User License Agreement, even though AutoEnginuity had never provided a copy of that document to AirPro. *See* August 25, 2021 Letter, attached as **Exhibit G**.

64. This was the first time that AirPro was informed by Opus of the supposed change to the terms under which it was licensing the Giotto product.

65. Mr. Herron claimed in his August 25, 2021 letter that AirPro's alleged breaches of the previously undisclosed End User License Agreement justified the termination of AirPro's software license. Mr. Herron threatened to discontinue sending AirPro further updates to the Giotto products as a result, despite the fact that AirPro had already invested millions of dollars on equipment for the specific purpose of using the Giotto software. *See id.*

66. On September 2, 2021, Mr. Margol of AirPro responded to Mr. Herron, explaining that AirPro had invested millions of dollars in equipment and software license fees in connection with its use of the Giotto product, and further noting the significant assistance AirPro had provided to Opus, Drew Technologies, and AutoEnginuity over the years in connection with improvements to that product. *See* September 2, 2021 Email, attached as **Exhibit H.** Mr. Margol also described how AirPro had addressed the issue of the manner in which AirPro marketed its use of the Giotto product. *See id*.

67. Mr. Herron responded on or about October 4, 2021, largely ignoring the substance of Mr. Margol's prior email and taking the position that AirPro was still misrepresenting the Giotto project and was also violating the new, previously

undisclosed End User License Agreement. *See* Letter from Brian Herron, attached as **Exhibit I**.

68. On October 21, 2021, Mr. Herron sent yet another letter to AirPro, in which he falsely claimed again that he had sent AirPro a letter in March of 2020, and in which he again claimed that AirPro was in violation of the previously undisclosed End User License Agreement. *See* October 21, 2021 letter, attached as **Exhibit J**.

69. Mr. Herron also stated in that letter that Defendants were terminating AirPro's license and right to use the Giotto product. See *id*.

70. Defendants' wrongful termination of AirPro's license and ability to use the Giotto product temporarily left AirPro with limited access to up-to-date aftermarket diagnostic software, and it forced AirPro to have to transition to a new diagnostic software vendor.

71. The foregoing conduct of Defendants constitutes a thinly veiled attempt to harm their competitor by preventing its use of the Giotto product and otherwise inflicting financial harm on AirPro.

72. In addition, Opus has wrongfully attempted over the past few years to entice AirPro technicians to leave AirPro and join Opus, even though Opus, and specifically Mr. Herron, were well aware that those technicians were subject to non-competition and non-disclosure agreements.

73. Upon information and belief, this wrongful solicitation was an effort to not only lure AirPro's highly qualified technicians away from AirPro, but also to gain additional inside information regarding the operations of AirPro.

74. At least one former AirPro employee left AirPro and joined Opus as a result of this wrongful solicitation.

## COUNT I
## BREACH OF CONRACT (AGAINST DREW TECHNOLOGIES)

75. AirPro incorporates the allegations in all preceding paragraphs as though set forth fully herein.

76. The Mutual Party Agreement between Drew Technologies and AirPro was a valid and binding agreement.

77. AirPro performed all of its obligations under the Mutual Party Agreement.

78. Upon information and belief, Drew Technologies breached the Mutual Party Agreement in numerous ways during the three-year period following expiration of the agreement, including by using the information and technical knowledge provided by AirPro under that Agreement to wrongfully establish a competing business.

79. AirPro has been damaged as a result of Drew Technologies' breach.

WHEREFORE, AirPro respectfully requests that this Court enter judgment in its favor in an amount in excess of Seventy-Five Thousand and 00/100 Dollars

($75,000.00), along with costs, interest, attorneys' fees, and any other relief which the Court deems just and equitable.

## COUNT II
## UNFAIR COMPETITION (AGAINST ALL DEFENDANTS)

80. AirPro incorporates the allegations in all preceding paragraphs as though set forth fully herein.

81. The acts of all Defendants described above constitute common law unfair competition under Michigan law.

82. AirPro has been damaged as a result of Defendants' unfair competition.

WHEREFORE, AirPro respectfully requests that this Court enter judgment in its favor in an amount in excess of Seventy-Five Thousand and 00/100 Dollars ($75,000.00), along with costs, interest, attorneys' fees, and any other relief which the Court deems just and equitable.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
## (AGAINST ALL DEFENDANTS)

83. AirPro incorporates the allegations in all preceding paragraphs as though set forth fully herein.

84. AirPro had a valid business expectancy with respect to its customers and potential customers in connection with the provision of remote diagnostic services utilizing the Giotto product.

85. Defendants were keenly aware of this business expectancy at all relevant times.

86. Defendants intentionally and wrongfully interfered with that expectancy through their actions as described above.

87. AirPro has been damaged as a result of Defendants' actions.

WHEREFORE, AirPro respectfully requests that this Court enter judgment in its favor in an amount in excess of Seventy-Five Thousand and 00/100 Dollars ($75,000.00), along with costs, interest, attorneys' fees, and any other relief which the Court deems just and equitable.

                                     Respectfully submitted,

                                     VARNUM LLP
                                   Attorneys for Plaintiff

Dated:  December 8, 2022          By: /s/ Adam J. Brody_____
                                     Adam J. Brody (P62035)
                                     Ziyad I. Hermiz (P72236)
                                 VARNUM LLP
                                 Bridgewater Place
                                 333 Bridge St. NW, Suite 1700
                                 P.O. Box 352
                                 Grand Rapids, MI 49501-0352
                                 Tel: (616) 336-6000
                                 ajbrody@varnumlaw.com
                                 zihermiz@varnumlaw.com

## **DEMAND FOR JURY**

Plaintiff hereby demands a trial by jury in this matter on all issues so triable.

                                                Respectfully submitted,

                                                VARNUM LLP
                                                Attorneys for Plaintiff

Dated:  December 8, 2022        By: /s/ Adam J. Brody_____
                                                   Adam J. Brody (P62035)
                                                   Ziyad I. Hermiz (P72236)
                                               VARNUM LLP
                                               Bridgewater Place
                                               333 Bridge St. NW, Suite 1700
                                               P.O. Box 352
                                               Grand Rapids, MI 49501-0352
                                               Tel: (616) 336-6000
                                               ajbrody@varnumlaw.com
                                               zihermiz@varnumlaw.com

20369208.1