## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AIRPRO DIAGNOSTICS, LLC,

        Plaintiff,

v.

DREW TECHNOLOGIES, INC., a Michigan
corporation, OPUS IVS, INC., a Delaware
corporation, AUTOENGINUITY, LLC, an
Arizona limited liability corporation,
and BRIAN HERRON, an individual,

        Defendants.

Case No. 2:22-cv-12969

District Judge Linda V. Parker
Magistrate Elizabeth A. Stafford

_____/

| | |
|---|---|
| Adam J. Brody (P62035) | William J. Stapleton (P38339) |
| Ziyad I. Hermiz (P72236) | Hooper Hathaway, P.C. |
| Varnum LLP | 126 S. Main Street |
| 260 E. Brown St., Ste. 150 | Ann Arbor, MI 48104 |
| Birmingham, MI 48009 | 734-662-4426 |
| 248-567-7800 | wstapleton@hooperhathaway.com |
| zihermiz@varnumlaw.com | Attorney for Defendants |
| Attorneys for Plaintiff | |

_____/

## ANSWER & COUNTERCLAIMS

NOW COMES Defendants Opus IVS, Inc. ("Opus") and Brian Herron
("Herron") (collectively, "Defendants"), by and through the undersigned counsel,
and hereby file their Answer and Counterclaims to Plaintiff Airpro Diagnostics,
LLC's ("Airpro") Complaint as set forth herein.  Except as expressly admitted,

1

modified, or explained, each and every allegation contained in Airpro's Complaint is hereby denied.[1]

## **ANSWER**

1.      Admitted upon information and belief.

2.      Denied.

3.      Denied. Admitted that Opus is a Delaware corporation with its principal place of business located at 7322 Newman Blvd, Building 3, Dexter, MI 48130.

4.      Denied.

5.      Admitted that Herron resides at 6620 Dexter Ann Arbor Road, Dexter, Michigan 48130.

6.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and, therefore, deny the same.

7.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and, therefore, deny the same.

8.      Admitted.

9.      Admitted.

---

[1] Drew Technologies, Inc. merged into Opus on December 31, 2020, as evidenced by the Certificate of Merger attached hereto as Exhibit A.  AutoEnginuity, LLC also merged into Opus on December 31, 2020, as evidenced by the Certificate of Merger attached hereto as Exhibit B.  Thus, AutoEnginuity and Drew no longer exist and can no longer sue or be sued.

## GENERAL ALLEGATIONS

10.    The Massachusetts right to repair legislation ("R2R") consists of written documents which speak for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 10 are inconsistent with those contents, Defendants deny the same.

11.    The Memorandum of Understanding ("MOU") related to the R2R legislation is a written documents which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 11 conflict with those contents, Defendants deny the same.

12.    The R2R and MOU are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 12 conflict with those contents, Defendants deny the same.

13.    The R2R is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 13 conflict with those contents, Defendants deny the same. Admitted that R2R does not designate the Equipment and Tool Institute ("ETI") as the intended depository of the R2R information from all Original Equipment Manufacturers ("OEMs"), and several OEMs do not license data through ETI.  Except as expressly admitted herein, denied.

14.    The R2R and MOU are written documents which speaks for themselves and are the best evidence of its contents. Insofar as the allegations in Paragraph 14

3

conflict with those contents, Defendants deny the same. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 and therefore deny the same.

15.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and therefore deny the same.

16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and therefore deny the same.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and therefore deny the same.

18.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore deny the same.

19.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore deny the same.

20.    Admitted.

21.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and therefore deny the same.

22.    Admitted that the "Giotto" product was created and licensed by AutoEnginuity, LLC ("AutoEnginuity"). Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22 and therefore deny the same.

4

23.    The R2R and MOU consist of written documents which speak for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 23 conflict with those contents, Defendants deny the same. Defendants lack knowledge or information sufficient to form a belief as to what Airpro means by "derived directly from the OEM data and instructions contained in ETI's Tek-Net library" and therefore deny the same. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23 and therefore deny the same.

24.    Denied.

25.    Denied.

26.    Admitted that Airpro was never reliant on AutoEnginuity and Drew for its continued operation. Specifically, it is admitted that Drew's CarDAQ-J2534 is an SAE standard device, which could be purchased from several other vendors such as Bosch, Dearborn Group, Actia, Bluestreak, and others. Similarly, it is admitted that the Giotto product is an aftermarket multi-brand diagnostic tool and there were many other similar tools in the market that Airpro could have used instead of the Giotto product, such as Launch, Snap-on, Autel, Bosch, Delphi, and more.  Except as expressly admitted herein, denied.

27.    Admitted that Opus is a company created to address the evolving needs of independent repair shops.  Except as expressly admitted herein, denied.

28.     Admitted that Herron is the Chief Executive Officer at Opus. Except as expressly admitted herein, denied.

29.     The License Agreement between AutoEnginuity and Airpro is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 29 conflict with those contents, Defendants deny the same. Defendants lack knowledge or information sufficient to form a belief as to what Airpro means by "[f]rom the beginning," and therefore deny the remaining allegations in Paragraph 29.

30.     Defendants lack knowledge or information sufficient to form a belief as to what Airpro means by "[o]ne of the key aspects of the Giotto product" and therefore deny the allegations in Paragraph 30.

31.     Denied.

32.     Denied.

33.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and therefore deny the same.

34.     The "Mutual Party Agreements" are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 34 are inconsistent with those contents, Defendants deny the same. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34 and therefore deny the same.

6

35.    The Mutual Party Agreements are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 35 conflict with those contents, Defendants deny the same.

36.    The Mutual Party Agreements are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 36 conflict with those contents, Defendants deny the same.

37.    The Mutual Party Agreements are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 37 conflict with those contents, Defendants deny the same.

38.    The Mutual Party Agreements are written documents which speaks for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 38 conflict with those contents, Defendants deny the same.

39.    Denied.

40.    Denied.

41.    Admitted that the only purported "pricing structure" information that Airpro told Drew about (and not pursuant to or in accordance with the Mutual Party Agreement) was the price it charged per CompuFlash unit, which was not confidential or proprietary information. Except as expressly admitted herein, denied.

42.    Denied that Drew did not have any ability to service collision repair shops or successfully provide remote diagnostic services at that time. It is further

denied that Airpro's use of the Giotto product and the CarDAQ J-2534 device constituted any "proprietary combination of hardware and software[.]"

43.    It is admitted that Drew had already developed and sold a product called RAP Crash well before February 13, 2017, the date of signature on both Mutual Party Agreements. It is further admitted that the RAP Crash product won the coveted SEMA award in November of 2016. Except as expressly admitted herein, denied.

44.    Denied.

45.    Admitted that Opus is a competitor of Airpro and that AutoLogic Diagnostics, Blue Link Diagnostic Solutions, and Farsight are businesses related to Opus. Except as expressly admitted herein, denied.

46.    It is admitted that Airpro provided basic customer feedback to AutoEnginuity, like any other customer, requesting that new vehicle coverage be added. Except as expressly admitted herein, denied.

47.    It is admitted that, on information and belief, Airpro reaped substantial benefits from the new vehicle coverage that AutoEnginuity added to the Giotto product pursuant to customer feedback.  Except as expressly admitted herein, denied.

48.    Admitted Opus reached an agreement to acquire AutoEnginuity in 2020. Defendants lack knowledge or information sufficient to form a belief as to what Airpro means by "via Drew Technologies" and therefore deny the remaining allegations in Paragraph 48.

49.     Admitted on information and belief that Herron contacted Mr. Olsen in or around January 2020. Except as admitted on information and belief, denied for lack of knowledge or information sufficient to form a belief.

50.     Denied that Airpro provided any "assistance with functionality improvements for [either] the AutoEnginuity product [or] the Drew Technologies J2534 interface."  Defendants lack knowledge or information sufficient to form a belief as to the remainder of the allegations in Paragraph 50, and therefore deny the same.

51.     Admitted that Opus and Airpro are competitors. It is further admitted that Opus and Airpro were competitors well before Opus's acquisition of AutoEnginuity. Except as expressly admitted, denied.

52.     Admitted that AutoEnginuity implemented a new End User License Agreement ("EULA") in December 2020, but denied that it was intended to harm AirPro or was unbeknownst to AirPro. Except as expressly admitted herein, denied.

53.     Denied.

54.     The EULA is a written document that speaks for itself and is the best evidence of its contents. Insofar as those contents are inconsistent with the allegations in Paragraph 54, Defendants deny the same. Defendants expressly deny that the EULA "specifically prohibited Airpro's entire business model for providing remote diagnostic services."

55.     Denied that "Defendants took these actions" and that Airpro assisted in the refinement and improvement of the Giotto Product. Except as previously denied, Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 55 and therefore deny the same.

56.     Ford's lawsuit against Airpro consists of written documents that speak for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 56 conflict with those contents, Defendants deny the same.

57.     Ford's lawsuit against Airpro consists of written documents that speak for themselves and are the best evidence of their contents. Insofar as the allegations in Paragraph 57 are inconsistent with those contents, Defendants deny the same.

58.     Admitted that Herron sent a letter to Airpro on or about March 11, 2020. Ford's "exhibit to a filing" is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 58 are inconsistent with those contents, Defendants deny the same.

59.     Denied.

60.     Denied.

61.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and therefore deny the same.

62.     Admitted that Herron responded to a request from Ford that Opus review and provide commentary on Airpro's response to an interrogatory in Ford's lawsuit against Airpro in May 2021. Except as admitted, denied.

63.     Denied that AutoEnginuity had never provided a copy of the End User License Agreement to Airpro. The August 25, 2021 Letter is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 63 are inconsistent with those contents, Defendants deny the same.

64.     Denied.

65.     The August 25, 2021 Letter is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 65 are inconsistent with those contents, Defendants deny the same.

66.     The September 2, 2021 Email is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 66 are inconsistent with those contents, Defendants deny the same.

67.     Denied that the End User License Agreement had not previously been disclosed to Airpro. The October 4, 2021 Letter is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 67 are inconsistent with those contents, Defendants deny the same.

68.     Denied that the End User License Agreement had not previously been disclosed and denied that Herron falsely claimed that he had sent Airpro a letter in

March of 2020. The October 21, 2021 Letter is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 68 conflict with those contents, Defendants deny the same.

69.     The October 21, 2021 Letter is a written document that speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 69 conflict with those contents, Defendants deny the same.

70.     Denied that the termination of Airpro's license was "wrongful." Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 70 and therefore deny the same.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

## COUNT I
## BREACH OF CONTRACT (AGAINST DREW TECHNOLOGIES)

75.     Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-74 herein.

76.     The Mutual Party Agreement is a written document which speaks for itself and is the best evidence of its contents. Insofar as the allegations in Paragraph 76 conflict with those contents, Defendants deny the same.

77.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 and therefore deny the same.

78.     Denied.

79.     Denied, including the prayer for relief.

## COUNT II
## UNFAIR COMPETITION (AGAINST ALL DEFENDANTS)

80.     Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-79 herein.

81.     Denied.

82.     Denied, including the prayer for relief.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
## (AGAINST ALL DEFENDANTS)

83.     Defendants repeat and incorporate by reference all answers and denials contained in Paragraphs 1-82 herein.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied, including the prayer for relief.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Defendants, having answered the allegations in the Complaint, hereby set forth their affirmative and additional defenses to Airpro's allegations as follows:

## FIRST DEFENSE
### (Waiver)

Airpro's claims are barred under the doctrine of waiver because, among other reasons, Airpro expressly assented to the terms of the EULA governing the Giotto Product. Further, Airpro was repeatedly made aware of the terms of the EULA, yet continued to use the Giotto Product, and thus again assented to the terms of the EULA by conduct/performance. Airpro has thus waived any ability to contest the validity of the EULA.

## SECOND DEFENSE
### (Estoppel)

Airpro's claims are barred under the doctrine of estoppel because, among other reasons, Airpro expressly assented to the terms of the EULA governing the Giotto Product. Further, Airpro was repeatedly made aware of the terms of the EULA, yet continued to use the Giotto Product, and thus again assented to the terms of the EULA by conduct/performance. Airpro is thus estopped from contesting the validity of the EULA.

14

### THIRD DEFENSE
**(Laches)**

Airpro's claims are barred by the doctrine of laches because an unreasonable amount of time has passed since the EULA was implemented, and Airpro cannot belatedly contest the validity thereof.

### FOURTH DEFENSE
**(Costs and Attorneys' Fees)**

Airpro has failed to set forth any allegations that could support entitlement to costs or attorneys' fees.

### FIFTH DEFENSE
**(Good Faith)**

Airpro's claims are barred by its failure to act at all times in good faith and in accordance with reasonable commercial standards.

### SIXTH DEFENSE
**(Set-Off)**

To the extent Defendants are determined to be liable to Airpro in any amount, which liability is expressly denied, Defendants are entitled to a set-off from such amount equal to the damages that have been incurred by Defendants as a direct and proximate result of Airpro's breaches of the EULA and Airpro's unfair competition, as described in the Counterclaims below.

**SEVENTH DEFENSE**
**(Contractual Terms)**

Defendants plead the terms and conditions of all applicable agreements between the parties, written or otherwise, and incorporates those terms, conditions, and provisions by reference herein as a bar to any recovery and relief sought by Airpro in this case.

**EIGHTH DEFENSE**
**(Unclean Hands)**

Airpro is barred from recovery by the doctrine of uncleans hands for unlawfully misrepresenting the Giotto Product, failing to purchase multiple licenses to the Giotto Product for multiple concurrent users, subjecting Defendants to potential third-party liability for Airpro's misuse and misrepresentation of the Giotto Product, and in other and such further ways as may be shown through discovery.

**NINTH DEFENSE**
**(Failure to Mitigate)**

To the extent Defendants are determined to be liable to Airpro in any amount, which liability is expressly denied, upon information and belief, Airpro failed to mitigate its damages, and such failure to mitigate operates as a bar in whole or in part to some or all of the recovery sought by Airpro in this matter.

**TENTH DEFENSE**
**(In Pari Delicto)**

Airpro's claims are barred in whole or in part by the equitable doctrine of *In Pari Delicto* for unlawfully misrepresenting the Giotto Product, failing to purchase

16

multiple licenses to the Giotto Product for multiple concurrent users, subjecting Defendants to potential third-party liability for Airpro's misuse and misrepresentation of the Giotto Product, and in other and such further ways as may be shown through discovery.

## ELEVENTH DEFENSE
### (Justification)

Airpro cannot establish tortious interference with business expectancy against Defendants because Defendants' actions in implementing the EULA were justified by, *inter alia*, Defendants' legitimate desire to avoid third-party liability for misrepresentations of Defendants' products by licensees and Defendants' legitimate interest in defining the generally applicable parameters pursuant to which licensees may use Defendants' products.

## TWELFTH DEFENSE
### (No Valid Business Expectancy)

Airpro cannot establish tortious interference with business expectancy because it cannot show the existence of a valid business expectancy with respect to its customers or potential customers in connection with the provision of remote diagnostic services utilizing the Giotto Product.

## THIRTEENTH DEFENSE
### (No Improper Interference)

Even if Airpro could show a valid business expectancy with which Defendants interfered, Airpro cannot establish tortious interference because any purported

interference was proper. The implementation of the EULA was neither wrongful *per se*, nor done with malice or unjustified in law.

## FOURTEENTH DEFENSE
### (Reservation of Right to Add Defenses)

Defendants reserve the right to assert any and all additional defenses which become known to them through discovery or otherwise during the pendency of this lawsuit.

## COUNTERCLAIMS

Opus IVS, Inc., ("Opus") by and through its undersigned attorneys, asserts the following Counterclaims against Airpro Diagnostics, LLC ("Airpro"), alleging and saying as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Opus is a corporation organized and existing pursuant to the laws of the State of Delaware, with a principal place of business in Dexter, Michigan.

2.      Upon information and belief, Airpro is a limited liability company with its principal place of business located in Jacksonville, Florida.

3.      Upon information and belief, none of Airpro's members are citizens of Michigan or Delaware.

4.      This Court has personal jurisdiction over the parties because, *inter alia*, both parties have consented to this Court's jurisdiction.

5.     This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship between Opus and Airpro, and the amount in controversy exceeds $75,000, exclusive of interest and costs consistent with 28 U.S.C. § 1332.

6.     Venue for this action is proper in this district and division consistent with 28 U.S.C. §§ 1391 (b)(2)-(3).

## FACTS

7.     Opus is an automotive technology company that provides intelligent vehicle support through diagnostic and programming services.

8.     Motor vehicles have become increasingly technologically advanced, and most newer car models contain many (approximately 10-40) computer modules which contain data regarding the health of the vehicle's components. Opus's suite of software programs provides diagnostic tools to its customers, allowing automotive technicians to accurately and efficiently identify potential issues with a vehicle.

9.     Opus provides diagnostic tools and services to two distinct sets of customers, broadly referred to as "mechanical sales" and "collision sales." Collision sales involve the marketing and provision of diagnostic tools and services to automotive collision repair businesses. Mechanical sales involve the marketing and

provision of a different set of diagnostic tools and services to automotive parts dealers and maintenance repair shops.

10.    Opus and Airpro are competitors with respect to both collision and mechanical sales, and Opus and Airpro compete to provide their services to the same sets of customers with respect to collision and mechanical sales.

**Airpro Acquires Licenses to Use AutoEnginuity's Giotto Software.**

11.    Scan tools are electronic tools that consist of software that allows automotive repair technicians to interface with a vehicle's computer modules, allowing them to remotely identify and diagnose issues.

12.    In the automotive repair industry, there are two broad categories of scan tool products: (1) Original Equipment Manufacturer ("OEM" or "OE") scan tools; and (2) aftermarket scan tools. These tools are differentiated in part by the software they use: (1) OEM scan tools use OEM software; and (2) aftermarket software scan tools use aftermarket software.

13.    OEM scan tools are specific to a particular manufacturer's line of vehicles and meet warranty repair guidelines as set by the OEM. Further, because OEM scan tools are specific to a particular manufacturer's line of vehicles, they have an increased level of exposure to testing for those vehicles, increased model coverage, and greater access to feedback for making improvements.

14.     On the other hand, aftermarket scan tools are not specific to a particular manufacturer's line of vehicles and are not required to meet warranty repair guidelines as set by the OEM. Because aftermarket scan tools are not specific to a particular manufacturer's line of vehicles, they do not have the same level of exposure to testing, model coverage, and access to feedback for improvements that the OEM scan tools have for a particular OEM's vehicles.

15.     To represent a scan tool as an OEM scan tool is to represent that it is a product that uses OEM software, is associated with the original manufacturer and a particular brand of vehicles, is endorsed by the original manufacturer, and has the benefit of the increased levels of exposure testing and access to feedback for improvements that result from the narrow focus of OEM scan tools and the OEM-specific standards they must meet.

16.     AutoEnginuity's Giotto Software (the "Giotto Product" or the "Software") is an aftermarket scan tool software. Opus currently licenses the Giotto Product as part of its collision sales.

17.     In 2016, Airpro began obtaining licenses to the Giotto Product from AutoEnginuity which, at that time, were governed by an End User License Agreement (the "old EULA"), a true and accurate copy of which is attached hereto as Exhibit C.

**Airpro Is Held Liable For Violating Ford's Famous Blue-Oval Trademark By Falsely Representing the Giotto Product as OEM Software.**

18.     In 2020, Opus learned that Ford Motor Co. ("Ford") and a related entity had filed a lawsuit against Airpro in this Court claiming that Airpro had violated Ford's intellectual property rights.

19.     Among other things, Ford claimed that Airpro was falsely representing that Airpro's customers were receiving a Ford OEM scan through use of the aftermarket Giotto Product that AutoEnginuity had licensed to Airpro.

20.     Airpro made these false representations by claiming, for example, that its scan tool (which used the Giotto Product) uses "OEM Scan Tool Software Applications."

21.     Ford asserted claims against Airpro for trademark infringement, false designation of origin, unfair and deceptive trade practices in violation of Michigan statutory and common law, copyright infringement, and breach of contract.

22.     In that lawsuit, *Ford Motor Co. et al. v. AirPro Diagnostics, LLC*, case number 20-CV-10518 (the "Ford-Airpro Lawsuit"), this Court granted Ford's motion for partial summary judgment as to liability on Ford's breach of contract, trademark dilution and trademark infringement claims, among others. The Ford-Airpro Lawsuit ultimately settled after Airpro's liability had been established.

23.     Significantly, Ford's trademark infringement claim was specifically premised on AirPro's use of "precise replicas of Ford's trademarks to pass off [AutoEnginuity's] aftermarket software as Ford Diagnostic Software."

24.     Ford's breach of contract claim was based on Airpro's violation of the End User License Agreement applicable to Ford's Diagnostic Software.

25.     In the Ford-Airpro Lawsuit, Airpro specifically acknowledged that it agreed to the terms of the EULA each time it uploaded the Ford Diagnostic Software onto its scan tool.

26.     In granting partial summary judgment as to liability on Ford's breach of contract claim, this Court explained that—by choosing to use the Ford Diagnostic Software—Airpro became bound by the terms of the EULA governing that software.

27.     In granting partial summary judgment as to liability on Ford's trademark infringement claim, this Court found that AirPro had unlawfully used Ford Marks in representing AutoEnginuity's Giotto Software—an aftermarket software—as OEM software.

28.     This Court concluded: "It cannot be disputed that . . . AirPro set out to identify Ford as one source of OEM software used on its scan tool, not just to claim that its scan tool is compatible with Ford's Diagnostic Software."

29.     AirPro's trademark infringement of Ford's Marks necessarily entailed a representation of AutoEnginuity's Giotto Product as OEM software.

30.     But the Giotto Product is an aftermarket scan tool software, not an OEM scan tool software.

31.     Nevertheless, Airpro inaccurately and unlawfully advertised and marketed the Giotto Product as an OEM scan tool software in an effort to, on information and belief, successfully mislead consumers and unfairly compete with Opus.

32.     On March 11, 2020, Opus sent Airpro a letter (the "March 11 Letter") expressing its concerns regarding Airpro's use and representation of the Giotto Product. Although Airpro contends it never received the March 11 Letter, Airpro was repeatedly made aware of the March 11 Letter through: (1) subsequent written correspondence from Opus; and (2) discovery and depositions in the Ford-Airpro Lawsuit.

33.     Opus expressed its concern in the March 11 Letter that Airpro was falsely representing to its customers and potential customers that: (1) a scan performed using the Giotto Product is originating from "OEM Scantool Software"; and (2) a scan performed using the Giotto Product is "an OE scan or equivalent to an OE scan."

34.     While the Giotto Product is among the best in the industry with comprehensive coverage, AutoEnginuity did not and has never represented that use of the Giotto Product will achieve the same results as or is otherwise equivalent to an OEM scan performed using OEM software, such as Ford's IDS, FDRS, or FJDS. Opus similarly has never made such representations.

35.     In other words, Opus and AutoEnginuity ensure that their products are lawfully marketed.

36.     Opus and AutoEnginuity similarly require that licensees of their products market those products lawfully.

**AutoEnginuity Implements a New EULA to Ensure Lawful Use of the Giotto Product**

37.     To ensure lawful use of the Giotto Product by licensees, AutoEnginuity implemented a new End User License Agreement ("EULA") for the Giotto Product on December 1, 2020. A true and accurate copy of the EULA is attached hereto as Exhibit D.

38.     AutoEnginuity provided licensees of the Giotto Product with notice of the EULA through major software updates to the Giotto Product. During the software installation process for major updates to the Giotto Product, a dialog box appears:



39.    The dialog box contains a message that states: "Please read the following license agreement carefully." It then provides a full copy of the EULA for the end user to review.

40.    The beginning of the EULA conspicuously states in all caps:

IN ORDER TO USE THE SOFTWARE YOU MUST ACCEPT ALL OF THE TERMS OF THIS AGREEMENT. AFTER READING THE TERMS, IF YOU AGREE TO THEM, PLEASE INDICATE YOUR DECISION BY CLICKING ON "I AGREE" ON THE SERVICE REGISTRATION PAGE. IF YOU DO NOT AGREE, YOU WILL NOT BE ALLOWED TO PURCHASE A LICENSE TO USE THE SOFTWARE OR ANY PRODUCT ON WHICH THE SOFTWARE IS INSTALLED.

41.    The end user can then either accept the terms or reject the terms of the EULA.

42.    While the end user is free to accept or reject the terms of the EULA, the installation of major updates to the Giotto Product is conditional on the end user accepting the EULA and thereby consenting to abide by its terms.

43.    Specifically, end users of the Giotto Product are required to accept the terms of the EULA prior to the file transfer for any major software update installation.

**Airpro Repeatedly Agrees to the Terms of the EULA.**

44.    AutoEnginuity created four (4) major software updates per year for the Giotto Product. Airpro paid an annual fee for access to these software updates.

45.    The installations of these software updates were performed by designated Airpro employees. On information and belief, the Airpro employees who performed these installations were Airpro's Chief Technology Officer, Jonathan Brigman ("Brigman") and Airpro's Tier II Tech Support, Luis Vega ("Vega").

46.    When AutoEnginuity made a new software update available, those designated Airpro employees would receive notification of the new updates from AutoEnginuity. And to install the updates, the Airpro employees had to review and accept the EULA.

47.     On December 24, 2020, AutoEnginuity sent out an update to the Giotto Product entitled "Giotto (19.0)." The description for this update was "Giotto® 19.0 introduces the 21MY support and continues to improve enhanced BMW, Porsche, and J2534 hardware support."

48.     On information and belief, designated Airpro employees Brigman and Vega received and installed the Giotto (19.0) software update on Airpro's units of the Giotto Product, which required review and acceptance of the EULA. These employees were thus notified of and accepted the terms of the EULA on behalf of Airpro by installing Giotto (19.0).

49.     When AutoEnginuity merged into Opus on December 31, 2020, AutoEnginuity assigned its rights to the Giotto Product and rights under the EULA to Opus. Opus sent out additional updates to the Giotto Product in 2021: "Giotto (19.1)" on March 19, 2021; "Giotto (19.2)" on June 7, 2021; and "Giotto (19.3)" on September 23, 2021. On information and belief, designated Airpro employees Brigman and Vega also received and installed these updates to the Giotto Product on Airpro's units of the Giotto Product, which also required review and acceptance of the EULA.

50.     Airpro thus expressly assented to the terms of the EULA on multiple occasions. In addition to this express consent, Airpro was made aware of the EULA

28

via written correspondence from Opus on May 24, 2021, August 25, 2021, and October 4, 2021.

51.     Nevertheless, Airpro continued to use the Giotto Product, thereby assenting to the EULA.

52.     Further, as Airpro specifically acknowledged in the Ford-Airpro Lawsuit, Airpro agreed to the terms of the EULA (even in the absence of repeated written notice from Opus) by repeatedly using the Giotto Product in its scan tool.

**Airpro's Numerous Breaches of the EULA.**

53.     Section 3.2(v) of the EULA expressly states: "you may not, nor may you permit any third party to . . . make statements that diagnostic services performed using Software are equivalent to the OE diagnostic system[.]" <u>Ex. D</u>**.**

54.     Despite the warnings in the March 11 Letter, the Ford-Airpro Lawsuit, and additional verbal and written warnings in correspondence between Opus and Airpro, Airpro continued to make false and misleading public statements regarding the Giotto Product.

55.     For example, Airpro made statements that it utilizes OEM scan tool software—not aftermarket scan tool software—and in fact only uses OEM licensed software.

56.     But, on information and belief, the reality is that Airpro performed approximately 96-98% of its diagnostic scans using the Giotto Product, an aftermarket software.

57.     Airpro's public statements regarding the Giotto Product were highly misleading to the marketplace and Airpro's customers and allowed Airpro to unfairly compete with Opus using Opus's own product.

58.     These false and misleading public statements constitute willful violations of the terms of the EULA, specifically those contained in Section 3.2(v). *See* Ex. D.

59.     Further, Airpro repeatedly violated additions provisions of the EULA.

60.     Section 3.1 of the EULA states: "Each individual license for the Software provides a license for one copy of the Software that may be installed on only one computer or PC at a time and used by a single user (i.e., multiple users are not allowed to concurrently use a copy installed on a single computer)[.]" Ex. D.

61.     Section 3.1 emphasizes: "For clarity if you have two concurrent users using the Software, then you must purchase two Software licenses." *See* Ex. D.

62.     Additionally, Section 3.1 provides that: "Each licensed copy of the Software may be used solely to provide diagnostic services on vehicles located under the same roof (and within 500 feet) of the computer on which the Software is installed." Ex. D.

30

63.     Section 3.2(vi) of the EULA reiterates: "you may not, nor may you permit any third party to . . . use the Software on any computer that is not under the same rooftop (and within 500 ft.) as the vehicle the Software is being connected to for diagnostics." *See* Ex. D.

64.     In 2021, Opus learned that Airpro was: (a) using the single-user licenses to the Giotto Product for multiple concurrent users; and (b) was allowing its customers to perform "self-directed scans" in violation of the EULA.

65.     Indeed, Airpro readily admitted that it allowed its customers to perform free self-scans using the Giotto Product.  In essence, Airpro was purchasing minimal licenses to use the Giotto Product, then taking affirmative steps to repeatedly transfer those licenses to avoid having to purchase additional licenses in an effort to rob AutoEnginuity and Opus of the fruits of their labors.

66.     But, in addition to the above-described prohibitions, Section 11.2 of the EULA expressly prohibits transfer or assignment of the license without prior written consent, which Airpro never obtained. Ex. D.

67.     On August 25, 2021 Opus sent Airpro another letter (the "August 25 Letter") explaining that its statements about the Giotto product were misleading and that its use (and that of its customers) were in violation of the express terms of the EULA.

68. Specifically, Opus was concerned that Airpro continued to falsely represent to its customers and potential customers that: (i) a scan performed using the Giotto Product is originating from "OEM Scantool Software"; and (ii) a scan performed using the Giotto Product is "an OE scan or equivalent to an OE scan." Opus explained that, not only did these representations constitute direct violations of the EULA, but Airpro's actions could potentially subject Opus to liability.

69. Further, these statements were highly misleading to the public because Airpro on information and belief performed 96-98% of its scans using the Giotto Product, an aftermarket scan tool software.

70. In the August 25 Letter, Opus specifically reiterated that Airpro's practice of allowing multiple, concurrent users to use a single-user license and its practice of allowing its customers to perform "self-directed scans" were direct violations of the EULA.

71. Airpro responded by email dated September 2, 2021, stating that it would slightly modify the unlawful description of the Giotto Product. Opus responded that this proposal was clearly insufficient, as it did not resolve the unlawful advertising of the Giotto Product as OEM software (*i.e.* Ford software) and would not bring Airpro into compliance with the EULA.

72.   To be clear, Airpro's proposed changes would still have falsely represented the Giotto Product, continued to violate the terms of the EULA, and continued to violate Ford's intellectual property rights.

73.   After Airpro further refused to lawfully represent Opus's Giotto Product, continued to allow multiple concurrent users per license in an effort to rob AutoEnginuity and Opus of the fruits of their labors, and failed to otherwise comply with the EULA, Opus terminated the EULA by letter dated October 21, 2021.

74.   On information and belief, Airpro has been able to unlawfully and wrongfully divert customers away from Opus by, *inter alia*, misrepresenting Opus's Giotto Product as OEM software, allowing customers to perform self-directed scans using Opus's Giotto Product, and failing to acquire additional Giotto Product licenses from Opus for multiple concurrent users as required by the EULA.

75.   Damages from this unlawful diversion of business include, but are not limited to, Opus's lost net profits, loss of customers, loss of sales, loss of business expectancies and opportunities, loss of customer goodwill, harm to Opus's business reputation, and other damages stemming from the competitive advantage that Airpro obtained through its misuse and unlawful representation of the Giotto Product.

76.     Further, Opus has suffered damages in the form of lost revenue from the additional Giotto Product licenses Airpro was contractually obligated to purchase for additional concurrent users, but failed to do, in breach of the EULA.

77.     In or around January 2023, Airpro's Executive Vice President of Operations Josh McFarlin told Repairer Driven News: "We [i.e. Airpro] are very diligent in complying with the complex and changing terms of End User License Agreements (EULAs) for all diagnostic software applications we work with."

78.     Airpro's business practices as revealed in the Ford-Airpro Lawsuit and this lawsuit show otherwise.

## COUNT I:
## BREACH OF CONTRACT

79.     The preceding paragraphs of these Counterclaims are hereby realleged and incorporated by reference as if fully set forth herein.

80.     The EULA constitutes an enforceable, binding contract between Opus and Airpro.

81.     Opus performed all of its obligations under the EULA.

82.     Airpro materially breached the EULA by:

    a.   Allowing multiple users to concurrently use one (1) Giotto Product license, in violation of Section 3.1 of the EULA;

b.  Failing to purchase a license to the Giotto Product for each concurrent user of the Giotto Product, in violation of Section 3.1 of the EULA;

c.  Using licenses to the Giotto Product to provide diagnostic services on vehicles that were not located under the same roof and within 500 feet of the computer on which the Software was installed, in violation of Section 3.1 of the EULA;

d.  On information and belief, lending, leasing, sublicensing, and/or redistributing the Software to third parties by, *inter alia*, allowing Airpro customers to perform "self-directed scans," in violation of Section 3.2(iii) of the EULA;

e.  Making statements that diagnostic services performed using the Software are equivalent to the OEM diagnostic system, which was factually false and in violation of Section 3.2(v) of the EULA;

f.  Using the Software on computers that were not under the same rooftop as and within 500 feet of the vehicle the Software is being connected to for diagnostics, in violation of Section 3.2(vi) of the EULA;

g.  On information and belief, assigning or transferring rights to the Software to third parties by, *inter alia*, allowing Airpro customers

35

to perform "self-directed scans," in violation of Section 11.2 of the EULA.

83.    Opus has been damaged as a direct and proximate result of the foregoing breaches.

**COUNT II:**
**UNFAIR COMPETITION**

84.    The preceding paragraphs of these Counterclaims are hereby realleged and incorporated by reference as if fully set forth herein.

85.    Opus and Airpro are competitors with respect to both collision sales and mechanical sales in the automotive repair industry.

86.    Among other things, Airpro's unlawful misrepresentation of Opus's Giotto Product as OEM software, equivalent to an OEM scan, and originating from OEM scan tool software constitute common law unfair competition. Further, Airpro's use of a single Giotto Product license by multiple concurrent users, including on information and belief Airpro's allowing third parties to perform "self-directed scans," allowed Airpro to unfairly compete with Opus.

87.    The nature of this unfair competition by Airpro is exacerbated by the fact that Airpro misused Opus's own product (which AutoEnginuity and Opus developed through expenditure of substantial time and resources) to unfairly compete with Opus.

88.     Opus has been damaged as a direct and proximate result of Airpro's unfair competition.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully pray the Court for the following relief:

    (a)   That Airpro have and recover nothing from Defendants by way of this lawsuit;

    (b)   That the Court deny Airpro's request for attorneys' fees and costs;

    (c)   That the Court award Opus damages in an amount to be determined at trial, plus pre- and post-judgment interest at the legal rate;

    (d)   That the Court award Opus its reasonable attorneys' fees, expenses, and all costs incurred in this action;

    (e)   For a trial by jury on all issues so triable; and

    (f)   For such other and further relief to Opus as the Court may deem proper and just.

**[SIGNATURE PAGE FOLLOWS]**

This the 12th day of October, 2023.

        HOOPER HATHAWAY, P.C.


        BY:   /s/ William J. Stapleton
              William J. Stapleton (P38339)
              126 South Main Street
              Ann Arbor, MI 48104
              (734) 662-4426
              wstapleton@hooperhathaway.com
              *Attorney for Defendants*

        WYRICK ROBBINS YATES & PONTON LLP

        By:   /s/ Samuel A. Slater
              Samuel A. Slater
              NC Bar No. 43212 (application *pro hac vice* forthcoming)
              Email: sslater@wyrick.com
              T. Nelson Hughes, Jr.
              NC Bar No. 59342 (application *pro hac vice* forthcoming)
              Email: nhughes@wyrick.com
              4101 Lake Boone Trail, Suite 300
              Raleigh, North Carolina 27607
              Telephone.: (919) 781-4000
              Facsimile:  (919) 781-4865
              *COUNSEL FOR DEFENDANTS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record, and that a copy has been sent via U.S. Mail to the following:

Adam J. Brody
Ziyad I. Hermiz
VARNUM LLP
Bridgewater Place
333 Bridge St. NW, Suite 1700
P.O. Box 352
Grand Rapids, MI  49501-0352

I declare that the above statements are true to the best of my knowledge,

information and belief.

BY:   /s/William J. Stapleton
        William J. Stapleton (P38339)
        HOOPER HATHAWAY, P.C.
        126 South Main Street
        Ann Arbor, MI 48104
        (734) 662-4426
        wstapleton@hooperhathaway.com
        *Attorney for Defendants*