UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

AIRPRO DIAGNOSTICS, LLC, a
Florida limited liability company,                Case No. 22-12969-LVP-EAS

   Plaintiff,                                     Honorable Linda V. Parker

v.                                                           Magistrate Judge Elizabeth A. Stafford

DREW TECHNOLOGIES, INC., a
Michigan corporation, OPUS IVS,
INC., a Delaware corporation,
AUTOENGINUITY, LLC, an Arizona
limited liability corporation, and
BRIAN HERRON, an individual,

   Defendants.
and

OPUS IVS, INC.

   Defendant/Counter-Plaintiff,

v.

AIRPRO DIAGNOSTICS, LLC, a
Florida limited liability company,

   Plaintiff/Counter-Defendant.

---

| | |
|---|---|
| Adam J. Brody (P62035) | William J. Stapleton (P37339) |
| Ziyad I. Hermiz (P72236) | Rachel N. Hanson (P82828) |
| VARNUM LLP | HOOPER HATHAWAY, PC |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendants and/Counter-Plaintiff |
| Bridgewater Place | 126 S. Main Street |
| 333 Bridge Street NW, 17th Floor | Ann Arbor, MI 48104 |
| P.O. Box 352 | (734) 662-4426 |
| Grand Rapids, MI 49501-0352 | wstapleton@hooperhathaway.com |
| (616) 336-6000 | rhanson@hooperhathaway.com |
| ajbrody@varnumlaw.com | |
| zihermiz@varnumlaw.com | |

## PLAINTIFF/COUNTER-DEFENDANT'S ANSWER TO DEFENDANT OPUS IVS, INC.'S COUNTERCLAIMS AND AFFIRMATIVE AND OTHER DEFENSES

Plaintiff/Counter-Defendant, AirPro Diagnostics, LLC, by and through its attorneys, states as follows for its answer to Defendant/Counter-Plaintiff, Opus, IVS, Inc.'s, Counterclaims:

1.     Opus is a corporation organized and existing pursuant to the laws of the State of Delaware, with a principal place of business in Dexter, Michigan.

**ANSWER:  Admitted, upon information and belief.**

2.     Upon information and belief, Airpro is a limited liability company with its principal place of business located in Jacksonville, Florida.

**ANSWER:  Admitted.**

3.     Upon information and belief, none of Airpro's members are citizens of Michigan or Delaware.

**ANSWER:  Admitted.**

4.     This Court has personal jurisdiction over the parties because, *inter alia*, both parties have consented to this Court's jurisdiction.

**ANSWER:  The allegations of this paragraph state a legal conclusion to which no response is required.  To the extent a response is required, the allegations of this paragraph are admitted.**

5.     This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship between Opus and Airpro, and the amount in

controversy exceeds $75,000, exclusive of interest and costs consistent with 28 U.S.C. § 1332.

**ANSWER: The allegations of this paragraph state a legal conclusion to which no response is required. To the extent a response is required, the allegations of this paragraph are admitted.**

6.     Venue for this action is proper in this district and division consistent with 28 U.S.C. §§ 1391 (b)(2)-(3).

**ANSWER: The allegations of this paragraph state a legal conclusion to which no response is required. To the extent a response is required, the allegations of this paragraph are admitted.**

## FACTS

7.     Opus is an automotive technology company that provides intelligent vehicle support through diagnostic and programming services.

**ANSWER: Admitted, upon information and belief.**

8.     Motor vehicles have become increasingly technologically advanced, and most newer car models contain many (approximately 10-40) computer modules which contain data regarding the health of the vehicle's components. Opus's suite of software programs provides diagnostic tools to its customers, allowing automotive technicians to accurately and efficiently identify potential issues with a vehicle.

**ANSWER: The allegations of this paragraph that relate to the increase in complexity of cars in recent years are admitted.  The remaining allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

9.     Opus provides diagnostic tools and services to two distinct sets of customers, broadly referred to as "mechanical sales" and "collision sales."  Collision sales involve the marketing and provision of diagnostic tools and services to automotive collision repair businesses. Mechanical sales involve the marketing and provision of a different set of diagnostic tools and services to automotive parts dealers and maintenance repair shops.

**ANSWER:  Admitted, upon information and belief.**

10.     Opus and Airpro are competitors with respect to both collision and mechanical sales, and Opus and Airpro compete to provide their services to the same sets of customers with respect to collision and mechanical sales.

**ANSWER:  Admitted, upon information and belief.**

**Airpro Acquires Licenses to Use AutoEnginuity's Giotto Software.**

11.     Scan tools are electronic tools that consist of software that allows automotive repair technicians to interface with a vehicle's computer modules, allowing them to remotely identify and diagnose issues.

**ANSWER:  Admitted.**

12.     In the automotive repair industry, there are two broad categories of scan tool products: (1) Original Equipment Manufacturer ("OEM" or "OE") scan tools; and (2) aftermarket scan tools.  These tools are differentiated in part by the software they use: (1) OEM scan tools use OEM software; and (2) aftermarket software scan tools use aftermarket software.

**ANSWER: Denied.**

13.     OEM scan tools are specific to a particular manufacturer's line of vehicles and meet warranty repair guidelines as set by the OEM. Further, because OEM scan tools are specific to a particular manufacturer's line of vehicles, they have an increased level of exposure of testing for those vehicles, increased model coverage, and greater access to feedback for making improvements.

**ANSWER: Denied.**

14.     On the other hand, aftermarket scan tools are not specific to a particular manufacturer's line of vehicles and are not required to meet warranty repair guidelines as set by the OEM.  Because aftermarket scan tools are not specific to a particular manufacturer's line of vehicles, they do not have the same level of exposure to testing, model coverage, and access to feedback for improvements that the OEM scan tools have for a particular OEM's vehicles.

**ANSWER: Denied.**

15.     To represent a scan tool as an OEM scan tool is to represent that it is a product that uses OEM software, is associated with the original manufacturer and a particular brand of vehicles, is endorsed by the original manufacturer, and has the benefit of the increased levels of exposure testing and access to feedback for improvements that result from the narrow focus of OEM scan tools and the OEM-specific standards they must meet.

**ANSWER: Denied.**

16.     AutoEnginuity's Giotto Software (the "Giotto Product" or the "Software") is an aftermarket scan tool software.  Opus currently licenses the Giotto Product as part of its collision sales.

**ANSWER:  Admitted, upon information and belief.**

17.     In 2016, Airpro began obtaining licenses to the Giotto Product from AutoEnginuity which, at that time, were governed by an End User License Agreement (the "old EULA"), a true and accurate copy of which is attached hereto as Exhibit C.

**ANSWER: It is admitted only that the terms of the End User License Agreement attached to Counter-Plaintiff's Counterclaims speak for themselves.  By way of further response, it is admitted that Counter-Defendant began obtaining licenses for the Giotto software in approximately 2016.**

**Airpro Is Held Liable For Violating Ford's Famous Blue-Oval Trademark By Falsely Representing the Giotto Product as OEM Software.**

18.     In 2020, Opus learned that Ford Motor Co. ("Ford") and a related entity had filed a lawsuit against Airpro in this Court claiming that Airpro had violated Ford's intellectual property rights.

**ANSWER:  The allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

19.     Among other things, Ford claimed that Airpro was falsely representing that Airpro's customers were receiving a Ford OEM scan through use of the aftermarket Giotto Product that AutoEnginuity had licensed to Airpro.

**ANSWER: It is admitted only that the contents of the pleadings filed in the referenced lawsuit speak for themselves.  By way of further response, Counter-Defendant denies that it falsely represented anything at any point in time, as alleged in the referenced lawsuit.**

20.     Airpro made these false representations by claiming, for example, that its scan tool (which used the Giotto Product) uses "OEM Scan Tool Software Applications."

**ANSWER: Denied.**

6

21.     Ford asserted claims against Airpro for trademark infringement, false, designation of origin, unfair and deceptive trade practices in violation of Michigan statutory and common law, copyright infringement, and breach of contract.

**ANSWER: It is admitted only that the contents of the pleadings submitted in the referenced lawsuit speak for themselves.**

22.     In that lawsuit, *Ford Motor Co. et al v. AirPro Diagnostics, LLC,* case number 20-CV-10518 (the "Ford-Airpro Lawsuit"), this Court granted Ford's motion for partial summary judgment as to liability on Ford's breach of contract, trademark dilution and trademark infringement claims, among others.   The Ford-Airpro Lawsuit ultimately settled after Airpro's liability had been established.

**ANSWER: It is admitted only that the contents of this Court's Order in the referenced lawsuit speak for themselves.  By way of further response, Counter-Defendant states that the referenced Order was an interim order, which would have been subject to appeal had the lawsuit not been resolved, and has no preclusive effect.**

23.     Significantly, Ford's trademark infringement claim was specifically premised on AirPro's use of "precise replicas of Ford's trademarks to pass off [AutoEnginuity's] aftermarket software as Ford Diagnostic Software."

**ANSWER: It is admitted only that the contents of the pleadings submitted in the referenced lawsuit speak for themselves.**

7

24.     Ford's breach of contract claim was based on Airpro's violation of the End User License Agreement applicable to Ford's Diagnostic Software.

**ANSWER: It is admitted only that the contents of the pleadings submitted in the referenced lawsuit speak for themselves.  By way of further response, Counter-Defendant denies that it violated the End User License Agreement at issue in the referenced lawsuit.**

25.     In the Ford-Airpro Lawsuit, Airpro specifically acknowledged that it agreed to the terms of the EULA each time it uploaded the Ford Diagnostic Software onto its scan tool.

**ANSWER: It is admitted only that the contents of the pleadings submitted in the referenced lawsuit speak for themselves.**

26.     In granting partial summary judgment as to liability on Ford's breach of contract claim, this Court explained that – by choosing to use the Ford Diagnostic Software – Airpro became bound by the terms of the EULA governing that software.

**ANSWER: It is admitted only that the contents of this Court's Order in the referenced lawsuit speaks for itself.  By way of further response, Counter-Defendant states that the referenced Order was an interim order, which would have been subject to appeal had the lawsuit not been resolved, and has no preclusive effect.**

27.     In granting partial summary judgment as to liability on Ford's trademark infringement claim, this Court found that AirPro had unlawfully used Ford Marks in representing AutoEnginuity's Giotto Software – an aftermarket software – as OEM software.

**ANSWER:  It is admitted only that the contents of this Court's Order in the referenced lawsuit speaks for itself.  By way of further response, Counter-Defendant states that the referenced Order was an interim order, which would have been subject to appeal had the lawsuit not been resolved, and has no preclusive effect.**

28.     This Court concluded: "It cannot be disputed that . . .AirPro set out to identify Ford as one source of OEM software used on its scan tool, not just to claim that its scan tool is compatible with Ford's Diagnostic Software."

**ANSWER: It is admitted only that the contents of this Court's Order in the referenced lawsuit speaks for itself.  By way of further response, Counter-Defendant states that the referenced Order was an interim order, which would have been subject to appeal had the lawsuit not been resolved, and has no preclusive effect.**

29.     AirPro's trademark infringement of Ford's Marks necessarily entailed a representation of AutoEnginuity's Giotto Product as OEM software.

**ANSWER: Denied.**

9

30.     But the Giotto Product is an aftermarket scan tool software, not an OEM scan tool software.

**ANSWER:  It is admitted, upon information and belief, that the Giotto Product is not an "OEM scan tool software," as that term has been specifically defined by Counter-Plaintiff.**

31.     Nevertheless, Airpro inaccurately and unlawfully advertised and marketed the Giotto Product as an OEM scan tool software in an effort to, on information and belief, successfully mislead consumers and unfairly compete with Opus.

**ANSWER:  Denied.**

32.     On March 11, 2020, Opus sent Airpro a letter (the "March 11 Letter") expressing its concerns regarding Airpro's use and representation of the Giotto Product. Although Airpro contends it never received the March 11 Letter, Airpro was repeatedly made aware of the March 11 Letter through: (1) subsequent written correspondence from Opus; and (2) discovery and depositions in the Ford-Airpro Lawsuit.

**ANSWER: It is denied that Counter-Plaintiff sent the referenced letter on March 11, 2020.  By way of further response, Counter-Defendant states that the contents of the referenced letter speak for themselves.**

33.    Opus expressed its concern in the March 11 Letter that Airpro was falsely representing to its customers and potential customers that: (1) a scan performed using the Giotto Product is originating from "OEM Scantool Software"; and (2) a scan performed using the Giotto Product is "an OE scan or equivalent to an OE scan."

**ANSWER: It is admitted only that the contents of the referenced letter speak for themselves.**

34.    While the Giotto Product is among the best in the industry with comprehensive coverage, AutoEnginuity did not and has never represented that use of the Giotto Product will achieve the same results as or is otherwise equivalent to an OEM scan performed using OEM software, such as Ford's IDS, FDRS, or FJDS. Opus similarly has never made such representations.

**ANSWER: The allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

35.    In other words, Opus and AutoEnginuity ensure that their products are lawfully marketed.

**ANSWER: The allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

11

36.     Opus and AutoEnginuity similarly require that licensees of their products market those products lawfully.

**ANSWER:  The allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

### AutoEnginuity Implements a New EULA to Ensure Lawful
### Use of the Giotto Product

37.     To ensure lawful use of the Giotto Product by licensees, AutoEnginuity implemented a new End User License Agreement ("EULA") for the Giotto Product on December 1, 2020. A true and accurate copy of the EULA is attached hereto as Exhibit D.

**ANSWER:  It is denied that the motivation behind Counter-Plaintiff's change to its End User License Agreements was motivated by a desire "to ensure lawful use of" its products.  By way of further response, Counter-Defendant states that, upon information and belief, Counter-Plaintiff's true motivation was to wrongfully prohibit Counter-Defendant from utilizing the Giotto software in connection with its business.**

38.     AutoEnginuity provided licensees of the Giotto Product with notice of the EULA through major software updates to the Giotto Product. During the software installation process for major updates to the Giotto Product, a dialog box appears:



**ANSWER:  The allegations of this paragraph are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.**

39.    The  dialog  box  contains  a  message  that  states:  "Please  read  the following license agreement carefully."  It then provides a full copy of the EULA for the end user to review.

**ANSWER: It is admitted only that the contents of the referenced dialog box speak for themselves.**

13

40.     The beginning of the EULA conspicuously states in all caps:

IN ORDER TO USE THE SOFTWARE YOU MUST ACCEPT ALL
OF THE TERMS OF THIS AGREEMENT. AFTER READING THE
TERMS, IF YOU AGREE TO THEM, PLEASE INDICATE YOUR
DECISION BY CLICKING ON "I AGREE" ON THE SERVICE
REGISTRATION PAGE. IF YOU DO NOT AGREE, YOU WILL
NOT BE ALLOWED TO PURCHASE A LICENSE TO USE THE
SOFTWARE OR ANY PRODUCT ON WHICH THE SOFTWARE IS
INSTALLED.

**ANSWER: It is admitted only that the terms of the referenced End User
License Agreement speak for themselves.**

41.     The end user can then either accept the terms or reject the terms of the
EULA.

**ANSWER: It is admitted only that the terms of the referenced End User
License Agreement speak for themselves.**

42.     While the end user is free to accept or reject the terms of the EULA, the
installation of major updates of the Giotto Product is conditional on the end user
accepting the EULA and thereby consenting to abide by its terms.

**ANSWER: It is admitted only that the terms of the referenced End User
License Agreement speak for themselves.**

43.     Specifically, end users of the Giotto Product are required to accept the
terms of the EULA prior to the file transfer for any major software update
installation.

14

**ANSWER: It is admitted only that the terms of the referenced End User License Agreement speak for themselves.**

**Airpro Repeatedly Agrees to the Terms of the EULA.**

44.    AutoEnginuity created four (4) major software updates per year for the Giotto Product. Airpro paid an annual fee for access to these software updates.

**ANSWER:  The allegations of this paragraph related to the creation of software updates are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth.  By way of further response, Counter-Defendant admits that it paid a fee to Counter-Plaintiff with respect to its use of the Giotto software.**

45.    The installations of these software updates were performed by designated Airpro employees. On information and belief, the Airpro employees who performed these installations were Airpro's Chief Technology Officer, Jonathan Brigman ("Brigman") and Airpro's Tier II Tech Support, Luis Vega ("Vega").

**ANSWER: Denied.**

46.    When AutoEnginuity made a new software update available, those designated Airpro employees would receive notification of the new updates from AutoEnginuity. And to install the updates, the Airpro employees had to review and accept the EULA.

**ANSWER: Denied.**

47.     On December 24, 2020, AutoEnginuity sent out an update to the Giotto Product entitled "Giotto (19.0)."  The description for this update was "Giotto® 19.0 introduces the 21MY support and continues to improve enhanced BMW, Porsche, and J2534 hardware support."

**ANSWER:  It is admitted only that the contents of the referenced updates speak for themselves.**

48.     On information and belief, designated Airpro employees Brigman and Vega received and installed the Giotto (19.0) software update on Airpro's units of the Giotto Product, which required review and acceptance of the EULA.  These employees were thus notified of and accepted the terms of the EULA on behalf of Airpro by installing Giotto (19.0).

**ANSWER:  The allegations of this paragraph state a legal conclusion to which no response is required.  To the extent that a response is required, Counter-Defendant denies the allegations of this paragraph.**

49.     When AutoEnginuity merged into Opus on December 31, 2020, AutoEnginuity assigned its rights to the Giotto Product and rights under the EULA to Opus.  Opus sent out additional updates to the Giotto Production in 2021:  "Giotto (19.1)" on March 19, 2021; "Giotto (19.2)" on June 7, 2021; and "Giotto (19.3)" on September 23, 2021. On information and belief, designated Airpro employees Brigman and Vega also received and installed these updates to the Giotto Product

16

on Airpro's units of the Giotto Product, which also required review and acceptance of the EULA.

**ANSWER: The allegations of this paragraph related to the merger of AutoEnginuity and Counter-Plaintiffs are neither admitted nor denied, as Counter-Defendant is without sufficient knowledge or information to form a belief as to their truth. By way of further response, Counter-Defendant denies the allegations of this paragraph.**

50.　Airpro thus expressly assented to the terms of the EULA on multiple occasions. In addition to this express consent, Airpro was made aware of the EULA via written correspondence from Opus on May 24, 2021, August 25, 2021, and October 4, 2021.

**ANSWER: The allegations of this paragraph state a legal conclusion to which no response is required. To the extent a response is required, Counter-Defendant admits only that it received the correspondence referenced in this paragraph.**

51.　Nevertheless, Airpro continued to use the Giotto Product, thereby assenting to the EULA.

**ANSWER: The allegations of this paragraph state a legal conclusion to which no response is required.**

52.     Further, as Airpro specifically acknowledged in the Ford-Airpro Lawsuit, Airpro agreed to the terms of the EULA (even in the absence of repeated written notice from Opus) by repeatedly using the Giotto Product in its scan tool.

**ANSWER: It is admitted only that the contents of the pleadings submitted in the referenced lawsuit speak for themselves.**

### Airpro's Numerous Breaches of the EULA.

53.     Section 3.2(v) of the EULA expressly states: "you may not, nor may you permit any third party to . . . make statements that diagnostic services performed using Software are equivalent to the OE diagnostic system[.]" Ex. D.

**ANSWER: It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

54.     Despite the warnings in the March 11 Letter, the Ford-Airpro Lawsuit, and additional verbal and written warnings in correspondence between Opus and Airpro, Airpro continued to make false and misleading public statements regarding the Giotto Product.

**ANSWER: Denied.**

55.     For example, Airpro made statements that it utilizes OEM scan tool software – not aftermarket scan tool software – and in fact only uses OEM licensed software.

**ANSWER: Denied.**

18

56.     But, on information and belief, the reality is that Airpro performed approximately 96-98% of its diagnostic scans using the Giotto Product, an aftermarket software.

**ANSWER: Denied.**

57.     Airpro's public statements regarding the Giotto Product were highly misleading to the marketplace and Airpro's customers and allowed Airpro to unfairly compete with Opus using Opus's own product.

**ANSWER: Denied.**

58.     These false and misleading public statements constitute willful violations of the terms of the EULA, specifically those contained in Section 3.2(v). *See* Ex. D.

**ANSWER: Denied.**

59.     Further, Airpro repeatedly violated additions provisions of the EULA.

**ANSWER: Denied.**

60.     Section 3.1 of the EULA states: "Each individual license for the Software provides a license for one copy of the Software that may be installed on only one computer or PC at a time and used by a single user (i.e., multiple users are not allowed to concurrently use a copy installed on a single computer)[.]" Ex. D.

**ANSWER: It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

61.     Section 3.1 emphasizes: "For clarity if you have two concurrent users using the Software, then you must purchase two Software licenses." *See* <u>Ex. D</u>.

**ANSWER: It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

62.     Additionally, Section 3.1 provides that: "Each licensed copy of the Software may be used solely to provide diagnostic services on vehicles located under the same roof (and within 500 feet) of the computer on which the Software is installed." <u>Ex. D</u>.

**ANSWER: It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

63.     Section 3.2(vi) of the EULA reiterates: "you may not, nor may you permit any third party to . . . use the Software on any computer that is not under the same rooftop (and within 500 ft.) as the vehicle the Software is being connected to for diagnostics." See Ex. D.

**ANSWER: It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

64.     In 2021, Opus learned that Airpro was: (a) using the single-user licenses to the Giotto Product for multiple concurrent users; and (b) was allowing its customers to perform "self-directed scans" in violation of the EULA.

**ANSWER: Denied.**

65.    Indeed, Airpro readily admitted that it allowed its customers to perform free self-scans using the Giotto Product. In essence, Airpro was purchasing minimal licenses to use the Giotto Product, then taking affirmative steps to repeatedly transfer those licenses to avoid having to purchase additional licenses in an effort to rob AutoEnginuity and Opus of the fruits of their labors.

**ANSWER: Denied.**

66.    But, in addition to the above-described prohibitions, Section 11.2 of the EULA expressly prohibits transfer or assignment of the license without prior written consent, which Airpro never obtained. Ex. D.

**ANSWER:  It is admitted only that the contents of the referenced End User License Agreement speak for themselves.**

67.    On August 25, 2021 Opus sent Airpro another letter (the "August 25 Letter") explaining that its statements about the Giotto product were misleading and that its use (and that of its customers) were in violation of the express terms of the EULA.

**ANSWER: It is admitted only that the contents of the referenced letter speak for themselves.  By way of further response, Counter-Defendant denies that it ever misled anyone or otherwise engaged in wrongdoing.**

68.    Specifically, Opus was concerned that Airpro continued to falsely represent to its customers and potential customers that: (i) a scan performed using

21

the Giotto Product is originating from "OEM Scantool Software"; and (ii) a scan performed using the Giotto Product is "an OE scan or equivalent to an OE scan." Opus explained that, not only did these representations constitute direct violations of the EULA, but Airpro's actions could potentially subject Opus to liability.

**ANSWER: It is admitted only that the contents of the referenced letter speak for themselves. By way of further response, Counter-Defendant denies that the allegations made in the referenced letter are factually accurate.**

69. Further, these statements were highly misleading to the public because Airpro on information and belief performed 96-98% of its scans using the Giotto Product, an aftermarket scan tool software.

**ANSWER: Denied.**

70. In the August 25 Letter, Opus specifically reiterated that Airpro's practice of allowing multiple, concurrent users to use a single-user license and its practice of allowing its customers to perform "self-directed scans" were direct violations of the EULA.

**ANSWER: It is admitted only that the contents of the referenced letter speak for themselves. By way of further response, Counter-Defendant denies that the allegations made in the referenced letter are factually accurate.**

71. Airpro responded by email dated September 2, 2021, stating that it would slightly modify the unlawful description of the Giotto Product. Opus

responded that this proposal was clearly insufficient, as it did not resolve the unlawful advertising of the Giotto Product as OEM software (*i.e.* Ford software) and would not bring Airpro into compliance with the EULA.

**ANSWER: It is admitted only that the contents of the referenced letters speak for themselves.  By way of further response, Counter-Defendant denies that the allegations made in the referenced letter from Counter-Plaintiff are factually accurate.**

72.    To be clear, Airpro's proposed changes would still have falsely represented the Giotto Product, continued to violate the terms of the EULA, and continued to violate Ford's intellectual property rights.

**ANSWER:  Denied.**

73.    After Airpro further refused to lawfully represent Opus's Giotto Product, continued to allow multiple concurrent users per license in an effort to rob AutoEnginuity and Opus of the fruits of their labors, and failed to otherwise comply with the EULA, Opus terminated the EULA by letter dated October 21, 2021.

**ANSWER:  Denied.**

74.    On information and belief, Airpro has been able to unlawfully and wrongfully divert customers away from Opus by, *inter alia*, misrepresenting Opus's Giotto Product as OEM software, allowing customers to perform self-directed scans

using Opus's Giotto Product, and failing to acquire additional Giotto Product licenses from Opus for multiple concurrent users as required by the EULA.

**ANSWER: Denied.**

76. Damages from this unlawful diversion of business include, but are not limited to, Opus's lost net profits, loss of customers, loss of sales, loss of business expectancies and opportunities, loss of customer goodwill, harm to Opus's business reputation, and other damages stemming from the competitive advantage that Airpro obtained through its misuse and unlawful representation of the Giotto Product.

**ANSWER: Denied.**

76. Further, Opus has suffered damages in the form of lost revenue from the additional Giotto Product licenses Airpro was contractually obligated to purchase for additional concurrent users, but failed to do, in breach of the EULA.

**ANSWER: Denied.**

77. In or around January 2023, Airpro's Executive Vice President of Operations Josh McFarlin told Repairer Driven News: "We [i.e. Airpro] are very diligent in complying with the complex and changing terms of End User License Agreements (EULAs) for all diagnostic software applications we work with."

**ANSWER: It is admitted only that the referenced quote accurately reflects the statement made by Mr. McFarlin.**

78.     Airpro's business practices as revealed in the Ford-Airpro Lawsuit and this lawsuit show otherwise.

**ANSWER: Denied.**

**COUNT I:**
**BREACH OF CONTRACT**

79.     The preceding paragraphs of these Counterclaims are hereby realleged and incorporated by reference as if fully set forth herein.

**ANSWER: Counter-Defendant restates and incorporates its answers to the allegations contained in all preceding Paragraphs as if fully set forth herein.**

80.     The EULA constitutes an enforceable, binding contract between Opus and Airpro.

**ANSWER: Denied.**

81.     Opus performed all of its obligations under the EULA.

**ANSWER: Denied.**

82.     Airpro materially breached the EULA by:

a.  Allowing multiple users to concurrently use one (1) Giotto Product license, in violation of Section 3.1 of the EULA;

b.  Failing to purchase a license to the Giotto Product for each concurrent user of the Giotto Product, in violation of Section 3.1 of the EULA;

25

c. Using licenses to the Giotto Product to provide diagnostic services on vehicles that were not located under the same roof and within 500 feet of the computer on which the Software was installed, in violation of Section 3.1 of the EULA;

d. On information and belief, lending, leasing, sublicensing, and/or redistributing the Software to third parties by, inter alia, allowing Airpro customers to perform "self-directed scans," in violation of Section 3.2(iii) of the EULA;

e. Making statements that diagnostic services performed using the Software are equivalent to the OEM diagnostic system, which was factually false and in violation of Section 3.2(v) of the EULA;

f. Using the Software on computers that were not under the same rooftop as and within 500 feet of the vehicle the Software is being connected to for diagnostics, in violation of Section 3.2(vi) of the EULA;

g. On information and belief, assigning or transferring rights to the Software to third parties by, *inter alia*, allowing Airpro customers to perform "self-directed scans," in violation of Section 11.2 of the EULA.

**ANSWER: Denied.**

26

83.     Opus has been damaged as a direct and proximate result of the foregoing breaches.

**ANSWER: Denied.**

**COUNT II:**
**UNFAIR COMPETITION**

84.     The preceding paragraphs of these Counterclaims are hereby realleged and incorporated by reference as if fully set forth herein.

**ANSWER: Counter-Defendant restates and incorporates its answers to the allegations contained in all preceding Paragraphs as if fully set forth herein.**

85.     Opus and Airpro are competitors with respect to both collision sales and mechanical sales in the automotive repair industry.

**ANSWER: Admitted.**

86.     Among other things, Airpro's unlawful misrepresentation of Opus's Giotto Product as OEM software, equivalent to an OEM scan, and originating from OEM scan tool software constitute common law unfair competition. Further, Airpro's use of a single Giotto Product license by multiple concurrent users, including on information and belief Airpro's allowing third parties to perform "self-directed scans," allowed Airpro to unfairly compete with Opus.

**ANSWER: Denied.**

87.     The nature of this unfair competition by Airpro is exacerbated by the fact that Airpro misused Opus's own product (which AutoEnginuity and Opus

27

developed through expenditure of substantial time and resources) to unfairly compete with Opus.

**ANSWER: Denied.**

88.   Opus has been damaged as a direct and proximate result of Airpro's unfair competition.

**ANSWER: Denied. By way of further response, Counter-Defendant states that the only entity that engaged in unfair competition is Counter-Plaintiff, which, upon information and belief, has resulted in millions of dollars in profit for Counter-Plaintiff that is rightfully subject to disgorgement in favor of Counter-Defendant on its affirmative claims.**

**WHEREFORE,** Counter-Defendant respectfully requests this Court enter Judgment in its favor and against Counter-Plaintiff, dismiss Counter-Plaintiff's Counterclaim s with prejudice, and award Counter-Defendant its costs and attorney fees, together with any other relief that the Court deems just and proper.

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiff/Counter-Defendant

Dated:  October 30, 2023          /s/ Adam J. Brody_____
Adam J. Brody (P62035)
Ziyad I. Hermiz (P72236)
Bridgewater Place
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

ajbrody@varnumlaw.com
zihermiz@varnumlaw.com

## **AFFIRMATIVE AND OTHER DEFENSES**

NOW COMES Counter-Defendant, AirPro Diagnostics, LLC, and states that it may rely on one or more of the following affirmative and other defenses prior to or at time of trial:

1.      Counter-Plaintiff has failed to state a claim upon which relief can be granted.

2.      Counter-Plaintiff's claims may be barred, in whole or in part, by the doctrines of waiver, laches, estoppel, consent, mootness, and/or unclean hands.

3.      Counter-Plaintiff has not suffered any compensable damages.

4.      Counter-Plaintiff's claims may be barred, in whole or in part, by the applicable provisions of the governing EULA.

5.      Counter-Defendant's actions have been taken in good faith.

6.      Plaintiffs' claims are contrary to the public interest, as they are anti-competitive and seek to stifle lawful competition.

7.      Counter-Defendant reserves the right to assert additional affirmative defenses that become known throught the course of discovery or otherwise.

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiff/Counter-Defendant

Dated:  October 30, 2023          /s/ Adam J. Brody_____
Adam J. Brody (P62035)
Ziyad I. Hermiz (P72236)

30

Bridgewater Place
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
zihermiz@varnumlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

AIRPRO DIAGNOSTICS, LLC, a
Florida limited liability company,

        Plaintiff,

v.

DREW TECHNOLOGIES, INC., a
Michigan corporation, OPUS IVS,
INC., a Delaware corporation,
AUTOENGINUITY, LLC, an Arizona
limited liability corporation, and
BRIAN HERRON, an individual,

        Defendants.

Case No. 22-12969-LVP-EAS

Honorable Linda V. Parker

Magistrate Judge: Elizabeth A. Stafford

---

## CERTIFICATE OF SERVICE

I certify that on the date below, I electronically filed **Plaintiff/Counter-Defendant's Answer To Defendant Opus IVS, Inc.'s Counterclaims and Affirmative and Other Defenses** and this **Certificate of Service**, with the Clerk of the District Court using its CM/ECF System, which will then electronically notify ECF participants registered to receive notice via the CM/ECF electronic filing system.

Dated:  October 30, 2023        /s/ Adam J. Brody _____
                        Adam J. Brody (P62035)
                        Ziyad I. Hermiz (P72236)
                        VARNUM LLP
                        Bridgewater Place
                        P.O. Box 352
                        Grand Rapids, MI 49501-0352
                        (616) 336-6000
                        ajbrody@varnumlaw.com
                        zihermiz@varnumlaw.com

32