UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AIRPRO DIAGNOSTICS, LLC,

    Plaintiff,

v.

DREW TECHNOLOGIES, INC.,
OPUS IVS, AUTOENGINUITY, LLC,
and BRIAN HERRON,

    Defendants.
_____/

Civil Case No. 22-12969
Honorable Linda V. Parker

## AMENDED OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Plaintiff AirPro Diagnostics, LLC ("AirPro") filed this lawsuit on December 8, 2022, against Defendants Drew Technologies, Inc. ("Drew Technologies"), Opus IVS, Inc., AutoEnginuity, LLC, and Drew Herron (collectively "Defendants"). AirPro alleges the following claims in its Complaint: (I) breach of contract against Drew Technologies; (II) unfair competition against Defendants; and (III) tortious interference with business expectancy against Defendants. The matter is presently before the Court on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15.) The motion has been fully briefed. (ECF Nos. 17, 18). Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral

argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2). For the reasons set forth below, the Court is denying Defendants' motion.

## I. Standard of Review

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). However, the court "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in

the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The court may take judicial notice only "of facts which are not subject to reasonable dispute." *Jones v. Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (quoting *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005)).

II. **Factual and Procedural Background**

This case concerns technological devices used to perform remote diagnostic and calibration services for motor vehicles at locations other than original equipment manufacturer ("OEM") dealerships. (*See generally* ECF No. 1.) Around 2014-2015, CompuFlash, LLC was formed and developed a device ("CompuFlash device") that independent automotive repair and collision shops could use to perform vehicle module programming. (*Id*. at PageID 4, ¶¶ 14-15.) In 2016, AirPro was formed to distribute the CompuFlash device to customers, which CompuFlash would manufacture, and to organize its service centers to provide remote services to those customers. (*Id*. at PageID 4-5, ¶¶ 18, 19.)

The CompuFlash device used an interface known as the "Cardaq" J2534, which was produced and distributed by Drew Technologies. (*Id*. at PageID 5, ¶ 20.) The CompuFlash device also incorporated scan tool diagnostic software, and CompuFlash and AirPro selected a software product known as "Giotto," which AutoEnginuity created and licensed. (*Id*. ¶¶ 21-22.) CompuFlash and AirPro

3

chose the Giotto product due to its wider vehicle coverage and the fact it was derived directly from the OEM data and instructions contained in the Equipment and Tool Institute ("ETI") Tek-Net library. (*Id.* ¶ 23.)

ETI is the leading trade association in the scan tool aftermarket and is the intended depository of information from all OEMs. (*Id.* at PageID 3, ¶ 13.) A key aspect of the Giotto product, as with any automotive diagnostic software, is its ability to be updated as new vehicles are manufactured and sold. (*Id.* at PageID 6, ¶ 30.) Otherwise, the diagnostic software would become functionally obsolete over time. (*Id.* ¶ 31.)

AirPro licensed the Giotto product pursuant to a license agreement with AutoEnginuity. (*Id.* at PageID 6, ¶ 29 (citing ECF No. 1-1).) The license agreement contained no restrictions on where the services using the software could be performed or the manner in which AirPro marketed its services. (*Id.*)

Opus IVS is a conglomerate of various entities in the field of automotive repair and includes AutoEnginuity and Drew Technologies. (*Id.* ¶ 27.) Herron is President of Opus IVS and has been affiliated with AutoEnginuity and Drew Technologies for years. (*Id.*)

In 2016, Drew Technologies began to try and compete with CompuFlash via Drew Technologies' "Remote Assistance Program" ("RAP"). (*Id.* at PageID 7, ¶ 32.) In January 2017, Drew Herron contacted AirPro to explore potential

4

partnership or acquisition opportunities between AirPro, CompuFlash, and Drew Technologies.  (*Id.* ¶ 33.)  In February 2017, a Mutual Party Agreement was executed by Drew Technologies and AirPro (*id.* ¶ 34 (citing ECF No. 1-2)), and an identical agreement was executed by Drew Technologies and CompuFlash (*id.* (citing ECF No. 1-3)).

Pursuant to those agreements, the parties agreed to exchange "Information," such as "business strategies, pricing, techniques, computer programs, methods, drawings, formulas, specifications, software, or other data of a business or technical nature."  (*Id.* ¶ 35 (quoting ECF Nos. 1-2 & 1-3, ¶ 2).)  The parties also agreed that information disclosed would be "used solely for the purposes of [e]valuations, discussions, and potential partnerships" between the three entities.  (ECF No. 1-2 at PageID 23, ¶ 5; *see also* ECF No. 1 at PageID 7, ¶ 36.)  The agreements had a one-year term but restricted the parties for three years after the agreements' expiration from "prepar[ing] or attempt[ing] to prepare any works derived, whether in whole or in part, from the Information" exchanged "without the prior written consent of the [entity that disclosed the Information]."  (ECF No. 1-2 at PageID 24, ¶ 9; *see also* ECF No. 1 at PageID 8, ¶ 37.)

Within the three-year window, Drew Technologies "wrongfully used . . . information and technical knowledge [obtained from AirPro] to enhance [Drew Technologies'] RAP product in an effort to directly compete with AirPro in

5

the field of remote diagnostic services." (ECF No. 1 at PageID 9, ¶ 43.) Drew Technologies used the same software vendor, AutoEnginuity, in an effort to replicate AirPro's business model. (*Id.* ¶ 44.) In connection with its licensing of the Giotto product, AirPro provided, without any compensation, information and recommendations to AutoEnginuity to continuously improve the Giotto product's capabilities and performance. (*Id.* at PageID 9-10, ¶¶ 46-47.)

Opus IVS, by virtue of its ownership of Drew Technologies, now competes directly with AirPro. (*Id*. at PageID 9, ¶ 45.) In January 2020, Opus IVS acquired AutoEnginuity. (*Id*. at PageID 10, ¶ 48.) At that time, Herron informed AirPro that the acquisition would not change AirPro and AutoEnginuity's relationship. (*Id*. ¶ 49.) However, the acquisition meant that AutoEnginuity also competed directly with AirPro. (*Id*. ¶ 51.)

In December 2020, AutoEnginguity implemented a new End User License Agreement ("EULA"), which AirPro neither received nor was informed of. (*Id*. at PageID 10-11, ¶¶ 52-53.) The new EULA prohibits AirPro's "entire business model for providing remote diagnostic services" and "place[s] restrictions on the manner in which the services provided using the AutoEnginuity Giotto product could be marketed." (*Id*. at PageID 11, ¶ 43 (citing ECF No. 1-4).)

On February 27, 2020, Ford Motor Company and Ford Global Technologies, LLC (collectively "Ford") filed a lawsuit against AirPro in this District ("Ford

6

litigation"). (*Id.* ¶ 56.) The case was assigned Civil Case No. 20-10518 and was assigned to the Honorable George Caram Steeh. *See Ford Motor Co. v. AirPro Diagnostics, LLC*, Civil Case No. 20-10518 (E.D. Mich. filed Feb. 27, 2020). Ford alleged, in part, that AirPro's operation of its remote diagnostic business and marketing of its services violated the terms of the new EULA. (ECF No. 1 at PageID 11, ¶ 56.) One of Ford's complaints was that AirPro passed off the Giotto product as OEM diagnostic software.[1] (*Id.* ¶ 57.)

During the Ford litigation, Ford submitted a letter purportedly sent by Herron to AirPro on March 11, 2020. (*Id.* ¶ 58 (citing ECF No. 1-5).) This letter in fact was never sent to AirPro. (*Id.* ¶ 59.) Instead, AirPro believes Herron fabricated the letter to help Ford in its litigation against AirPro and to harm AirPro, as a result. (*Id.* ¶ 60.) Herron also provided a letter directly to Ford in which Herron criticized the manner in which AirPro marketed its services. (*Id.* ¶ 62 (citing ECF No. 1-6).)

---

[1] The parties eventually settled the Ford litigation and a stipulation dismissing the case with prejudice was entered May 24, 2023. Stip., *Ford Motor Co. v. AirPro Diagnostics, LLC*, Civil Case No. 20-10518 (E.D. Mich. May 24, 2023), ECF No. 127. Earlier in the case, the parties had filed cross-summary judgment motions with Ford seeking partial summary judgment as to liability, only, as to four of its seven counts against AirPro. On December 20, 2022, Judge Steeh granted Ford's motion. Op. & Order, *id.*, ECF No. 122. In that decision, Judge Steeh found that AirPro "intended to identify Ford, as well as other OEMs, as the source of the software that can be used on its scan tool." *Id.* at 29.

On August 25, 2021, Herron sent a letter to AirPro claiming AirPro was in violation of the EULA. (*Id.* ¶ 63 (citing ECF No. 1-7).) This was the first time AirPro was informed of any change to the licensing terms. (*Id.* at PageID 13, ¶ 64.) Herron further claimed that AirPro's breach of the agreement's terms justified the termination of its software license. Herron threatened to stop sending AirPro updates to the Giotto products, despite the fact that AirPro had invested millions of dollars on equipment for the specific purpose of using the Giotto software. (*Id.* ¶ 65.) After subsequent communications, Herron wrote AirPro on October 21, 2021, indicating that Defendants were terminating AirPro's license and right to use the Giotto product. (*Id.* at Page 13-14, ¶¶ 66-69.) This left AirPro with limited access to up-to-date aftermarket diagnostic software and forced AirPro to transition to a new diagnostic software vendor. (*Id.* at PageID 14, ¶ 70.)

In the meantime, Opus IVS attempted to entice AirPro technicians to join Opus IVS, despite the fact that the technicians were subject to non-compete and non-disclosure agreements of which Opus IVS and Herron were aware. (*Id.* ¶ 72.) Opus IVS sought the technicians for their qualifications and the inside information they knew about AirPro. (*Id.* at PageID 15, ¶ 73.) At least one AirPro employee joined Opus as a result of this solicitation. (*Id.* ¶ 74.)

### III. Applicable Law & Analysis

#### A. Breach of Contract[2]

AirPro alleges that Drew Technologies breached the parties' Mutual Party Agreement.[3] The agreement states that it is governed by Michigan law.[4] (ECF No. 102 at PageID 25, ¶ 19.) Under Michigan law, a plaintiff alleging breach of contract must show (1) the terms of a contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citation omitted). Defendants argue that AirPro offers only conclusory allegations to support its breach of contract claim, comparing

---

[2] In their briefs, the parties do not address AirPro's claims in the same order. The Court elects to address them in the order alleged in the Complaint.

[3] In a footnote, Defendants assert that AirPro's breach of contract claim against Drew Technologies cannot survive because Drew Technologies merged with Opus IVS on December 31, 2020. (ECF No. 15 at PageID 83 n.1.) Defendants make a similar argument with respect to AirPro's tort claims against this defendant and its claims against AutoEnginuity, which also merged with Opus IVS. (*Id.*) As AirPro notes in response, however, in a merger, the surviving entity has all liabilities of each constituent entity. (ECF No. 17 at PageID 276 n.2 (quoting Mich. Comp. Laws § 450.1736(8)(d))); *see also Jackson v. Corizon Health Inc.*, No. 19-cv-13382, 2022 WL 16575691, at *10 (E.D. Mich. Nov. 1, 2022). Therefore, AirPro could cure this asserted defect in its Complaint by amending its pleading to name Opus IVS as the subject of the claims.

[4] In a footnote, Defendants suggest that Arizona law might govern AirPro's claims. (*See* ECF No. 15 at PageID 91 n.2.) As Defendants acknowledge, however, the outcome of their motion is no different whether Michigan or Arizona law is applied. (*Id.*)

AirPro's allegations to the plaintiff's in *Bestop, Inc. v. Tuffy Securities Products, Inc.*, No. 13-cv-10759, 2014 WL 172299 (E.D. Mich. Jan. 15, 2014).

As Defendants indicate, the provisions of the confidentiality agreements in the present matter and *Bestop* are similar. *See id.* at *2. Those provisions require the parties to hold confidential and proprietary information in trust and confidence, identify the use to which the information may be used, and preclude disclosure to third parties. The allegations as to how a breach occurred in both cases are not equivalent, however.

The district court in *Bestop* held that the plaintiff had not stated a plausible breach of contract claim, reasoning:

> Tuffy has only made conclusory allegations that Bestop breached the confidentiality agreement. Tuffy states that Bestop took confidential information, which Tuffy alleges breaches the agreement, and put that information to use in creating the allegedly infringing patent and product. But Tuffy fails to put forth any factual support for its allegations. Tuffy does not assert what information Bestop took, although, as Bestop states, Tuffy would or should know. Tuffy also does not assert to what use Bestop put the allegedly breaching information.

*Id.* at 8. Here, in comparison, AirPro identifies the information Drew Technologies obtained: AirPro's "business model and pricing structure" and "details regarding how [AirPro] use[s] . . . the AutoEnginuity Giotto product in conjunction with the Cardaq interface[.]" (ECF No. 1 at PageID 8, ¶ 41.) AirPro need not identify a specific document that conveyed this proprietary information to

10

state a plausible claim. AirPro also alleges how Drew Technologies used the allegedly breaching information: "to enhance [Drew Technologies'] RAP product in an effort to directly compete with AirPro in the field of remote diagnostic services." (*Id.* at PageID 9, ¶ 43.)

For these reasons, AirPro pleads sufficient facts to state a viable breach of contract claim.

### B. Unfair Competition

"Michigan follows the general law of unfair competition." *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 17, 2015) (quoting *Clairol, Inc. v Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1118 (6th Cir. 1979)). As one treatise describes the claim:

> Originally, the law of unfair competition dealt generally with the palming off of one's goods as those of a rival trader. Thus it was said that the essence of common-law unfair competition was the bad-faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the source or the origin of goods[.] In other words, under such a theory, unfair competition is seen as a species of deceit.
>
> Later, unfair competition was extended to outlawing "parasitism" under the principle that one may not appropriate a competitor's skill, expenditures, and labor. Today, the incalculable variety of illegal practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use. It is a broad and flexible doctrine. *Thus it is now said that the essence of unfair competition law is fair play*.

*Id.* (emphasis in original) (quoting 54A Am. Jur. 2d Monopolies & Restraints of Trade § 1039) (footnotes removed); *see also* 1 McCarthy on Trademarks & Unfair Competition § 1:9 (5th ed. 2023) (offering "synonyms for unfair competition" such as "the rule of fair play"; "acts that are 'contrary to good conscience'"; "a level of rascality that would raise an eyebrow"; and "the decent thing to do in trade").

Defendants argue that AirPro's Complaint fails to give "fair notice" of which of Defendants' actions constitute unfair competition. Defendants also argue that Exhibits F, G, I, and J to the Complaint and Judge Steeh's findings when granting partial summary judgment to Ford in the Ford litigation show that Defendants acted with proper motives. More particularly, Defendants maintain that AirPro was making misstatements regarding the Giotto product by misrepresenting it as OEM software and this justified the new EULA and termination of AirPro's license.

AirPro's Complaint provides sufficient notice of Defendants' alleged unfair play. The specified exhibits to the Complaint are Opus IVS' untested accusations concerning AirPro. And Defendants do not challenge AirPro's assertion that the findings in the Ford litigation lack preclusive effect here. Instead, Defendants argue that "not once" do they "state or even suggest that Judge Steeh's findings 'should be taken as established fact in this case.'" (ECF No. 18 at PageID 350 (quoting ECF No. 18 at PageID 280).) Yet, this Court would have to take those

12

facts as established to find the "completely innocuous scenario" that Defendants' put forth. (*Id.* at PageID 353 (quoting *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 782 (E.D. Mich. 2010).)

Additionally, the imposition of the new EULA and termination of AirPro's license are not the only actions supporting AirPro's unfair competition claim. In its Complaint, AirPro also describes Defendants' wrongful use of its proprietary and confidential information to compete directly with AirPro, Defendants attempts to attract AirPro's technicians and success in doing so as to at least one technician, and Herron's alleged false claims in the Ford litigation.

For these reasons, the Court denies Defendants' motion to dismiss AirPro's unfair competition claim.

### C. Tortious Interference with Business Expectancy

Under Michigan law, to prevail on a claim of a tortious interference with a business relationship or expectancy, a plaintiff must prove the following:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Courser v. Allard*, 969 F.3d 604, 620-21 (6th Cir. 2020) (citing *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich.

13

Ct. App. 2005)). With respect to the third element, the defendant's "intentional interference" must be "a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150, AFL-CIO*, 3 F.4th 866, 874 (6th Cir. 2021) (quoting *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157-58 (Mich. Ct. App. 2004)). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Id.* (quoting *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992)). Defendants argue that AirPro does not allege sufficient facts to plausibly plead all of these elements.

### 1. Business Relation or Expectancy

First Defendants maintain that the Complaint fails to allege any specific business relations or expectancies with which they allegedly interfered. Defendants argue that "the existence of a valid business relationship must be clearly identified in the complaint." (ECF No. 15 at PageID 92-93 (quoting *Visions Auto Glass, Inc. v. Safelite Sols., Inc.*, No. 10-cv-00791, 2012 WL 13184337, at *6 (W.D. Mich. July 13, 2012)).) Thus, Defendants further argue, AirPro must identify the specific customers at issue, which it did not do. (*Id.* at PageID 93.)

14

"Under Michigan law, to satisfy the element of a valid business expectancy, [the plaintiff] must show that [it] had more than a subjective expectation of entering into a business relationship." *Atlas Technologies, LLC v. Levine*, 268 F. Supp. 3d 950, 967 (E.D. Mich. 2017) (quoting *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 789 (E.D. Mich. 2013)) (cleaned up and additional citations omitted). "The business relationship or expectancy of a relationship must be a reasonable likelihood or probability, not mere wishful thinking." *Id*. (quoting *Lucas v. Monroe Cnty.*, 203 F.3d 964, 979 (6th Cir. 2000)) (brackets and additional citations omitted).

In *Lucas*, the plaintiff towing companies alleged that the county sheriff's department improperly removed them from the county's list of towing servicers. 203 F.3d at 967. The district court dismissed the plaintiff's tortious interference claim finding the plaintiffs' "business relationship or expectancy of a relationship with a third party . . . too attenuated . . . ." *Id.* at 979. The Sixth Circuit reversed, finding that the plaintiffs presented evidence of "an anticipated business relationship with an identifiable class of third parties"—to wit, "stranded motorists who arranged for towing services via the call list maintained by the Sheriff's Department." *Id*.

Here, AirPro alleges that it has distributed the CompuFlash device, which incorporates the Giotto software, to customers which are vehicle repair and

15

collision shops. It is with these customers that AirPro has existing or reasonable expectant business relationships and with which AirPro alleges Defendants interfered. This element is plausibly alleged.

### 2. Defendants' Knowledge

Related to their first argument, Defendants next argue that the Complaint fails to allege that they knew of AirPro's specific business relationships or expectancies. As indicated above, it is AirPro's relationships with existing and potential customers with which it claims Defendants interfered. The allegations in the Complaint render it plausible that Defendants were aware of those relationships due to their extensive dealings with AirPro over the years, including in connection with AirPro's licensing of the Giotto product and the Mutual Party Agreements. The facts here are distinguishable from the case on which Defendants rely, where the parties apparently had no business history with one another: *Literati, LLC v. Literati, Inc.*, No. 20-cv-12764, 2021 WL 1122209 (E.D. Mich. Mar. 24, 2021).

### 3. Intentional and Improper Influence

Lastly, Defendants maintain that the Complaint "contains no facts suggesting—let alone showing 'with specificity' . . . affirmative acts by Defendants that were done intentionally to interfere with [AirPro]'s business expectancies *and* were either *per se* wrongful or malicious." (ECF No. 15 at PageID 95 (emphasis in original).) Defendants assert that the Complaint contains

16

limited allegations addressing this element: legal conclusions in paragraphs 84 and 86 and an allegation that "is nothing more than speculation" in paragraph 52. (*Id.* at PageID 95-96.) Defendants also quote decisions where the courts stated that improper conduct and an improper motive cannot be found where the defendant's actions were motivated by legitimate business reasons, and argue that "[t]his case warrants the same result." (*Id.* at PageID 96-97 (quoting *Mourad v. Marathon Petroleum Co.*, 129 F. Supp. 3d 517, 523-27 (E.D. Mich. 2015), *aff'd* 654 F. App'x 792 (6th Cir. 2016); *Posh Ent., Inc. v. Eton St. Rest., Inc.*, No. 06-11991, 2007 WL 9811145, at *6 (E.D. Mich. Dec. 14, 2007); *Elias v. Fed. Home Loan Mortg. Corp.*, 581 F. App'x 461, 464 (6th Cir. 2014)).)

Starting with Defendants' last argument, "Michigan courts previously 'endorsed a per se rule that conduct motivated by legitimate personal and business reasons was shielded from liability for tortious interference.'" *Booth v. Flint Police Officers Ass'n*, No. 21-2960, 2022 WL 2046515, at *4 (6th Cir. June 7, 2022) (quoting *Roche Diagnostics Corp. v. Shaya*, 427 F. Supp. 3d 905, 926 (E.D. Mich. 2019)). However, "[t]hat per se rule was disavowed" in *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451 (Mich. Ct. App. 1989). *Booth*, 2022 WL 2046515, at *4; *see also Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 427 (6th Cir. 1994). As the Michigan Court of Appeals reasoned when retracting from its previous blanket assertion:

17

> [T]he fact that certain actions are taken with the intent that they inure to the personal or pecuniary benefit of the defendant cannot, per se, in our view, weave a broad and impenetrable blanket of immunity from liability for those actions. Certainly, in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests. But these ends do not necessarily justify the means undertaken. A defendant may not, with impunity, sabotage the contractual agreements of others, and that defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right.

*Tata Consultancy Servs.*, 31 F.3d at 427 (quoting *Jim-Bob*, 443 N.W.2d at at 462-63).

In *Jim-Bob*, the Michigan Court of Appeals adopted a balancing test for assessing whether a defendant's acts were intentional and improper. *Id.* (quoting *Jim-Bob, Inc.*, 443 N.W.2d at 463). Courts consider "the defendant's motive" along with "(1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Id.* (quoting *Jim-Bob, Inc.*, 443 N.W.2d at 463). The Michigan Court of Appeals has vacillated between the two approaches. *Compare Dalley v. Dykema Gossett, PLLC*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010) (using the per se rule); *BPS Clinical Laboratories v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) (same); *with Wood v. Herndon & Herndon Investigations, Inc.*, 465 N.W.2d 5, 8 (Mich. Ct. App. 1990) (rejecting

per se rule and applying balancing test); *Strategy & Execution Inc. v. LXR Biotech LLC*, No. 337015, 2018 WL 3186219, at *4 (Mich. Ct. App. June 28, 2018) (same). Nevertheless, the Sixth Circuit Court of Appeals has repeatedly followed *Jim-Bob*'s approach. *Tata Consultancy Servs.*, 31 F.3d at 427 (finding that "[t]he approach taken by the Court of Appeals in *Jim-Bob* seems entirely consistent with that taken by the [Michigan] Supreme Court in *Wilkinson v. Powe*, [1 N.W.2d 539 (1942)]" where "the Supreme Court said that there can be no categorical answer to the question of what will constitute justification"); *ADR NA, LLC v. Agway*, 303 F.3d 653, 659 (6th Cir. 2002) (quoting *Tata Consultancy Servs.*, 31 F.3d at 424) ("a desire to further one's own economic interests does not constitute justification for actively inducing another to violate his contractual undertakings"); *Booth*, 2022 WL 2046515, at *4. The Sixth Circuit also has observed that a defendant's motive "is usually . . . [a] question . . . for the jury." *Tata Consultancy Servs.*, 31 F.3d at 427 (quoting *Wilkinson*, 1 N.W.2d at 542).

Therefore, while there may be some evidence to support a legitimate business reason for Defendants' actions, this is not enough to establish that AirPro's tortious interference claim must be dismissed. Defendants' other arguments also fail. AirPro's Complaint plausibly alleges intentional conduct and an improper motive, *such as*:

- improperly using AirPro's confidential and proprietary information to wrongfully compete with AirPro;

19

- secretly amending the EULA with the intent to target AirPro's remote diagnostic business model, knowing that AirPro had invested years of hard work and substantial investment in structuring that model around the Giotto product; and

- attempting to recruit and, in at least in one case, successfully recruiting AirPro technicians to breach their employment agreements with AirPro and work for Defendants.

For these reasons, the Court concludes that AirPro plausibly pleads its tortious interference claim.

### IV. Conclusion

In summary, the Court holds that AirPro alleges sufficient facts in its Complaint to render its claims plausible on their face.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (ECF No. 15) is **DENIED**.

                                                                     s/ Linda V. Parker
                                                                     LINDA V. PARKER
                                                                     U.S. DISTRICT JUDGE

Dated: September 21, 2023