UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AIRPRO DIAGNOSTICS, LLC, a Florida limited liability company, | Case No. 22-cv-12969-LVP-EAS |
| Plaintiff, | Honorable Linda V. Parker |
| v. | Magistrate Judge: Elizabeth A. Stafford |
| DREW TECHNOLOGIES, INC., a Michigan corporation, OPUS IVS, INC., a Delaware corporation, AUTOENGINUITY, LLC, an Arizona limited liability company, and BRIAN HERRON, an individual, | |
| Defendants. | |

| | |
|---|---|
| Adam J. Brody (P62035) | William J. Stapleton (P38339) |
| Ziyad I. Hermiz (P72236) | HOOPER HATHAWAY, PC |
| Francesca L. Parnham (P87300) | Attorney for Defendants |
| VARNUM LLP | 126 S. Main Street |
| Attorneys for Plaintiff | Ann Arbor, MI 48104 |
| Bridgewater Place | (734) 662-4426 |
| 333 Bridge Street NW, 17th Floor | wstapleton@hooperhathaway.com |
| P.O. Box 352 | |
| Grand Rapids, MI 49501-0352 | Samuel A. Slater (NC # 43212) |
| (616) 336-6000 | T. Nelson Hughes, Jr.  (NC # 59342) |
| ajbrody@varnumlaw.com | WYRICK   ROBBINS   YATES   & |
| zihermiz@varnumlaw.com | PONTON LLP |
| flparnham@varnumlaw.com | 4101 Lake Boone Trail, Suite 300 |
| | Raleigh, NC 27607 |
| | (919) 781-4000 |
| | sslater@wyrick.com |
| | NHughes@wyrick.com |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Drew Technologies, Inc. ("Drew"), Opus IVS, Inc. ("Opus IVS"), Autoenginuity, LLC ("Autoenginuity"), and Brian Herron ("Herron") (collectively, "Defendants" or "Opus") respectfully submit this Motion for Summary Judgment ("Motion") seeking dismissal of each of Plaintiff AirPro Diagnostics, LLC's ("Plaintiff" or "AirPro") claims.  Opus IVS also moves for partial summary judgment as to liability on its breach of contract claim against AirPro.  Defendants have filed their Brief in Support of this Motion ("Brief"), in accordance with LR 7.1(d), contemporaneously herewith. For the reasons stated in their Brief below, Defendants request that the Court grant Defendants' Motion.

WHEREFORE, Defendants respectfully request that the Court grant their Motion for Summary Judgment as to all of AirPro's claims and partial summary judgment as to liability only as to Opus IVS's claim for breach of contract.

Respectfully submitted,

Date: February 18, 2025

BY: /s/ Samuel A. Slater
WYRICK ROBBINS YATES & PONTON LLP
Samuel A. Slater (NC Bar No. 43212)
T. Nelson Hughes, Jr.  (NC Bar No. 59342)
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607
(919) 781-4000
sslater@wyrick.com
NHughes@wyrick.com

BY: /s/ William J. Stapleton
HOOPER HATHAWAY, PC

ii

William J. Stapleton (P38339)
126 S. Main Street
Ann Arbor, MI 48104
(734) 662-4426
wstapleton@hooperhathaway.com

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... vi

INDEX OF EXHIBITS........................................... **Error! Bookmark not defined.**

COMPLIANCE WITH E.D. MICH. L.R. 7.1(a).................................................... ix

CONCISE STATEMENT OF ISSUES PRESENTED ............................................x

STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY
.................................................................................................................... xii

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................1

   A. The Parties and their Past Business Relationships .........................................1

   B. 2017 "Project Waterfall" Merger Discussions between Drew and AirPro. ....2

   C. Opus' Remote Scanning Business...................................................................4

   D. The Ford-AirPro Lawsuit and the Demise of the Parties' Business
   Relationship. ........................................................................................................7

   E. Opus implemented a new EULA in December 2020 to add industry standard
   provisions and protect Opus from third-party liability..........................................9

   F. Opus repeatedly warned AirPro that continued misrepresentation of the Giotto
   Software as OEM software would lead to termination of AirPro's license to use
   the Giotto Software................................................................................................11

STANDARD OF REVIEW ...................................................................................15

   I. AirPro's claim for breach of contract fails because Airpro only designated a
   single item of confidential "Information," Opus did not use any of AirPro's
   confidential "Information," and AirPro manufactured its breach claim after years
   of open and lawful competition by Opus. ...........................................................15

     A. AirPro disclosed only one document to Drew designated as confidential
     "Information," never designated any verbally disclosed information as
     confidential "Information," and such verbally disclosed information could not
     have qualified as confidential "Information."..................................................17

       i. AirPro designated a single proforma as confidential "Information" under
       the MPA, and nothing else. ..........................................................................17

       ii. AirPro never designated any verbally disclosed information as
       confidential "Information." ..........................................................................18

       iii. The information AirPro contends was verbally disclosed cannot qualify
       as confidential "Information" under the MPA. .............................................19

         a. AirPro's "pricing structure" was not confidential...............................19

b.   AirPro's "business model" was not confidential. ................................20

c.   AirPro's use of the Giotto Software and CarDAQ VCIs was not confidential. ...............................................................................................21

B.   Opus did not use any AirPro confidential "Information" in its independent development of its own products and services. .................................................23

C.   AirPro waived any claim for breach of the MPA by never contending that Opus wrongfully used any of AirPro's purported confidential "Information" until *after* Opus terminated AirPro's license to the Giotto Software in October 2021. ...................................................................................................................25

II.   Because Opus terminated AirPro's license to the Giotto Software due to legitimate and acknowledged liability concerns, AirPro's claim for tortious interference fails. ..................................................................................................26

A.   Opus was justified in terminating AirPro's license to the Giotto Software. 27

B.   There is no "wrongful act" to support AirPro's tortious interference claim against Opus because Opus had a right to terminate AirPro's license to the Giotto Software. ...............................................................................................29

i.   AirPro assented to the New EULA. ..........................................................29

ii.   Opus had a right to terminate the New EULA. .......................................30

C.   AirPro was not entitled to receive annual updates to the Giotto Software and continued to use the then-current version of the Giotto Software after the license termination. ..................................................................................................32

D.   AirPro's tortious interference claim is barred by the economic loss rule because it is based solely on alleged breaches of contract. .............................33

III.   There is no factual basis for AirPro's unfair competition claim................34

IV.   Opus IVS is entitled to partial summary judgment as to liability only on its claim for breach of contract against AirPro. .......................................................35

CERTIFICATE OF SERVICE ...............................................................................36

## TABLE OF AUTHORITIES

**Cases**

*ABO Staffing Servs., Inc. v. UnitedHealthcare Ins. Co.*, No. CV 22-11696, 2023 WL
    3865510 (E.D. Mich. June 7, 2023), *reconsideration denied,* No. 22-CV-11696,
    2024 WL 1256283 (E.D. Mich. Mar. 25, 2024)...................................................27

*Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150, AFL-CIO*, 3
    F.4th 866 (6th Cir. 2021) .......................................................................................27

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .......................................................15

*Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950 (E.D. Mich. 2017) ....................33

*Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, No. 14-10922, 2017 WL
    957686 (E.D. Mich. 2017).....................................................................................27

*Brewster v. Martin Marietta Aluminum Sales, Inc.*, 145 Mich.App. 641, 378 N.W.2d
    558 (1985)..............................................................................................................33

*Costello Publishing Co. v. Rotelle*, 670 F.2d 1035 (D.C. Cir. 1981) ......................30

*Courser v. Allard*, 969 F.3d 604 (6th Cir. 2020) .....................................................27

*Emmet v. Franco*, No. 16-CV-11211, 2016 WL 4396059 (E.D. Mich. Aug. 18, 2016)
    .................................................................................................................................34

*Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 743 N.W.2d 585 (2007) 18

*Holtzlander v. Brownell*, 182 Mich. App. 716, 453 N.W.2d 295 (1990)................30

*Lee v. Panera Bread Co.*, No. 1:22-CV-11958, 2023 WL 2606611 (E.D. Mich. Mar. 6, 2023), *report and recommendation adopted*, No. 1:22-CV-11958, 2023 WL 2603934 (E.D. Mich. Mar. 22, 2023) ...................................................................30

*Lewis v. City of Detroit*, No. 09-CV-14792, 2011 WL 2084067 (E.D. Mich. May 24, 2011) ..............................................................................................................29

*Live Cryo, LLC v. CryoUSA Imp. & Sales, LLC*, No. 17-CV-11888, 2017 WL 4098853 (E.D. Mich. Sept. 15, 2017) ...............................................................33

*Matter of Provider Meds, L.L.C.*, 907 F.3d 845 (5th Cir. 2018) ............................30

*Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, 125 F. Supp. 3d 497 (D. Del. 2015) ...........................................................................................................................29

*Monat v. State Farm Ins. Co.*, 469 Mich. 679, 677 N.W.2d 843 (Mich.2004) .......29

*Patel v. Patel*, 324 Mich. App. 631, 922 N.W.2d 647 (2018) .................................25

*People v. Gates*, 434 Mich. 146, 452 N.W.2d 627 (Mich.1990) .............................29

*Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767 (Mich. Ct. App. Mar. 17, 2015) .............................................................................................34

*Q N. LLC v. Land One LLC*, No. 291946, 2010 WL 3564800 (Mich. Ct. App. Sept. 14, 2010) ...........................................................................................................34

*Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir. 1993) ...........................................30

*Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436 (6th Cir. 2014) .................. xiii, 30

*Singer v. Goff*, 334 Mich. 163, 168, 54 N.W.2d 290, 292 (1952) ...........................19

*State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322 (S.D.N.Y. 2020)..30

*Traton News, LLC v. Traton Corp.*, 528 F.App'x. 525 (6th Cir. 2013)...................30

*United States v. Dominguez*, 359 F.3d 839 (6th Cir. 2004)....................................29

*Urb. Assocs., Inc. v. Standex Elecs., Inc.*, 216 F. App'x 495 (6th Cir. 2007)..........27

*Victory Lane Quick Oil Change, Inc. v. Hoss*, 659 F. Supp. 2d 829 (E.D. Mich. 2009)

............................................................................................................... 31, 33

## Treatises

54 A Am. Jur. 2d Monopolies & Restraints of Trade § 1039..................................34

## <u>COMPLIANCE WITH E.D. MICH. L.R. 7.1(a)</u>

The parties' counsel conferred with one another under L.R. 7.1(a) before Defendants filed this motion.  Counsel for Defendants explained the nature of this motion and requested, but did not obtain, Plaintiff's concurrence in the relief sought.

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Is Defendant Opus IVS, Inc. ("Opus IVS") entitled to summary judgment on Plaintiff AirPro Diagnostics, LLC's ("AirPro") claim for breach of contract against Defendant Drew Technologies, Inc.[1] where (A) the confidential "Information" at issue was not confidential; (B) Opus did not use any AirPro confidential "Information" in its independent development of its own products and services; and (C) AirPro waived any purported claim for breach?

Opus IVS's Answer: Yes

2.    Is Opus entitled to summary judgment on AirPro's claim for tortious interference with business expectancy when (A) Opus had legitimate business reasons for terminating AirPro's license to the Giotto Software, including the liability risk AirPro had created for Opus; (B) Opus had a contractual right to terminate AirPro's license; (C) AirPro had no right to receive updated versions of the Giotto Software and simply continued to use the versions it already had access to post-termination of the license; and (D) the economic loss doctrine bars this claim because it is based on alleged breach of a contractual duty?

Opus' Answer: Yes

---

[1] Defendants Drew and AutoEnginuity both merged into Defendant Opus IVS on December 31, 2020. *See* ECF No. 15-2, PageID.111-12; ECF No. 15-3, PageID.114-15.  Accordingly, Defendants Autoenginuity, Drew, Opus IVS, and Brian Herron are collectively hereinafter referred to as either "Defendants" or "Opus", and Opus IVS, Inc. individually is hereinafter referred to as "Opus IVS".

3.     Is Opus entitled to summary judgment on AirPro's unfair competition when there is no evidence of any "unfair play" by Opus and the economic loss doctrine bars this claim because the bases for the "unfair play" are alleged breaches of contract?

Opus' Answer: Yes

4.     Is Opus IVS entitled to partial summary judgment as to liability only on its claim for breach of contract against AirPro when AirPro has admitted to allowing its customers to perform "Self Scans" using AirPro's license to the Giotto Software in violation of the End User License Agreement ("EULA") and AirPro made statements that diagnostic services performed using the Giotto Software were equivalent to the OE diagnostic system in violation of the EULA?

Opus IVS's Answer: Yes

## STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY

In accordance with Local Rule 7.1(d)(2), Defendants identify the following

cases are the controlling and most appropriate authority for the relief sought:

- *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)

- *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 743 N.W.2d 585 (2007)

- *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, No. 14-10922, 2017 WL 957686 (E.D. Mich. 2017)

- *Urb. Assocs., Inc. v. Standex Elecs., Inc.*, 216 F. App'x 495 (6th Cir. 2007)

- *ABO Staffing Servs., Inc. v. UnitedHealthcare Ins. Co.*, No. CV 22-11696, 2023 WL 3865510 (E.D. Mich. June 7, 2023), *reconsideration denied*, No. 22-CV-11696, 2024 WL 1256283 (E.D. Mich. Mar. 25, 2024)

- *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436 (6th Cir. 2014)

- *Victory Lane Quick Oil Change, Inc. v. Hoss*, 659 F. Supp. 2d 829 (E.D. Mich. 2009)

- *Live Cryo, LLC v. CryoUSA Imp. & Sales, LLC*, No. 17-CV-11888, 2017 WL 4098853 (E.D. Mich. Sept. 15, 2017)

- *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950 (E.D. Mich. 2017)

- *Victory Lane Quick Oil Change, Inc. v.* Hoss, 659 F. Supp. 2d 829 (E.D. Mich. 2009)

- *Emmet v. Franco*, No. 16-CV-11211, 2016 WL 4396059 (E.D. Mich. Aug. 18, 2016)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Parties and their Past Business Relationships

1.      Defendant Opus IVS (into whom Defendants AutoEnginuity, LLC ("AutoEnginuity") and Drew Technologies, Inc. ("Drew") have merged) and Plaintiff Airpro Diagnostics, LLC ("AirPro") are providers of remote scanning, diagnostics, calibration and programming services within the automotive repair industry and are competitors. Exhibit A, Herron Decl.; Exhibit B, McFarlin Dep. 66:10-23; ECF No. 15-2, PageID.111-12; ECF No. 15-3, PageID.114-15.

2.      In 2016, AirPro began purchasing automotive diagnostic hardware from Drew, known as CarDAQ J-2534 Vehicle Communication Interfaces ("VCIs") ("CarDAQ J-2534 VCIs"). Ex. A, Herron Decl. ¶ 5.

3.      Around the same time, AirPro began licensing automotive diagnostic software ("Giotto Software") from AutoEnginuity pursuant to an End User License Agreement ("EULA") and purchasing additional hardware from AutoEnginuity known as "Pro-line" VCIs through which to run the Giotto Software. Exhibit C, Horak Decl.; *see* original EULA, ECF No. 1-1, PageID.20-21.

4.      AirPro used both Drew's CarDAQ J-2534 VCIs and AutoEnginuity's Giotto Software and Pro-line VCIs as part of its "AirPro device," the device AirPro uses to provide its remote diagnostic scanning services. Exhibit D, Olsen Dep. 46:2-25; 47:1-14.

1

### B. 2017 "Project Waterfall" Merger Discussions between Drew and AirPro.

5.      In February 2017, Drew and AirPro began to discuss potential "synergies working together[,]" Exhibit E, which led to "Project Waterfall" discussions of potentially combining their respective remote automotive scanning businesses serving the automotive collision repair market through the formation of a new business entity. Exhibit F, Margol Dep. 47:8-12.

6.      As part of the Project Waterfall discussions, per the suggestion of Brian Herron, then-President of Drew ("Mr. Herron"), Ex. A, Herron Decl.; Exhibit G, Drew and AirPro executed a non-disclosure agreement labeled a Mutual Party Agreement ("MPA") on February 13, 2017. Exhibit H.

7.      After execution of the MPA, Mr. Herron, Lonnie Margol, CEO of AirPro ("Mr. Margol"), and Charles Olsen, Vice President of AirPro ("Mr. Olsen"), "toss[ed] around some ideas." *See* Exhibit I.

8.      This happened at an in-person meeting at AirPro's Jacksonville, FL offices in early March 2017 ("March 2017 Meeting") where AirPro contends it verbally disclosed confidential information to Drew.  Margol Dep. 56:7-17; Olsen Dep. 112:1-6; Exhibit J; Exhibit K.

9.      Drew sent a draft LOI to acquire AirPro on March 16, 2017. Exhibit L.

10.      At the time of Project Waterfall, Drew was already providing remote diagnostic services to the automotive collision repair market. Ex. A, Herron Decl. ¶

28.   Per AirPro, "the structure [of Project Waterfall] was that [Drew/Opus] were going *to continue* to operate their RAP and [AirPro] w[as] going to continue to operate AirPro." Ex. F, Margol Dep. 85:12-14 (emphasis added); *see also* Exhibit M, Geilen Dep. 40:5-24.

11.   "After [Drew/Opus] *were already competing with [AirPro]*, [Mr. Herron] wanted to work a deal with [AirPro in early 2017]." Ex. F, Margol Dep. 259:17-18 (emphasis added).

12.   The Project Waterfall discussions quickly fell apart around May 2017 due to the inability to reach an agreement on the critical issues of price and operational structure. *See, e.g.,* Exhibit N; Exhibit V, Herron Dep. 51:25; 52:1-12.

13.   "Basic stuff" about AirPro's business was discussed at the March 2017 Meeting; Mr. Margol could not "remember all the details, but it was some high-level stuff about what [AirPro] w[as] doing." Ex. F, Margol Dep. 61:23-25; 62:1.

14.   The lone document designated by AirPro as "confidential" under the MPA was "a confidential proforma" containing projections for AirPro's business in 2017. *See* Exhibit O.

15.   AirPro's pricing in 2017 was not confidential and was in fact made publicly available on multiple occasions. Ex. D, Olsen Dep. 127:7-13.

16.   AirPro discloses its pricing to its customers with no non-disclosure agreement or other protection in place, and AirPro's pricing even varies from

3

customer to customer. *Id.* 127:13-24; Ex. B, McFarlin Dep. 61:24-25; 62:1-25; 63:1-15.

17.     Although the MPA required that AirPro designate in writing any "confidential" information it verbally disclosed to Opus, consistent with the "basic" and "high-level" information shared, AirPro never did. ECF No. 1-2, PageID.24, § 10; Ex. F, Margol Dep. 61:23-25; 62:1; Ex. A, Herron Decl. ¶ 46.

18.     AirPro disclosed its intent to use the Giotto Software to AutoEnginuity (now Opus) back in April 2016, well before the February 2017 MPA was executed. Exhibit P; *see* MPA, ECF No. 1-2, PageID.25.

19.     AirPro disclosed the idea to run AutoEnginuity's Giotto Software through "a single J2534 interface" to AutoEnginuity, who was not a party to the MPA. Ex. D, Olsen Dep. 118:1-22; *see* MPA, ECF No. 1-2, PageID.25.

20.     Mr. Herron of Drew and Mr. Horak of AutoEnginuity had been discussing the idea of porting the Giotto Software to a J2534 interface years prior to 2017, in fact since 2006. Ex. A., Herron Decl. ¶ 52; Ex. C, Horak Decl. ¶¶ 14-15.

21.     The idea to run the Giotto Software through "a single J2534 interface" has been publicly available information since 2013: An interview of Mr. Horak is publicly available on Youtube from 2013 wherein Mr. Horak discussed his plan to port the Giotto Software over to a J2534 VCI. Exhibit Q at 18:23-20:11.

**C. Opus' Remote Scanning Business.**

22.    Opus' remote scanning service offerings, included its RAP product, were developed by teams of Drew/Opus engineers over a number of years based on extensive in-house testing and customer feedback. Ex. A, Herron Decl., ¶¶ 28-42.

23.    Drew's RAP product was developed in partnership with General Motors. *Id.* ¶ 29.  Innovative remote capabilities were added to the RAP product by Drew's partnering with a company called "Bluelink," who had advanced patented remote methodologies that were ultimately acquired by Opus when it purchased Bluelink in 2019. *Id.* ¶¶ 14, 23, 29, 33, 57.

24.    Drew's RAP "Crash" tool has been in existence since 2016 and could unload and offload OEM software as part of its remote diagnostic service capabilities in 2016. Ex. A, Herron Decl. ¶ 34.

25.    Opus uses patented methodologies to provide its remote scanning services on its RAP and DRIVE platforms and has used a variety of aftermarket diagnostic software to provide remote scanning services apart from the Giotto Software. *Id.* ¶¶ 14, 31, 51, 53-56.

26.    Opus created a new aftermarket software in 2020 by combining the code for the Autologic diagnostic software with the code for the Giotto Software. *Id.* ¶ 53.

27.    The combined Giotto/Autologic software is the aftermarket software that has been used by Opus since late 2020.  *Id.* ¶ 55.

5

28.     Opus never used the Giotto Software the same way AirPro did. AirPro used the Giotto Software with AutoEnginuity's Pro-line VCI to provide its remote scanning services, while Drew used the Giotto Software in conjunction with a CarDAQ J-2534 VCI. *Id.* ¶¶ 51-52; Ex. C, Horak Decl. ¶¶ 12, 20-22.

29.     In September 2019, Josh McFarlin, then-Vice President of Operations at AirPro, and Mr. Olsen made a "friendly visit" to the offices of Drew/Opus IVS for a meeting, and Mr. McFarlin described Drew/Opus at the time as both "a supplier and a competitor" to AirPro "in that they were providing remote diagnostic and services . . . in the collision repair industry, in the same market as [AirPro]"]. His assessment of the Drew/Opus-AirPro relationship at the time was "friendly competition." Ex. B, McFarlin Dep. 24:18-25; 89:5-25; 90:1-2; 90:17-25; 91:1-6.

30.     Neither Mr. McFarlin nor Mr. Olsen made any "complaints or statements" to Drew/Opus IVS during this "friendly visit" that they could not compete with AirPro or otherwise provide remote scanning diagnostic services to the collision repair market in late 2019. *Id.* 93:5-13.

31.     Yet AirPro contends now that "signing [the MPA] prohibited [Drew] from competing with AirPro in the collision space . . . That [Drew] would not build a device or get into competing with [AirPro] in the collision repair space." Ex. F, Margol Dep. 148:19-25; 149:1-8.

32.     Prior to the termination of AirPro's license to the Giotto Software in October 2021, AirPro had never claimed that Drew had improperly used AirPro's purported confidential information. Ex. D, Olsen Dep. 213:3-10.

33.     Instead, AirPro viewed Opus' termination of AirPro's license to the Giotto Software as a "tipping point" that made AirPro somehow realize that Drew/Opus had purportedly violated the MPA executed nearly five (5) years prior by using information allegedly disclosed five (5) years prior. *Id.* 213:3-13.

**D. The Ford-AirPro Lawsuit and the Demise of the Parties' Business Relationship.**

34.     OEM automotive diagnostic software is self-defining – it is the OEMs' (*e.g.* Ford, Honda, Toyota) automotive diagnostic software created by the OEM. Ex. D, Olsen Dep. 84:11-13; Ex. F, Margol Dep. 95:22-25; 96:1-11.

35.     Aftermarket automotive diagnostic software is software that is not created by the OEM but instead by an independent third-party, such as AutoEnginuity/Opus. Ex. B, McFarlin Dep. 103:13-15; Ex. D, Olsen Dep. 85:11-12.

36.     AirPro chose to misrepresent the Giotto Software as OEM software instead of aftermarket because it considered "aftermarket" to be a "dirty word", a "bad word" in the collision repair industry associated with "inferior[ity]." *See* Ex. D, Olsen Dep. 109:16-19; Ex. B, McFarlin Dep. 157:1-6; 159:12.

37.     OEM software has significant advantages over aftermarket software. Ex. A, Herron Decl. ¶¶ 60-61.

38.     Opus learned AirPro misrepresented its Giotto Software as OEM software through a lawsuit filed by Ford Motor Company ("Ford") on February 27, 2020 against AirPro in the U.S. District Court for the Eastern District of Michigan ("Ford-AirPro Lawsuit"). *See* Ex. A, Herron Decl. ¶ 58.

39.     Each of AirPro's scan reports from June 2018-September2021 – which were provided to AirPro's customers after every scan performed by AirPro – contained the following statement prominently displayed at the top of the Certificate of Scan: "*\*AirPro* utilizes embedded OEM software with OEM compliant interfaces which meet or exceed OEM requirements\*." *See* Exhibit R; Exhibit S at p. 1; Ex. D, Olsen Dep. 248:24-25; 249:1-19.

40.     Ford's trademark infringement claim against AirPro in the Ford-AirPro Lawsuit was based on AirPro's use of "precise replicas of Ford's trademarks to pass off [AutoEnginuity's] aftermarket software as Ford Diagnostic Software [*e.g.*, as OEM software]." *See* ECF No. 15-4 at p. 2.

41.     In granting partial summary judgment as to liability on Ford's trademark infringement claim on December 20, 2022, Judge Steeh concluded: "At a minimum, AirPro's use of the Ford marks was intended to cause confusion as to the source of the software it uses." ECF No. 15-4 at p. 30.

42.     Judge Steeh also determined that "AirPro ha[d] sought to portray itself as using only OEM software on its scan tools." ECF No. 15-4 at p. 35.

43.     This was despite the fact that approximately 96% of AirPro's scans performed for its customers were performed using Autoenginuity's/Opus' aftermarket Giotto Software in 2021. Exhibit T at p. 2; Exhibit U, Applequist Dep. 116:17-25; 117:1-16.

**E. Opus implemented a new EULA in December 2020 to add industry standard provisions and protect Opus from third-party liability.**

44.     In December 2020, Opus (via its then-subsidiary AutoEnginuity) implemented a new EULA ("New EULA") governing the use of the Giotto Software for every licensee of the Giotto Software, of which there were thousands. Ex. C, Horak Decl. ¶¶ 23, 29-36; *see* New EULA, ECF No. 1-4, PageID.31-36.

45.     Notice of the New EULA was provided through major software updates to the Giotto Software. Ex. C, Horak Decl. ¶ 30.

46.     The beginning of the New EULA stated:

IN ORDER TO USE THE SOFTWARE YOU MUST ACCEPT ALL OF THE TERMS OF THIS AGREEMENT. AFTER READING THE TERMS, IF YOU AGREE TO THEM, PLEASE INDICATE YOUR DECISION BY CLICKING ON "I AGREE" ON THE SERVICE REGISTRATION PAGE. IF YOU DO NOT AGREE, YOU WILL NOT BE ALLOWED TO PURCHASE A LICENSE TO USE THE SOFTWARE OR ANY PRODUCT ON WHICH THE SOFTWARE IS INSTALLED.

Ex. C, Horak Decl. ¶ 30.

47.     All licensees of the Giotto Software were required to accept the terms of the New EULA prior to the file transfer for any major software update installation. Ex. C, Horak Decl. ¶ 35.

48.     On December 24, 2020, AutoEnginuity sent out a major software update to the Giotto Software entitled "Giotto (19.0)."  Ex. C, Horak Decl. ¶ 36.

49.     Opus issued more major software updates to the Giotto Software in 2021: "Giotto (19.1)" on March 19, 2021; "Giotto (19.2)" on June 7, 2021; and "Giotto 19.3" on September 23, 2021. Ex. C, Horak Decl. ¶ 38.

50.     AirPro acknowledges assenting to the New EULA by installing versions (19.0), (19.1), and (19.2) of the Giotto Software. *See* Ex. U, Applequist Dep. 108:8-18; 109:2-25; 110:1-25; 111:1-15.

51.     The "key driver" behind updating the EULA was Opus' recent acquisition of AutoEnginuity in 2020 and a recognition that the EULA lacked a number of industry standard terms and conditions. Ex. V, Herron Dep. 199:18-23; *see*, *e.g.*, Ex. V, Herron Dep. 201:7-25; 202:1-10; Exhibit W, Horak Dep. 86:13-16; 89:2-9.

52.     Another consideration in Opus' decision to update the EULA was to protect Opus from being drawn into the then-pending Ford-AirPro Lawsuit. Ex. M, Geilen Dep. 72:17-20; 73:4-5.

53. AutoEnginuity assigned its rights to the Giotto Software and rights under the EULA to Opus when AutoEnginuity merged into Opus on December 31, 2020. Ex. C, Horak Decl. ¶ 37.

54. From 2016-2021, AutoEnginuity offered licensees of the Giotto Software annual subscriptions for a price of $450.00 that would give licensees access to updated versions of the Giotto Software released throughout a given year. Ex. C, Horak Decl. ¶¶ 24-27.

55. AirPro purchased these annual software update subscriptions for the Giotto Software. *Id.* ¶¶ 26, 28.

**F. Opus repeatedly warned AirPro that continued misrepresentation of the Giotto Software as OEM software would lead to termination of AirPro's license to use the Giotto Software.**

56. Between March 2020 and August 2021, AirPro and Opus "had continued conversations trying to resolve the issue [of AirPro's misrepresentations of the Giotto Software] and it continued to escalate." Ex. V, Herron Dep. 155:2-6.

57. Mr. Herron sent a March 11, 2020 letter to AirPro expressing Opus' concerns. Ex. V, Herron Dep. 33:23-25; 34:1-8; ECF No. 1-5, PageID.38. AirPro has no record of receiving that letter. Ex. F, Margol Dep. 184:10-23.

58. In addition to various conversations from March 2020 to August 2021 in which Opus expressed its concerns to AirPro, Opus sent multiple other letters to AirPro explaining Opus' concerns about AirPro's marketing and use of the Giotto

11

Software. ECF No. 1-7, PageID.43; ECF No. 1-9, PageID.48; ECF No. 1-10, PageID.50-51.

59.   Opus sent these additional notices to AirPro because Opus continued to see that, through the documents made public in the Ford-AirPro lawsuit, AirPro's website, and AirPro's scan reports ("Certificates of Scan"), that AirPro was continuing to inaccurately represent the Giotto Software as OEM software. Ex. A, Herron Decl. ¶ 69; Ex. V, Herron Dep. 108:22-25; 109:1-14; Exhibit X.

60.   In an August 25, 2021 letter ("August 25 Letter") from Mr. Herron (on behalf of Opus) to AirPro, Mr. Herron explained:

> [Opus] remain[s] concerned that the lawsuit filed by Ford Motor Company against AirPro indicates that AirPro claims to perform OE Scans using the AutoEnginuity Giotto products and software, and that AirPro's actions may be subjecting Opus IVS to potential liability … [Opus] believes that AirPro's statements are falsely representing AutoEnginuity products and services.

ECF No. 1-7, PageID.43.

61.   Opus' potential liability as a result of AirPro's actions was "the core issue" Opus had with AirPro's misrepresentations of the Giotto Software. Ex. V, Herron Dep. 164:11-25; 165:1-2; *accord* Ex. W, Horak Dep. 62:11-13; 62:15-25; 63:1.

62.   AirPro understood Opus' valid concerns and believed Opus' concerns to be legitimate. Ex. D, Olsen Dep. 209:6-13; 231:4-10.

63.    In the August 25 Letter, Opus also warned AirPro that its continued misrepresentations of the Giotto Software would leave Opus with "no choice but to terminate AirPro's [Giotto] software license[.]" ECF No. 1-7, PageID.43.

64.    Mr. Margol responded on behalf of AirPro to Mr. Herron's August 25 Letter on September 2, 2021 with proposed modified language describing the Giotto Software ("September 2 Proposal"). ECF No. 1-8, PageID.45-46.

65.    But AirPro's proposed modification was inconsistent with the public positions Opus saw AirPro was taking in the then-pending Ford-AirPro Lawsuit. Ex. A, Herron Decl. ¶¶ 78-80; *see also* Ex. X.

66.    As stated in Opus' October 4, 2021 response letter to AirPro's September 2 Proposal:

> [AirPro's] response to the motion for summary judgment [filed in the Ford-AirPro Lawsuit on September 30, 2021] amplifies that AirPro's position with respect to OEM is entirely inconsistent with ours. We find this troublesome for many reasons, and we cannot support any use of our product where it is represented as OEM or OEM equivalent, *especially in the determination of vehicle safety*.

ECF No. 1-9, PageID.48 (emphasis added).

67.    Opus conducted a survey of AirPro customers in September 2021 that confirmed Opus' concern that AirPro's customers believed AirPro only provided scans using OEM software. Ex. X at Opus0000129-30; Ex. A, Herron Decl. ¶¶ 70-71.

13

68.     In an October 21, 2021 letter ("October 21 Letter"), Opus indicated it was terminating AirPro's license to and right to use the Giotto Software effective October 25, 2021. ECF No. 1-10, PageID.50-51.

69.     Despite this, AirPro continued to use the Giotto Software for years after Opus terminated AirPro's license. Exhibit Y. *See*, *e.g.*, Exhibit Z.

70.     The only effect of the license termination was that Opus stopped selling AirPro annual updates to the Giotto Software, which Opus never had an obligation to sell. Exhibit AA; *see* Ex. C, Horak Decl. ¶¶ 24-27; *see generally* ECF No. 1-1, PageID.20-21; ECF No. 1-4, PageID.31-36.

71.     AirPro allowed 57 of its customers to perform 26,707 "Self Scans," or scans performed by AirPro's customers using AirPro's licenses to the Giotto Software in 2021. *See* Exhibits BB at p. 4; CC at pp. 25-26; & DD at p. 4.

72.     *As of late 2024*, AirPro was still misrepresenting the aftermarket software it currently uses as OEM software, and still has issues with customers believing they are getting scans performed using OEM software when they are not. Ex. B, McFarlin Dep. 163:24-25; 164:1-25; 165:1-25; Ex. A, Herron Decl. ¶¶ 82-84.

73.     As of late 2024, AirPro still had descriptions of its business presented to customers where it described its offerings as "Remote Provider of True OEM Diagnostics, Calibration & Programming Services" despite the fact that AirPro

"generally" still "use[s] aftermarket every time" for its diagnostic scans. Ex. B, McFarlin Dep. 177:7-9; 220:1-25.

74.     As AirPro's President admitted on October 31, 2024, AirPro's messaging to its customers *still* has "room for improvement." Ex. B, McFarlin Dep. 220:19-25; 221:1-3.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).

## ARGUMENT

I.   **AirPro's claim for breach of contract fails because Airpro only designated a single item of confidential "Information," Opus did not use any of AirPro's confidential "Information," and AirPro manufactured its breach claim after years of open and lawful competition by Opus.**

Years after AirPro knew about and accepted legitimate business competition with Opus in the automotive collision repair remote diagnostics market, see Ex. B, McFarlin Dep. 24:18-25; 89:5-25; 90:1-2; 90:17-25; 91:1-6; 93:5-13, Opus terminated AirPro's Giotto Software license. ECF No. 1-10, PageID.50-51. Upset with Opus for terminating the license, AirPro manufactured a breach of contract

claim unrelated to the license termination. *See* Ex. D, Olsen Dep. 213:3-13. AirPro's claim fails as set forth below.

The basis for AirPro's breach of contract claim[2] is that Drew violated the MPA by using purported confidential information about AirPro's "business model and pricing structure" and "details regarding how AirPro's use of the [Giotto Software] in conjunction with the Cardaq interface allowed AirPro to successfully provide remote diagnostic services to collision repair shops for a wide range of vehicle . . . to enhance [Drew's] RAP product in an effort to directly compete with AirPro in the field of remote diagnostic services." ECF No. 1, PageID.8-9 ¶¶ 41-43.

The Mutual Party Agreement ("MPA") at issue provides:

> For a period of three (3) years following the expiration of this Agreement, Recipient agrees not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information received from the Disclosure without the prior written consent of the Discloser. If at any time the Recipient produces works or products

---

[2] While distinct from the allegations in AirPro's Complaint, AirPro's claim for breach of contract appears to be based on a misinterpretation of the MPA between Drew and AirPro. AirPro's CEO, Mr. Margol, who signed the MPA on behalf of AirPro on February 13, 2017, testified that: "[S]igning [the MPA] prohibited [Drew/Opus] from competing with AirPro in the collision space . . . That they would not build a device or get into competing with us in the collision repair space." Ex. F, Margol Dep. 148:19-25; 149:1-8. But the MPA does not in any way state or even suggest that Drew/Opus "[can]not build a device or anything that would compete with [AirPro,]" which is what Mr. Margol somehow "underst[ood] the agreement" to prohibit. *Id.* 148:1-18. Mr. Margol's interpretation of the MPA is even more vexing given his admission that "[a]fter they [Drew/Opus] *were already competing with us [AirPro]*, he [Mr. Herron] wanted to work a deal with [AirPro in Febuary 2017]." *Id.* 259:17-18 (emphasis added).

16

related to the Information, the Recipient shall have the burden of proving through competent evidence the independent development of such works by Recipient's employees having no access to the Discloser's Information.

ECF No. 1-2, PageID.24, MPA § 9.  Under Section 4 of the MPA, "Information" is:

Confidential financial proprietary information, proprietary hardware and software design and know-how, confidential product information (including but not limited to AIRPRO's flash and programming tools, applications, and derivative products), confidential business and market information, and other proprietary or non-public information furnished in oral, visual, written and/or tangible form. Information shall include but not be limited to operating specifications, product specifications, strategic marketing and pricing information.

ECF No. 1-2, PageID.23, MPA § 4.  Section 10 of the MPA requires:

Each Party will mark any documentary or tangible Information considered confidential or proprietary as "Confidential" or "Proprietary" at the time of disclosure. *If information is disclosed verbally*, the disclosing Party identifying such Information as confidential and proprietary under this Agreement . . . will reduce such Information to writing within forty-five (45) days of the date of disclosure.

ECF No. 1-2, PageID.24, MPA § 10 (emphasis added).

**A. AirPro disclosed only one document to Drew designated as confidential "Information," never designated any verbally disclosed information as confidential "Information," and such verbally disclosed information could not have qualified as confidential "Information."**

    i.   <u>AirPro designated a single proforma as confidential "Information" under the MPA, and nothing else.</u>

The lone document disclosed to Drew and designated by AirPro as

"confidential" under the MPA was "a confidential proforma" containing projections

for AirPro's business in 2017. *See* Ex. O.   AirPro has not contended that Drew wrongfully used information from this proforma.   Instead, AirPro contends that Drew/Opus wrongfully used information verbally disclosed to Drew at an in-person meeting at AirPro's Jacksonville, FL offices in early March 2017 ("March 2017 Meeting"). Ex. F, Margol Dep. 56:7-17; Ex. D, Olsen Dep. 112:1-6.   But that information, even if disclosed, (1) was never designated as confidential "Information" under the MPA and (2) could not have qualified as confidential "Information."

> ii. <u>AirPro never designated any verbally disclosed information as confidential "Information."</u>

A "condition precedent" is "a fact or event that the parties intend must take place before there is a right to performance." *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 131, 743 N.W.2d 585, 588 (2007).   "If the condition is not satisfied, there is no cause of action for failure to perform the contract." *Id.*

Here, the condition precedent is that "[i]f information is disclosed verbally… the disclosing Party identifying such Information as confidential and proprietary under this Agreement . . . will reduce such Information to writing within forty-five (45) days of the date of disclosure." MPA § 10, ECF No. 1-2, PageID.24.   This requirement protects the parties from the exact sort of belated claim that AirPro now asserts.   By requiring, as a condition precedent, a formal written designation of

confidentiality, the parties to the MPA agreed upon a manner to know with certainty what was potentially protected confidential "Information" and what was not. [3]

AirPro never "reduce[d] . . . to writing within forty-five (45) days of the date of disclosure" any Information verbally disclosed to Drew as required by Section 10 of the MPA. Ex. A, Herron Decl. ¶ 46.  Because AirPro did not satisfy this condition precedent, any information verbally disclosed to Drew by AirPro was not entitled to protection under the MPA, and any use of that information by Drew/Opus (of which there is no evidence) would not be a breach of the MPA.

      iii.   <u>The information AirPro contends was verbally disclosed cannot qualify as confidential "Information" under the MPA.</u>

Even if AirPro had designated verbally disclosed "Information" as confidential, that information was not confidential as a matter of law.

      a.  *AirPro's "pricing structure" was not confidential.*

When asked by Opus to "[i]dentify. . . [the] 'pricing structure'" that AirPro contends was disclosed to Drew, AirPro could not identify any such pricing structure. *See* Ex. CC, Pl.'s Res. to Defs' Interrogatory No. 8, at pp. 15-16. AirPro admitted that its pricing was <u>not</u> confidential in 2017 (and was in fact made publicly available on multiple occasions). Ex. D, Olsen Dep. 127:7-13.  This is consistent

---

[3] *See Singer v. Goff*, 334 Mich. 163, 54 N.W.2d 290 (1952) ("[T]he cardinal principle" of contract interpretation is to "give harmonious effect, if possible, to each word and phrase.").

with the fact that AirPro discloses its pricing to its customers with no disclosure protections in place, and AirPro's pricing varies from customer to customer such that AirPro does not even have a set "pricing structure." Ex. D, Olsen Dep. 127:13-24; Ex. B, McFarlin Dep. 61:24-25; 62:1-25; 63:1-15.

      b.  *AirPro's "business model" was not confidential.*

Regarding AirPro's "business model," AirPro testified that it disclosed the following alleged "confidential" information to Drew verbally:

1) AirPro's "us[e] [of] a diagnostic tool to perform pre and post repair scans, to do diagnostics, to do it in an efficient way[.]" Ex. F, Margol Dep. 143:7-11.

2) "The way we delivered [good customer service]." *Id.* 254:15-18.

3) "Bringing in the service information and giving the information to the collision repair shop in a manner that they could use it." Ex. D, Olsen Dep. 120:2-4.

4) "[T]he efficiency of dividing the service requests and sending the service requests to the right technicians so the right technician could get on the right job at the right time." *Id.* 121:23-25; 122:1.

5) "[T]he number of technicians that it took to deliver the service[.]" Ex. F, Margol Dep. 344:10-11.

6) "[O]ur ability to record and how we went into live data[.]" *Id.* 344:24-25.

7) "How to go about delivering [service] in a very efficient manner." *Id.* 144:14-24.

8) The use of AirPro's "Orion system". *Id.* 146:10-20.

9) "Our customers, the list of customers". *Id.* 253:17.

None of this information was designated as confidential under Section 10 of the MPA as required. *See* ECF No. 1-2, PageID.24; Ex. A, Herron Decl. ¶ 46. Further, these vague categories of verbally disclosed information are not "proprietary hardware and software design and know-how, confidential product information (including but not limited to AIRPRO's flash and programming tools, applications, and derivative products), confidential business and market information, [or] other proprietary or non-public information" that could even be protected as "Information" under Section 4 of the MPA. MPA § 4, ECF No. 1-2, PageID.23. That AirPro claims broad statements about its "good customer service" and "efficiency" were confidential Information under the MPA speaks volumes.

        c.  *AirPro's use of the Giotto Software and CarDAQ VCIs was not confidential.*

On the "details regarding how AirPro's use of the [Giotto Software] in conjunction with the Cardaq interface allowed AirPro to successfully provide remote diagnostic services to collision repair shops for a wide range of vehicles," AirPro contends it verbally disclosed to Drew:

1) AirPro's use of the Giotto Software. Ex. F, Margol Dep. 146:10-20.

2) The idea to run the Giotto Software through "a single J2534 interface". Ex. D, Olsen Dep. 118:12-25.

3) "[O]ur entire process of how we put together the different applications [on the AirPro] to effectively deliver diagnostics, along with expanding beyond programming events of the tool, how we put those together, and how we managed the OEM software applications of when they were used and when

21

they were not used . . . We developed a process where we could unload and offload OEM applications to eliminate the conflicts of multiple applications being on the same tool . . . and also how we switch from one vehicle communication interface to another, how we manage that." Ex. D, Olsen Dep. 110:19-25; 111:7-21.

Yet again, AirPro never designated this information as confidential under Section 10 of the MPA as required. *See* ECF No. 1-2, PageID.24; Ex. A, Herron Decl. ¶ 46. And, even if AirPro had complied with that condition precedent, this information still could not have qualified as protected Information. Specifically, as to (1) Defendants already knew AirPro was using the Giotto Software given Defendants licensed the Giotto Software to AirPro, and AirPro had previously disclosed its intent to use the Giotto Software to AutoEnginuity (now Opus) back in April 2016, well before any MPA was executed. *See* Ex. P. As to (2), AirPro disclosed this idea to Mr. Horak of AutoEnginuity, neither of which were parties to the MPA. Ex. D, Olsen Dep. 118:1-22. Further, Mr. Herron of Drew and Mr. Horak of AutoEnginuity had been discussing the idea of porting the Giotto Software to a J2534 interface years prior to 2017, in fact since 2006. Ex. A., Herron Decl. ¶ 52; Ex. C, Horak Decl. ¶¶ 14-15. And this alleged confidential idea disclosed by AirPro was already public information: an interview of Mr. Horak is publicly available on Youtube *from 2013* (four (4) years prior to the execution of the MPA) wherein Mr. Horak openly discussed his plan to port the Giotto Software over to a J2534 interface. Exhibit Q at 18:23-20:11. As to (3), while Opus also has the capability to

22

"unload and offload OEM applications" on its physical scan tools in its provision of remote diagnostic services, Opus had been doing this with its RAP "Crash" tool prior to the MPA being executed. Ex. A, Herron Decl. ¶ 34.  AirPro cannot meet its threshold burden to show "Information" was disclosed to Drew.

### B. Opus did not use any AirPro confidential "Information" in its independent development of its own products and services.

The MPA required that: "For a period of three (3) years following the expiration of this Agreement [which had a 1-year term], Recipient agrees not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information received from the Disclosure without the prior written consent of the Discloser." ECF No. 1-2, PageID.24, MPA § 9.  AirPro's claim is that Drew wrongfully made certain "enhance[ments]" to its "RAP product" using information AirPro disclosed pursuant to the MPA. ECF No. 1, PageID.8-9 ¶¶ 41-43.  Even if "enhance[ments]" to a product could qualify as "works or products" under the MPA as AirPro claims, AirPro fails to identify any "enhancements" Drew made to its RAP product that were "related to the Information" AirPro disclosed to Drew. *See* Ex. CC at pp. 19-20, Pl.'s Response to Defs.' Interrogatory No. 11.  This alone is fatal to AirPro's claim for breach of contract.

Further, due to this failure, the burden of proving breach is properly on AirPro and the potential burden-shifting provision contained in Section 9 of the MPA does

not apply.[4]  But even if the burden of proving independent development were on Opus, the evidence shows independent development.  Opus' remote scanning service offerings, included its RAP product, were developed by teams of Drew/Opus engineers over a number of years based on extensive in-house testing and customer feedback. Ex. A, Herron Decl., ¶¶ 28-42.  Drew's RAP product, which is the subject of AirPro's claim, was developed in partnership with General Motors. *Id.* ¶ 29. Innovative remote capabilities were added to the RAP product by Drew's partnering with a company called "Bluelink," who had advanced patented remote methodologies that were ultimately acquired by Opus when it purchased Bluelink in 2019. *Id.* ¶¶ 14, 23, 29, 33, 57.

Significantly, Opus uses other patented methodologies to provide its remote scanning services on its RAP and DRIVE platforms and has used a variety of aftermarket diagnostic software to provide remote scanning services apart from the Giotto Software. *Id.* ¶¶ 14, 31, 51, 53-56.  Opus even created a new aftermarket software in 2020 by combining the code for the Autologic diagnostic software with the code for the Giotto Software. *Id.* ¶ 53 Opus never used the Giotto Software in the same manner as AirPro, given AirPro used the Giotto Software with

---

[4] For the burden-shifting provision of Section 9 of the MPA to possibly apply, AirPro must show that Drew "produce[d] works or products related to the Information" that AirPro disclosed to Drew, which it fails to do. ECF No. 1-2, PageID.24, MPA § 10.

AutoEnginuity's Pro-line VCI (a non-J2534 VCI), and Drew (Opus) used the Giotto Software (prior to combining it with the Autologic software) in conjunction with Drew's CarDAQ J-2534 VCI (a J2534 VCI). *Id.* ¶¶ 51-52; Ex. C, Horak Decl. ¶¶ 12, 20-22. While not required to do so, Opus has shown independent development.

### C. AirPro waived any claim for breach of the MPA by never contending that Opus wrongfully used any of AirPro's purported confidential "Information" until *after* Opus terminated AirPro's license to the Giotto Software in October 2021.

AirPro waived any claim for breach under the MPA by never asserting that claim for years and viewing Opus' competition with AirPro as "friendly" and lawful until Opus terminated AirPro's license to the Giotto Software. *See Patel v. Patel*, 324 Mich. App. 631, 634, 922 N.W.2d 647, 651 (2018) (explaining that an implied waiver may be shown "by a party's decisive, unequivocal conduct reasonably inferring the intent to waive"). In September 2019, Josh McFarlin, then-Vice President of Operations at AirPro, Ex. B, McFarlin Dep. 24:23-25, and Mr. Olsen of AirPro made a "friendly visit" to the offices of Drew/Opus for a meeting. *Id.* 91:1-6. Mr. McFarlin described Drew/Opus at the time as both "a supplier and a competitor" to AirPro "in that they were providing remote diagnostics and services . . . in the collision repair industry, in the same market as [AirPro]". *Id.* 90:1-2; 90:17-25. He assessed the Opus-AirPro relationship at the time as "friendly competition." *Id.* 89:5-25; 90:1-2; 91:1-6. Neither Mr. McFarlin nor Mr. Olsen made any "complaints or statements" to Drew/Opus at that time that they could not

25

compete with AirPro or otherwise conduct business by providing remote diagnostic scanning services to the collision repair market in late 2019. *Id.* 93:5-13.

Indeed, prior to the termination of AirPro's license to the Giotto Software in October 2021, AirPro had *never* claimed that Drew/Opus had improperly used AirPro's alleged confidential information. Ex. D, Olsen Dep. 213:3-10. Instead, AirPro viewed Opus' termination of AirPro's license to the Giotto Software as a "tipping point" that made AirPro somehow realize that Drew/Opus had violated the unrelated MPA executed nearly five (5) years prior by using information allegedly disclosed five (5) years prior. *See* Ex. D, Olsen Dep. 213:3-13. Even if AirPro could show any evidence of breach (it cannot), this Court should still grant summary judgment for Opus based on Opus' First Affirmative Defense because AirPro waived any claim for breach.

## II. Because Opus terminated AirPro's license to the Giotto Software due to legitimate and acknowledged liability concerns, AirPro's claim for tortious interference fails.

Under Michigan law, to prevail on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove the following:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4)

resulting damages to the party whose relationship or expectancy was disrupted.[5]

The defendant's "intentional interference" must be "a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."[6]

### A. Opus was justified in terminating AirPro's license to the Giotto Software.

"[T]he case law is clear that the interference—whether lawful or unlawful—must have been 'for the purpose of invading the contractual rights or business relationship of another.'"[7]  Per the Sixth Circuit, "[t]he weight of Michigan authority holds that when the defendant's actions are motivated by legitimate business reasons, its actions do not constitute improper motive or interference."[8]

Opus terminated AirPro's license to the Giotto Software due to the liability risk AirPro created for Opus by misrepresenting the Giotto Software as OEM software. Ex. V, Herron Dep. 164:11-25; 165:1-2; *accord* Ex. W, Horak Dep. 62:11-

---

[5] *Courser v. Allard*, 969 F.3d 604, 620-21 (6th Cir. 2020).

[6] *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Local 150, AFL-CIO*, 3 F.4th 866, 874 (6th Cir. 2021).

[7] *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, No. 14-10922, 2017 WL 957686, at *3 (E.D. Mich. 2017).

[8] *Urb. Assocs., Inc. v. Standex Elecs., Inc.*, 216 F. App'x 495, 514 (6th Cir. 2007); *see also ABO Staffing Servs., Inc. v. UnitedHealthcare Ins. Co.*, No. CV 22-11696, 2023 WL 3865510, at *4 (E.D. Mich. June 7, 2023), *reconsideration denied*, No. 22-CV-11696, 2024 WL 1256283 (E.D. Mich. Mar. 25, 2024) ("Michigan courts are clear that a defendant cannot be liable for a tortious interference claim where they have legitimate business reasons for the alleged conduct.").

13; 62:15-25; 63:1. From June 2018-September 2021, AirPro's Certificate of Scans stated: "*AirPro utilizes embedded OEM software with OEM compliant interfaces which meet or exceed OEM requirements*." *See* Exhibit R; Exhibit S at p. 1; Ex. D, Olsen Dep. 248:24-25; 249:1-10. These were sent to AirPro's customers after every scan, Ex. D, Olsen Dep. 249:11-19, despite the fact that AirPro performed approximately 96% of its scans using Opus' aftermarket Giotto Software during that timeframe. Ex. T at p. 2; Ex. U, Applequist Dep. 116:17-25; 117:1-16.

AirPro customers mistakenly believed in 2021 that AirPro only provided OEM scans, and AirPro customers still believed this as of late 2024. Ex. A, Herron Decl. ¶¶ 70-71; 82-84.  Further, AirPro acknowledged that it believed that Opus' expressed liability concerns about AirPro's misrepresenting the Giotto Software as OEM software were genuine and not fake. Ex. D, Olsen Dep. 209:6-13; 231:4-10. In fact, AirPro admitted to understanding Opus' concerns. *Id.*  Moreover, the doctrine of collateral estoppel prevents AirPro from relitigating the issue of whether it misrepresented the Giotto Software as OEM software, because Judge Steeh in the Ford-AirPro Lawsuit already judicially determined that: "At a minimum, AirPro's use of the Ford marks was intended to cause confusion as to the source of the software it uses." [9]  ECF No. 15-4 at p. 30. Judge Steeh further concluded that

---

[9] "'Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Lewis v. City*

"AirPro ha[d] [inaccurately] sought to portray itself as using only OEM software on its scan tools." *Id.*   Summary judgment on this claim is proper.

**B. There is no "wrongful act" to support AirPro's tortious interference claim against Opus because Opus had a right to terminate AirPro's license to the Giotto Software.**

    i.   <u>AirPro assented to the New EULA.</u>

EULAs can be implemented and amended through software updates because the licensee receives adequate consideration for agreeing to the terms, *e.g.*, the consideration is the ability to use the updated software.[10] Here, the New EULA was a clickwrap agreement because it is an agreement "that 'require[d] the user to manifest assent to the terms by clicking on an icon.'"[11] Ex. C, Horak Decl. ¶¶ 29-

---

*of Detroit*, No. 09-CV-14792, 2011 WL 2084067, at *2 (E.D. Mich. May 24, 2011). The first requirement for collateral estoppel is commonly referred to as "mutuality of estoppel." *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 677 N.W.2d 843, 845–846 (Mich.2004). But "*defensive* use of collateral estoppel does not require mutuality[,]" *Lewis v. City of Detroit*, No. 09-CV-14792, 2011 WL 2084067 (E.D. Mich. May 24, 2011), which is the manner in which Defendants assert collateral estoppel here. Judge Steeh's Order granting Summary Judgment in favor of Ford and against AirPro was (2) "a valid, final judgment", (3) "the same issue [of whether AirPro misrepresented its use of aftermarket software as OEM] was actually litigated[,]" (4) that issue was necessary to Judge Steeh's judgment as to liability against AirPro on Ford's claims for trademark infringement and trademark dilution, and (5) AirPro "had a full and fair opportunity to litigate the issue" in the Ford-AirPro lawsuit. *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004) (citing *People v. Gates*, 434 Mich. 146, 452 N.W.2d 627, 630–631 (Mich.1990))

[10] *See Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, 125 F. Supp. 3d 497, 500 (D. Del. 2015).

[11] *Lee v. Panera Bread Co.*, No. 1:22-CV-11958, 2023 WL 2606611, at *3 (E.D. Mich. Mar. 6, 2023), *report and recommendation adopted*, No. 1:22-CV-11958,

35. AirPro manifested its assent to the terms of the New EULA by continuing to use the Giotto Software for ten months and installing versions (19.0), (19.1), and (19.2) of the Giotto Software in late 2020 and 2021, all of which required accepting the clickwrap agreement as presented. Ex. C, Horak Decl. ¶¶ 30-36; Ex. U, Applequist Dep. 108:8-18; 109:2-25; 110:1-25; 111:1-15.

  ii. <u>Opus had a right to terminate the New EULA.</u>

Where a defendant has a contractual right, the "exercise of that right cannot, as a matter of law, constitute a per se wrongful act."[12] "[U]nder federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement."[13] This is true even for "perpetual" licenses.[14] Section 3.2(iii) of the New EULA prohibited licensees of the Giotto Software from "[l]end[ing], leas[ing], sublicense[ing], or redistribute[ing] the Software to any third party". ECF No. 1-4, PageID.31-32. Section 3.2(v) of the New EULA prohibited licensees of the Software from "mak[ing] statements that

---

2023 WL 2603934 (E.D. Mich. Mar. 22, 2023) (quoting *Traton News, LLC v. Traton Corp.*, 528 F.App'x. 525, 526 n.1 (6th Cir. 2013).

[12] *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 442 (6th Cir. 2014) (explaining exercise of a valid contractual right "cannot be actionable" as tortious interference)

[13] *Rano v. Sipa Press*, *Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (citing *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1045 (D.C. Cir. 1981); *accord Holtzlander v. Brownell*, 182 Mich. App. 716, 721, 453 N.W.2d 295, 298 (1990).

[14] *See*, *e.g.*, *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018); *accord State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020).

diagnostic services performed using Software are equivalent to the OE diagnostic system." *Id.*

AirPro materially breached the New EULA in two ways: (1) AirPro's allowing its customers to perform "Self Scans" using the Giotto Software, in violation of Section 3.2(iii) of the EULA; and (2) AirPro's unlawful representations of the Giotto Software as OEM software, in violation of Section 3.2(v) of the EULA. AirPro admits it allowed its customers to perform 26,707 "Self Scans" in 2021, meaning AirPro improperly allowed its customers to use AirPro's licenses to the Giotto Software. Exhibits BB at p. 4; CC at pp. 25-26; & DD at p. 4. As described above, AirPro repeatedly misrepresented the Giotto Software as OEM software in 2021 and was held liable for doing so in the Ford-AirPro lawsuit through Ford's trademark infringement claim. AirPro's practice of allowing third parties to use its license to the Giotto Software thousands of times in 2021 and AirPro's judicially determined misrepresentations were material breaches that gave Opus the right to terminate AirPro's license to the Giotto Software. Summary judgment on AirPro's claim for tortious interference is thus proper for the additional reason that there is "no evidence in the record that [Opus] took any purposefully *wrongful* actions to disrupt [AirPro's] relationship with any customers." *See Victory Lane Quick Oil Change, Inc. v. Hoss*, 659 F. Supp. 2d 829, 838 (E.D. Mich. 2009) (emphasis added).

31

**C. AirPro was not entitled to receive annual updates to the Giotto Software and continued to use the then-current version of the Giotto Software after the license termination.**

AutoEnginuity/Opus offered annual subscriptions to AirPro for access to updated versions of the Giotto Software. Ex. C, Horak Decl. ¶¶ 24-27. After its license termination, AirPro simply continued to use the versions of the Giotto Software it already had purchased to provide remote scanning services to its customers. Exhibit Y. *See*, *e.g.*, Exhibit Z.

Thus, the only practical effect of the license termination was that Opus stopped selling AirPro updated versions of the Giotto Software. Importantly, Opus was never obligated to sell *any* updates to AirPro because AirPro had no contractual right to software updates. *See* Horak Decl., Ex. C ¶¶ 24-27; *see generally* ECF No. 1-1, PageID.20-21; ECF No. 1-4, PageID.31-36; Ex. AA (Josh McFarlin of AirPro worrying on July 12, 2021: "I believe today we just buy as needed the same as any other customer. We should see if [Opus] will enter into some sort [sic.] longer term/broader agreement. Maybe even a 'code in escrow' type clause."). AirPro cannot show any recoverable damages from the license termination because AirPro continued to use the versions of the Giotto Software it had purchased, and AirPro had no right to continue receiving updated versions of the Giotto Software.[15]

---

[15] Even if AirPro could show customer relationships that were interfered with (they were not), those would be consequential damages that are barred under the terms of *both* the original EULA and the New EULA. *See Live Cryo, LLC v. CryoUSA Imp.*

### D. AirPro's tortious interference claim is barred by the economic loss rule because it is based solely on alleged breaches of contract.

Under Michigan law, the economic loss rule "draws a line between breach of contract claims arising from commercial transactions, where commercial and contract law protect the parties' economic expectations, and tort actions intended to remedy unanticipated injuries as a result of conduct that violates a separate legal duty apart from the contract."[16] "The conduct [must] constitute[] a breach of duty separate and distinct from a breach of contract."[17] "The question is simply whether a tort action would arise independent of the existence of a contract." *Id.*

Here, AirPro's tortious interference claim against Opus is solely based on breach of an alleged (but non-existent) contractual duty: Opus' purported duty to continue licensing the Giotto Software to AirPro. This is because AirPro's tortious interference claim is based on Opus' alleged wrongful termination of AirPro's

---

*& Sales, LLC*, No. 17-CV-11888, 2017 WL 4098853, at *10 (E.D. Mich. Sept. 15, 2017) (tortious interference damages are consequential damages that can be barred by a contractual disclaimer of consequential damages because "[l]imitations of remedies are valid and enforceable"); *see* original EULA, ECF No. 1-1, PageID.21; New EULA § 8.2, ECF No. 1-4, PageID.33.

[16] *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 963 (E.D. Mich. 2017).

[17] *Victory Lane Quick Oil Change, Inc. v.* Hoss, 659 F. Supp. 2d 829, 838 (E.D. Mich. 2009); *Brewster v. Martin Marietta Aluminum Sales, Inc.*, 145 Mich.App. 641, 667–69, 378 N.W.2d 558, 568 (1985).

33

license to the Giotto Software – an alleged breach of contract.[18] Because AirPro has "failed to present evidence that [Opus] took any action that breached a duty it owed to [AirPro] separate from [alleged] contractual obligations[,]" AirPro's claim for tortious interference is barred.[19]

### III.    There is no factual basis for AirPro's unfair competition claim.

"Michigan follows the general law of unfair competition."[20]

Originally, the law of unfair competition dealt generally with the palming off of one's goods as those of a rival trader . . . Later, unfair competition was extended to outlawing "parasitism[.]" Today, the incalculable variety of illegal practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use. It is a broad and flexible doctrine. Thus it is now said that the essence of unfair competition law is fair play.[21]

The only alleged "[un]fair play" is (1) Opus' alleged wrongful use of AirPro's confidential information and (2) Opus' alleged wrongful termination of AirPro's license to the Giotto Software.[22] As explained in Section I above, Opus did not use

---

[18] *Q N. LLC v. Land One LLC*, No. 291946, 2010 WL 3564800, at *11 (Mich. Ct. App. Sept. 14, 2010) (termination of a contract, if wrongful, gives rise to a breach of contract claim)

[19] *Emmet v. Franco*, No. 16-CV-11211, 2016 WL 4396059, at *7 (E.D. Mich. Aug. 18, 2016)

[20] *Primary Ins. Agency Grp.*, *LLC v.* Nofar, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 17, 2015).

[21] *Id.* (emphasis omitted) (quoting 54 A Am. Jur. 2d Monopolies & Restraints of Trade § 1039).

[22] Like AirPro's tortious interference claim, AirPro's unfair competition claim is also barred by the economic loss rule because AirPro's remedy for any alleged breaches of the MPA and wrongful termination of the Giotto Software license are in contract.

AirPro's confidential "Information." For the reasons explained in Section II above, Opus did not wrongfully terminate AirPro's license to the Giotto Software. AirPro's final claim is completely dependent on the facts underlying its breach of contract and tortious interference claims, such that it, too, should be dismissed.

## IV.   Opus IVS is entitled to partial summary judgment as to liability only on its claim for breach of contract against AirPro.

As explained *supra* Sec. II.B.i., the New EULA was a valid contract between Opus and AirPro, which AirPro breached by "lend[ing], leas[ing], sublicense[ing], [and] redistribute[ing] the Software" to third parties through "Self Scans." AirPro also breached Section 3.2(v) of the New EULA by "mak[ing] statements that diagnostic services performed using [the Giotto] Software [we]re equivalent to the OE diagnostic system," as explained *supra* Section II.B.ii. Opus IVS is entitled to partial summary judgment on its breach of contract claim.

Respectfully submitted,

Date: February 18, 2025       BY: /s/ Samuel A. Slater
                             WYRICK ROBBINS YATES & PONTON LLP
                             Samuel A. Slater (NC Bar No. 43212)
                             T. Nelson Hughes, Jr. (NC # 59342)
                             4101 Lake Boone Trail, Suite 300
                             Raleigh, NC 27607
                             (919) 781-4000
                             sslater@wyrick.com
                             NHughes@wyrick.com

                             BY: /s/ William J. Stapleton
                             William J. Stapleton (P38339)
                             HOOPER HATHAWAY, PC

35

William J. Stapleton (P38339)
126 S. Main Street
Ann Arbor, MI 48104
(734) 662-4426
wstapleton@hooperhathaway.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record:

Adam J. Brody
Ziyad I. Hermiz
Francesca L. Parnham
VARNUM LLP
Bridgewater Place
333 Bridge St. NW, Suite 1700
P.O. Box 352
Grand Rapids, MI  49501-0352

I declare that the above statements are true to the best of my knowledge,

information and belief.

BY:   /s/ William J. Stapleton
William J. Stapleton (P38339)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
wstapleton@hooperhathaway.com
*Attorney for Defendants*

36