UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

**AIRPRO DIAGNOSTICS, LLC**, a
Florida limited liability company,

       Plaintiff,

v.

**DREW TECHNOLOGIES, INC**., a
Michigan corporation, **OPUS IVS,
INC**., a Delaware corporation,
**AUTOENGINUITY, LLC**, an
Arizona limited liability corporation,
and **BRIAN HERRON**, an individual,

       Defendants.
and

OPUS IVS, INC.

       Defendant/Counter-Plaintiff,

v.

AIRPRO DIAGNOSTICS, LLC

       Plaintiff/Counter-Defendant.

Case No. 22-12969-LVP-EAS

Honorable Linda V. Parker

Magistrate Judge: Elizabeth A.
Stafford

---

| **VARNUM LLP** | **HOOPER HATHAWAY, PC** |
|---|---|
| Adam J. Brody (P62035) | William J. Stapleton (P37339) |
| Ziyad I. Hermiz (P72236) | Rachel N. Hanson (P82828) |
| Francesca L. Parnham (P87300) | 126 S. Main Street |
| Bridgewater Place | Ann Arbor, MI 48104 |
| 333 Bridge Street NW, 17th Floor | (734) 662-4426 |
| P.O. Box 352 | wstapleton@hooperhathaway.com |
| Grand Rapids, MI 49501-0352 | rhanson@hooperhathaway.com |
| (616) 336-6000 | Attorneys for Defendants |

ajbrody@varnumlaw.com
zihermiz@varnumlaw.com
flparnham@varnumlaw.com
Attorneys for Plaintiff

**WYRICK ROBBINS LLP**
Samuel A. Slater (#43212)
T. Nelson Hughes, Jr.  (#59342)
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607
(919) 781-4000
sslater@wyrick.com
nhughes@wyrick.com
Attorneys for Defendants

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff/Counter-Defendant, AirPro Diagnostics, LLC ("AirPro"), respectfully submits this Motion for Summary Judgment seeking dismissal of all claims alleged by Defendant/Counter-Plaintiff Opus IVS, Inc. ("Opus").

Pursuant to Local Rule 7.1, counsel for the parties conferred via telephone conference on February 12, 2025, during which counsel for AirPro explained the nature of the motion and its legal basis and requested, but did not obtain, concurrence in the relief sought.  The parties then engaged in further discussion via email, specifically regarding the relief Opus is pursing in connection with its claims.  As part of that discussion, counsel for Opus agreed to withdraw any claim for damages, such as for lost profits and lost customers, that would be based on Opus's financial records, instead claiming that Opus will pursue disgorgement as its remedy.

1

Respectfully submitted,

Dated:  February 18, 2025          By:  _/s/ Adam J. Brody_____
                                       Adam J. Brody (P62035)
                                       Ziyad I. Hermiz (P72236)
                                       Francesca L. Parnham (P87300)
                                       VARNUM LLP
                                       Bridgewater Place
                                       333 Bridge St. NW, Suite 1700
                                       P.O. Box 352
                                       Grand Rapids, MI 49501-0352
                                       Tel: (616) 336-6000
                                       ajbrody@varnumlaw.com
                                       zihermiz@varnumlaw.com
                                       flparnham@varnumlaw.com

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **AIRPRO DIAGNOSTICS, LLC**, a Florida limited liability company, | Case No. 22-12969-LVP-EAS |
| Plaintiff, | Honorable Linda V. Parker |
| v. | Magistrate Judge: Elizabeth A. Stafford |
| **DREW TECHNOLOGIES, INC**., a Michigan corporation, **OPUS IVS, INC**., a Delaware corporation, **AUTOENGINUITY, LLC**, an Arizona limited liability corporation, and **BRIAN HERRON**, an individual, | |
| Defendants. and | |
| OPUS IVS, INC. | |
| Defendant/Counter-Plaintiff, | |
| v. | |
| AIRPRO DIAGNOSTICS, LLC | |
| Plaintiff/Counter-Defendant. | |

| | |
|---|---|
| **VARNUM LLP** | **HOOPER HATHAWAY, PC** |
| Adam J. Brody (P62035) | William J. Stapleton (P37339) |
| Ziyad I. Hermiz (P72236) | Rachel N. Hanson (P82828) |
| Francesca L. Parnham (P87300) | 126 S. Main Street |
| Bridgewater Place | Ann Arbor, MI 48104 |
| 333 Bridge Street NW, 17th Floor | (734) 662-4426 |
| P.O. Box 352 | wstapleton@hooperhathaway.com |
| Grand Rapids, MI 49501-0352 | rhanson@hooperhathaway.com |
| (616) 336-6000 | Attorneys for Defendants |

ajbrody@varnumlaw.com
zihermiz@varnumlaw.com
flparnham@varnumlaw.com
Attorneys for Plaintiff

**WYRICK ROBBINS LLP**
Samuel A. Slater (#43212)
T. Nelson Hughes, Jr.  (#59342)
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607
(919) 781-4000
sslater@wyrick.com
nhughes@wyrick.com
Attorneys for Defendants

<u>**BRIEF IN SUPPORT OF PLAINTIFF'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

# <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES.................................................................... ii

ISSUES PRESENTED....................................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..............................iv

I.     INTRODUCTION ...................................................................1

II.    STATEMENT OF UNDISPUTED FACTS ....................................2

      A.    AIRPRO'S USE OF AUTOENGINUITY'S GIOTTO SOFTWARE......................2

      B.    DEFENDANTS' ATTEMPTS TO COMPETE ...................................4

      C.    THE PARTIES' MPAS .........................................................5

      D.    AIRPRO'S REPRESENTATIONS REGARDING ITS SERVICES........................9

      E.    THE FORD LAWSUIT ......................................................10

      F.    THE NEW EULA ...........................................................12

III.   STANDARD OF REVIEW ....................................................15

IV.   LAW AND ARGUMENT.......................................................15

      A.    AirPro is Entitled to Summary Judgment on Opus's Breach of Contract Claim ...............................................................15

            1.    Opus Has Abandoned its Claim that AirPro Violated the New EULA's Geographical Restriction................................16

            2.    AirPro did not Breach the Provision of the New EULA Regarding Concurrent Use......................................17

            3.    AirPro did not Breach the Provision of the New EULA Regarding Statements About its Services .....................20

      B.    AirPro is Entitled to Summary Judgment on Opus's Unfair Competition Claim ..........................................................23

V.    CONCLUSION.................................................................29

# INDEX OF AUTHORITIES

**Cases**

*A & M Records, Inc. v. MVC Distrib. Corp.*,
    574 F.2d 312 (6th Cir.1978) ......................................................................... 24

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)...................................................................................... 15

*Auto Konnect, LLC v. BMW of North America, LLC*,
    No. 18-14019, 2022 W.L. 1724497 (E.D. Mich. May 27, 2022) ..................... 28

*Clairol, Inc. v. Boston Discount Ctr. of Berkley, Inc.*,
    608 F.2d 1114 (6th Cir. 1979) ....................................................................... 24

*Consol. Rail Corp. v. Grand Trunk W.R. Co.*,
    853 F. Supp. 2d 666 (E.D. Mich. 2012)........................................................ 21

*Davis v. Benson*,
    2020 W.L. 5514136 (E.D. Mich. September 14, 2020)................................... 19

*Dura Global Techs., Inc. v. Magna Donnelly Corp.*,
    Case No. 07-10945, 2009 WL 3032594 (E.D. Mich. 2009)........................... 24

*Geomatrix, LLC v. NSF Int'l*,
    82 F.4th 466 (6th Cir. 2023) ......................................................................... 27

*Green Leaf Nursery, Inc. v. Kmart Corp.*,
    485 F. Supp. 2d 815 (E.D. Mich. 2007)........................................................ 16

*Harvey Invs., Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
    166 F.3d 1213 (6th Cir. 1998) ....................................................................... 27

*Home Ins. Co. v. Commercial and Indus. Sec. Servs., Inc.*,
    57 Mich.App. 143, 225 N.W.2d 716 (Mich.Ct.App.1975)............................. 28

*Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*,
    931 F.2d 1112 (6th Cir. 1991) ....................................................................... 19

*Passalacqua Corp. v. Restaurant Management II, Inc.*,
    885 F. Supp. 154 (E.D. Mich. 1995)............................................................. 24

*Rautu v. U.S. Bank*,
    557 Fed. Appx. 411 (6th Cir. 2014)............................................................... 28

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................... 15

**<u>ISSUES PRESENTED</u>**

1.    Is AirPro entitled to summary judgment with respect to Opus's breach of
      contract claim, where AirPro's conduct was not a breach of the terms of the
      agreement underlying Opus's claim, and where, in any event, there is no
      evidence that Opus suffered any harm as a result of the conduct alleged?

      AirPro's Answer:   Yes

2.    Is AirPro entitled to summary judgment with respect to Opus's unfair
      competition claim, where AirPro's conduct was truthful and consistent with
      industry standards, and where, in an event, there is no evidence that Opus
      suffered any harm as a result of the conduct alleged?

      AirPro's Answer:  Yes.

iii

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

Rule 56 of the Federal Rules of Civil Procedure and the decisions in *Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007), *Davis v. Benson*, 2020 W.L. 5514136, *3 (E.D. Mich. Sept. 14, 2020), *Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*, 931 F.2d 1112, 1116 (6th Cir. 1991), *Consol. Rail Corp. v. Grand Trunk W.R. Co*., 853 F. Supp. 2d 666, 670 (E.D. Mich. 2012), *Passalacqua Corp. v. Restaurant Management II, Inc*., 885 F. Supp. 154, 156 (E.D. Mich. 1995), *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 484–85 (6th Cir. 2023), and *Rautu v. U.S. Bank*, 557 Fed. Appx. 411, 413 (6th Cir. 2014) warrant the relief sought in this Motion.

I.      **INTRODUCTION**

AirPro instituted this lawsuit against Defendants to redress their wrongful conduct and unfair competition.  As is set forth in detail below, AirPro, under what it thought were significant contractual protections, provided Defendants with the road map for AirPro's highly successful remote automotive diagnostic business in 2017.  In violation of their contractual obligations and the common law, Defendants took that information and used it to establish a competing business.  What's worse, when Opus acquired Defendant AutoEnginuity, LLC ("AutoEnginuity") in 2020, Opus at that point controlled the very software that AirPro relied on for its operation, which AirPro had been licensing from AutoEnginuity.  Having acquired that control, Opus set off on a course of conduct aimed directly at attempting to cripple AirPro's business and increase their own market share.

After AirPro filed suit to enforce its rights under the parties' contract and other governing law, Opus responded by filing a baseless counterclaim against AirPro, for alleged breach of contract and unfair competition.  As the discussion below conclusively establishes, AirPro did not breach the End User License Agreement ("EULA") that it had with AutoEnginuity, nor did it engage in any unfair competition.  Importantly, even if Opus could prove otherwise, discovery in this case has established that Opus is entirely unable to show that it suffered any damages as a result of anything that AirPro has been accused of doing.  As a result, summary

1

judgment should be granted in favor of AirPro and against Opus with respect to Opus's counterclaim.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     AIRPRO'S USE OF AUTOENGINUITY'S GIOTTO SOFTWARE.

1.     AirPro was formed in 2016 to distribute a new device designed by Lonnie Margol, founder of AirPro, and CompuFlash, LLC, that combined the module programming features of the original CompuFlash device with the multi-vehicle, remote diagnostic and calibration capabilities of Mr. Margol's invention. *See* **Ex. A**, Declaration of Lonnie Margol, at ¶ 3; **Ex. B**, Margol Dep. Tr. at 21:4-14; 25:17-26:1.

2.     AirPro distributed the device primarily to collision repair shops, but also to mechanical or other specialty repair shops, and provided skilled remote diagnostic and calibration services to all shops.  *See* Ex. A, Margol Decl., at ¶ 4; Ex. B, Margol Dep. Tr. at 25:21-24.

3.     The CompuFlash device utilized an interface known as J2534, produced and distributed by Defendant Drew Technologies ("Drew Technologies"), and an aftermarket scan tool diagnostic software known as "Giotto," created by AutoEnginuity.  *See* Ex. A, Margol Decl., at ¶ 5; Ex. B, Margol Dep. Tr. at 24:10-15.

4.      AirPro selected the Giotto product in large part because of its wider vehicle coverage and the fact that, as AirPro understood it, the Giotto product had been derived directly from the original equipment manufacturer ("OEM") data and instructions contained in the Equipment and Tool Institute ("ETI") Tek-Net library. *See* Ex. A, Margol Decl., at ¶6.

5.      AirPro does not disclose and has never disclosed, via advertising or otherwise, the tools and software encompassed in its device, including the Giotto product. *See* Ex. B, Margol Dep. Tr. at 146:16-19; 160:18-20.

6.      Regarding why AirPro selected AutoEnginuity, Chuck Olsen of AirPro confirmed that "it was very important to [AirPro] that a company that we engaged with that did that was a member of ETI, had access to the ETI TekNet library and licensed informations from the OEMs and development of their applications." *See* **Ex. C**, Olsen Dep. Tr. at 38:8-14.

7.      AutoEnginuity was able to develop the Giotto Product utilizing information from ETI because of legislation passed in 2013. *See id.* at 38:8-14; 184:12-18.

8.      Specifically, in 2013, the State of Massachusetts passed right to repair, or "R2R," legislation. *See* **Ex. D**, R2R Agreement.  As described by ETI, the entire purpose of the legislation was to "require that data be made available to [aftermarket] tool manufacturers for the purpose of developing multi-brand diagnostic tools with

equivalent capabilities of the automaker's dealer shop tool[.]"  **Ex. E**, Herron Dep. Tr. Exhibit 20; Ex. C, Olsen Dep Tr. 66:18-67:1.

9.     Lothar Geilen of Opus conceded that he "wouldn't doubt" that the goal of this law was the creation of aftermarket scan tools with equivalent capabilities of automaker dealership tools.  *See* **Ex. F**, Geilen Dep. Tr. at 85:24-86:5.

10.    ETI, along with the Autocare Association and the Automotive Aftermarket Suppliers Association, issued a statement that addressed the industry's position on scan tools during this time.  *See* **Ex. G**, Herron Dep. Tr. at Exhibit 20.

### B.    DEFENDANTS' ATTEMPTS TO COMPETE.

11.    In 2016, Drew Technologies began to try to compete with CompuFlash via its "Remote Assistance Program" ("RAP"), which used the same technical concept that CompuFlash had pioneered previously.  *See* Ex. A, Margol Decl., at ¶ 7.

12.    However, at this time, AirPro was in an unprecedented position: the proprietary combination of hardware and software used in the AirPro device was <u>not</u> generally known in the industry.  *See* Ex. A, Margol Decl., at ¶ 8.

13.    AirPro developed this combination specifically "to meet the demands that the collision industry was asking of the service."  *See* Ex. C, Olsen Dep. Tr. at 37:3-12.

14.     As such, Drew Technologies was largely unable to service collision repair shops or successfully provide remote diagnostic software via its RAP product, instead doing the "significant majority" of its work with mechanical shops, and only offering collision related services in a "limited fashion." *See* Ex. F, Geilen Dep. at 57:16-20; 101:7-23; Ex. B, Margol Dep. Tr. at 65:21-66:17.  As a result, it was "looking to grow the business." *See* Ex. E, Herron Dep. at 25:15-24.

15.     As a result, in 2017, Brian Herron, President of Drew Technologies, approached Chuck Olsen of AirPro to explore potential partnership or acquisition opportunities between AirPro and Drew Technologies. *See* Ex. B, Margol Dep. Tr., at 57:1-9, 53:1-8; 55:14-56:19.

### C.     THE PARTIES' MPAS.

16.     After some preliminary discussions, on February 10, 2017, Drew Technologies and AirPro, and Drew Technologies and CompuFlash, entered into identical Mutual Party Agreements (together the "MPAs," each an "MPA").  ECF No. 1-2, PageID.22-25; 1-3, PageID.26-29.

17.     The crux of the MPAs was that the companies could disclose certain confidential information "solely for the purposes of: evaluations, discussions, and potential partnerships between Drew Tech and AirPro relating to the areas of automotive products." *Id.* at PageID.23, 27 at ¶ 5.

5

18.    This information included "business strategies, pricing, techniques, computer programs, methods, drawings, formulas, specifications, software, or other data of a business or technical nature[.]" *Id.* at ¶ 2.

19.    The language regarding the potential for harm was reflected in the executed MPAs, with the addition of relief in the form of attorneys' fees:

> **Each Party recognizes that the other Party would be seriously, immediately, and irreparably harmed and damaged if any unauthorized use was made of the Information, or if the Information were disclosed**, without the Discloser's consent, to any third party. In the event this Agreement is breached or threatened to be breached, the non-breaching Party shall be entitled to injunctive relief (including, without limitation, temporary restraining orders and injunctions), to enforcement by specific performance of this Agreement, and to damages including, but not limited to, its or their **reasonable attorneys' fees**.

*Id.* at PageID.25, 29 at ¶ 18 (emphasis added).

20.    The executed MPAs contain other important provisions:

| Paragraph | Provision |
|---|---|
| 3, 4 | Each party may disclose "Confidential financial proprietary information, proprietary hardware and software design and know-how, confidential product information (including but not limited to [the company's] flash and programming tools, applications, and derivative products), confidential business and market information, and other proprietary confidential or non-public information furnished in oral, visual, written and/or other tangible form, information shall include but not be limited to operating specifications, product specifications, strategic marketing and pricing information." |

| 7 | For a period of three (3) years following the expiration of this Agreement, the Recipient shall hold in confidence and, except as set forth herein, shall neither disclose any Information nor authorize or assist in any disclosure of Information. |
| 9 | For a period oi three (3) years following the expiration of this Agreement, Recipient agrees not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information received from the Disclosure without the prior written consent of the Discloser. *** |

21.    The parties signed their MPAs on February 10, 2017.  *Id.*

22.    Just a few days later, Mr. Herron represented to Mr. Margol that they two "can be good allies in this market" and sent a list of questions on behalf of Drew Technologies to help get things started."  *See* **Ex. H**, Excerpts of Defendants' Production, OPUS0000223; OPUS0000209.

23.    As soon as two weeks after that, Mr. Herron and Lothar Geilen of Opus were inquiring about meeting in-person with representatives of AirPro to exchange information relating to topics such as projections and employee benefits.  *See* **Ex. I**, OPUS0000244; OPUS0000283.

24.    At all times, however, AirPro's disclosures were made pursuant to the MPA.  *See* Ex. A, Margol Decl., at ¶ 12; Ex. B, Margol Dep. Tr. at 148:12-16; 336:14-9.

25.    During this time, AirPro disclosed to Drew Technologies and AutoEnginuity propriety information regarding the intimate details of how AirPro's

7

products function, specifically relating to "the use of multiple apps on the same tool," the ability to "switch[] from one vehicle interface to another," "the method of handling customer requests," AirPro's "ten-minute response pledge" and how AirPro addresses the pledge, how AirPro "manage[s] the scan reports in a very quick and efficient manner to deliver those to shops," and the method of efficiency related to triaging service requests.  *See e.g.*, Ex. C, Olsen Dep. Tr. at 129:13-18; 121:6-19, 23-25; 122:1-8.

26.    AirPro also provided suggestions regarding product development, such as relating to navigating the path to compatibility through J2534.  *See id.* at 118:1-25; 119:1-23.

27.    Because AirPro had launched in collision shops nationwide, AirPro was constantly developing its products during this time, and AirPro "showed [Defendants] everything."  *See id.* at 121:6-7.

28.    Although the parties got to the point of exchanging proposed Letters of Intent, further negotiations did not result in a deal, for the acquisition of AirPro or any other working relationship.  *See, e.g.,* Ex. E, Herron Dep. at 62:16-25; 72:4-6, 16-17; 73:4-6; 78:2-12.

29.    Rather than entering into a deal with AirPro, Opus instead "went forward and developed" exactly what AirPro had suggested previously, and

confidentially pursuant to the parties' MPAs, to directly compete with AirPro.  *See* Ex. C, Olsen Dep. Tr. at 118:1-25; Ex. E, Herron Dep. Tr. at 127:21-25; 128:1.

30.    AirPro's disclosures were the sole cause of Opus/Drew Technologies' newfound ability to enter the collision space, especially with respect to diagnostics, as Opus/Drew Technologies did not compete substantially in that space at the time. *See* Ex. E, Herron Dep. Tr. at 127:10-25; 128:1; Ex. F, Geilen Dep. Tr. at 101:7-23.

31.    By early 2021, unbeknownst to AirPro, Opus was growing its business "substantially," expanding its customer base into the collision repair space, especially targeting "more MSOs" (multi-store operator), also known as "collision companies that own more than…10 stores."  *See* Ex. E, Herron Dep. Tr. at 27:14-25.

### D.    AIRPRO'S REPRESENTATIONS REGARDING ITS SERVICES.

32.    At various times, AirPro referred to the services provided via its device using terms like "OEM sourced," "OEM equivalent," and "OEM compliant" because the Giotto software was derived from data provided directly from OEMs, and because that description was consistent with Mr. Olsen's discussion with Greg Potter, the Chief Technology Officer of ETI, among others.  *See* Ex. C, Olsen Dep Tr. at 67:18-25; 68:1-11.

33.    Mr. Potter "manages the process" by which companies access OEM data through ETI's TekNet Library.  *See id.* at 61:2-17.

9

34.    In light of Mr. Potter's experience in the industry and his involvement in and knowledge of ETI's operations, Mr. Olsen was comfortable relying on that opinion in AirPro's representation of its products:

> [T]his goes back to the conversations that I …had with Greg Potter and I had with multiple people in the industry of -- of the best way to describe this. Because there -- there was tools out there that were not legitimate tools, and there are tools that are legitimate that source the information -- licensed information from the OEM through ETI or direct licensing. So that OEM-sourced was the -- the best attempt. Like I said, I had conversations with Greg Potter about it. I had conversations with other people … about how best to differentiate a legitimate properly licensed tool that uses the … OEM information to provide the same functionality that is achieved with an OEM scan tool application.
>
> > \*  \*  \*
>
> Based on the conversations that I had with Greg Potter to describe -- and again, describing the differences from copied or pirated software to properly licensed software -- that it was sourced from the OEM data available in TekNet Library and/or licensing, which -- in the relationship with Jay, we believed that was exactly what it was.

*See id.* at 67:20-68:11; 229:2-16.

### E.    THE FORD LAWSUIT

35.    In February 2020, Ford Motor Company and a related entity filed a lawsuit against AirPro (the "Ford Lawsuit"), asserting various claims, including with respect to the manner in which AirPro marketed its services.  ECF No. 1, PageID.11, ¶ 56-57 ; Ex. B, Margol Dep. Tr. at 101:1-5.

36.    In broad brush, Ford claimed that AirPro's description of its remote diagnostic scan tool as "OEM sourced," "OEM equivalent," and "OEM compliant"

constituted unfair competition and deceptive trade practices.  *See* ECF No.1, PageID.11-12 at ¶ 56-57.

37.   At the same time that Ford was suing AirPro, Opus acquired AutoEnginuity.  *See* Ex. E, Herron Dep. Tr. at 91:3-7.

38.   Prior to this acquisition, AutoEnginuity was just the vendor of AirPro's diagnostic software.  But as a result of this acquisition, AutoEnginuity became AirPro's direct and largest competitor.  *See* Ex. B, Margol Dep. Tr. at 41:8-10.

39.   At that time, Mr. Herron contacted Mr. Olsen at AirPro and informed Mr. Olsen that the acquisition would not change AirPro's relationship with Defendant AutoEnginuity in any way and that AirPro should continue to conduct business with Defendant AutoEnginuity as usual, even though Defendants were now direct competitors of AirPro.  *See* Ex. C, Olsen Dep. Tr. at 131:7-132:13.

40.   However, shortly after Opus's acquisition of AutoEnginuity, Opus began actively aiding Ford in its lawsuit against AirPro.  *See* **Ex. J**, OPUS0008013-8014.

41.   In May 2021, Ford submitted as an exhibit to a filing a letter purportedly sent by Mr. Herron to Mr. Margol on March 11, 2020 related to AirPro's alleged conduct.  *See* Ex. E, Herron Dep. Tr. Ex. 15.  Mr. Herron could never come up with proof that he had actually sent this letter to Mr. Margol.  *See* Ex. E, Herron Dep. Tr. at 171:6-12.

### F.   THE NEW EULA

42.   From the beginning, AirPro licensed the AutoEnginuity Giotto product pursuant to a EULA, which contained no restrictions on where the services could be performed using the software or the manner in which AirPro could market its services.  *See* ECF No. 1-1, PageID 20-21.

43.   Once Opus acquired AutoEnginuity in 2020, however, it made the decision to modify its EULA, adding terms that directly targeted AirPro's business, under the guise of addressing concerns raised by Ford.  *See* Ex. F, Geilen Dep. Tr. at 72:17-20; 98-18-22.

44.   This new EULA (the "New EULA") was implemented in December 2020, without informing anyone at AirPro.  *See* Ex. A, Margol Decl., at ¶ 18; Ex. C, Olsen Dep. Tr. at 141:8-15.

45.   The New EULA contained restrictions on how the licensee could market the Giotto product: "[Y]ou may not, nor may you permit any third party to: . . . make statements that diagnostic services performed using Software are equivalent to the OE diagnostic system."  *See* ECF No. 1-4, PageID 31-32.

46.   The New EULA also, for the first time, appeared to prohibit AirPro's remote diagnostic business model: "[Y]ou may not, nor may you permit any third party to: . . . use the Software on any computer that is not under the same rooftop

(and within 500 ft.) as the vehicle the Software is being connected to for diagnostics" (the "New EULA's Geographical Restriction").  *See id.*, PageID 31.

47.    Further, the New EULA prohibited concurrent use: "multiple users are not allowed to concurrently use a copy installed on a single computer." *See id.*  The New EULA mandated that a second license be bought in such a case.  *See id.*

48.    Beginning in August 2021, Mr. Herron began to threaten to terminate AirPro's software license, alleging that AirPro breached the undisclosed New EULA such that termination was justified.  *See* Ex. A, Margol Decl., at ¶ 19.

49.    Specifically, Opus alleges that AirPro breached the sections of the New EULA discussed above.  *See* ECF No. 21, PageID.436-38.

50.    Despite AirPro's good faith attempts to address Opus's concerns, Opus "terminated" AirPro's license and right to use the AutoEnginuity product on October 21, 2021.  *See* Ex. A, Margol Decl., at ¶20.

51.    As a result, AirPro was forced to transition to new diagnostic software and hardware vendors and incurred significant costs through the process.  *See* Ex. A, Margol Decl., at ¶ 21; Ex. B, Margol Dep. Tr. at 158:16-24; 329:4-24.

52.    Bill VanOrden, Defendant AutoEnginuity's Technical Support Manager, validated that a license to install the Giotto software and its associated activation code are tied to the device upon which the software is installed, not the user.  *See* **Ex. K**, VanOrden Dep. Tr. at 65:7-25; 66:8-15.

53.     AutoEnginuity does not have the capability to create a second license for a particular tool in order for AirPro's customers to purchase and use a second license.  *See* Ex. C, Olsen Dep. Tr. at 208:1-4.

54.     Outside of statements made in connection with the Ford lawsuit, Opus has no evidence of AirPro making prohibited statements after December 1, 2020, the date Opus implemented the New EULA.  *See* **Ex. L**, Herron Corp. Rep. Dep. Tr. at 13:4-12.

55.     Opus has no evidence that AirPro breached the New EULA's Geographical Restriction.  *See* Ex. L, Herron Corp. Rep. Dep. Tr. at 11:20-24.

56.     Opus cannot identify a single customer who has informed Opus that it is leaving Opus to go do business with AirPro:

> Q.  Do you have even the identity of a single customer who you claim told you they were leaving Opus to go to AirPro?
>
> A.  As I mentioned before, we don't have any recordkeeping of that.
>
> Q.  And you certainly don't have any records of someone saying we're leaving for AirPro and, oh, by the way, it's because of this particular reasons.
>
> A.   I have recollection of that happening but I don't have specific records about it.

*See* Ex. L, Herron Corp. Rep. Dep. Tr. At 20:20-21:3 (emphasis added).

57.     Opus is interpreting the New EULA's "concurrent use" prohibition against its plain meaning: that a use on a Monday and another use on a Tuesday constitutes concurrent use.  *See* Ex. E, Herron Dep. Tr. at 186-88.

14

58.   Opus has no actual evidence of any revenue or customers being diverted from Opus to AirPro.  *See* Ex. L, Herron Corp. Rep. Dep. at 22:5-7.

59.   Even if such revenue had been diverted, Opus has no evidence that such diversion was caused by anything wrongful done by AirPro.  *See id.*

60.   Opus is not asserting any categories of damages other than what Mr. Herron testified to in his corporate representative deposition.  *See id.* at 40:8-41:6.

61.   Mr. Herron never mentioned or discussed disgorgement damages, nor did he attempt to quantify such damages, in his corporate representative deposition. *See id.*

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

## IV.   <u>LAW AND ARGUMENT</u>

### A.   <u>AIRPRO IS ENTITLED TO SUMMARY JUDGMENT ON OPUS'S BREACH OF CONTRACT CLAIM</u>.

Under Michigan law, a plaintiff claiming a breach of contract must prove: "(1) a contract between the parties, (2) the terms of the contract require performance of a certain action, (3) a breach, and (4) the breach caused injury to the other party."

*Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007). Opus falls short with respect to several of the foregoing elements.

Opus originally claimed in its counterclaim that AirPro breached the New EULA in three distinct ways. Opus abandoned its first claim, and the undisputed evidence recounted above demonstrates that Opus cannot recover on its remaining breach of contract theories.

### 1. Opus Has Abandoned its Claim that AirPro Violated the New EULA's Geographical Restriction.

Opus initially asserted in its counterclaim that AirPro breached the New EULA's Geographical Restriction by utilizing the Giotto software on devices geographically located more than 500 feet away from the vehicle. *See* ECF No. 21, PageID.436 at ¶ 82. However, Mr. Herron has since admitted that discovery in this case did not reveal any breach of the New EULA's Geographical Restriction:

> Q. Okay. Do you believe that AirPro breached that particular provision, and if so how?
>
> A. You know, there's a lot of information in this case, so it's -- forgive me if I can't remember everything about every single point. But the geographical restrictions was centered around if the software that we had was used more than 500 feet away from the car by AirPro or by an AirPro customer. So we believed that to be the case.
>
> Q. In what way did you believe it to be the case, Brian? Just describe the factual scenario for me that you think was occurring that constituted a breach.
>
> A. We were trying to understand if AirPro was using the software, you know, with some other technology outside of the actual kit underneath the roof of the vehicle. Now, I -- I don't believe to date

16

there's been any evidence produced by AirPro indicating that that has been the case, but that was, you know, an integral part of the license agreement which was also adopted by many car companies, that the software should be used under the roof to make sure it functions correctly.

Q. Okay.  So just so I'm clear, as we sit here today you've not seen any evidence of an actual violation of that restriction by AirPro; is that correct?

A. The geographical restriction, correct.

*See* Ex. L, Herron Corp. Rep. Dep. Tr. at 11:20-24 (emphasis added).  As such, Opus has effectively abandoned its claim that AirPro breached the New EULA's Geographical Restriction, and summary judgment must be entered in favor of AirPro on this claim.

## 2.  AirPro did not Breach the Provision of the New EULA Regarding Concurrent Use.

The basis for Opus's second claim of alleged breach is that AirPro was allowing its customers to perform so-called "self-scans," where a collision shop employee who would normally work in tandem with an AirPro technician to address a repair would instead work solely on his or her own, using the AirPro device.  *See* ECF No. 21, PageID. 432-33 at ¶60-64.  According to Opus, once a customer licensed the Giotto software and it was installed on the AirPro tool, AirPro was required to be engaged in any service performed by that customer: "if the customer utilizes AirPro's services and expertise, that would have been fine."  *See* Ex. L Herron Dep. Tr.  at 207:3-7.  But somehow, if that same customer decided that the

17

service at issue was sufficiently simple that it could handle it alone, such use would

somehow be a breach <u>by AirPro</u> of the New EULA.

Not only is this argument non-sensical, but Opus is in any event unable to tie

the factual circumstances surrounding AirPro's actual operations to the language of

the New EULA.  All that the New EULA states regarding this issue is as follows:

> Each individual license for the Software provides a license for one copy
> of the Software that may be installed on only one computer or PC at a
> time and used by a single user (i.e., multiple users are not allowed to
> concurrently use a copy installed on a single computer) . . . For clarity,
> if you have two concurrent users using the Software, then you must
> purchase two Software licenses.

*See* ECF No. 1-4, PageID.31, at ¶ 3.1.

That is all AirPro has ever done.  That is, AirPro would buy a license for each

and every device that it had in the field, with a single copy installed on each device.

This is exactly the manner in which the New EULA contemplates the use of the

software, as confirmed by AutoEnginuity's own Technical Support Manager, Bill

VanOrden, who testified that a license is tied to a particular device.  *See* Ex. K,

VanOrden Dep. Tr. at 65:7-25; 66:8-15.  There is no evidence that AirPro ever

installed a copy of the same license to Giotto software on more than one AirPro

device at a time.

In reality, this entire claim is premised on Mr. Herron's after the fact argument

that the use case described above, in which an AirPro customer uses the AirPro

device to perform a service without involving AirPro, somehow constitutes

"concurrent" use by multiple users. But such an assertion is contrary to the very meaning of that phrase. That is, for two uses to be "concurrent," they must be happening <u>at the same moment in time</u>. *See Davis v. Benson*, 2020 W.L. 5514136, *3 (E.D. Mich. September 14, 2020) ("'Concurrent' is defined as 'operating or occurring at the same time.'"). That simply did not happen here.

During his deposition, Mr. Herron revealed his confusion on this issue, as he testified that it would be a violation of the "concurrent use" provision of the New EULA "if on a Monday [AirPro's customer] is working with AirPro and having AirPro do something with the software tool but if on Tuesday someone at [the customer] wants to do it on their own." *See* Ex. E, Herron Dep. Tr. at 186-88. Of course, by definition, a use on a Monday and another use on a Tuesday is not "concurrent" use, because they happen at different points in time. *See Benson*, 2020 W.L. 5514136, at *3. Accordingly, AirPro's customers who were using one device equipped with one software license were operating within the terms of the New EULA, and Opus's breach of contract claim related to such use fails.[1]

---

[1] It is also noteworthy that it is not even possible to assign more than one license to a single AirPro device, as Opus suggests would be required to comply with the New EULA. *See* Ex. C, Olsen Dep. Tr. at 208:1-4. This is yet another reason why Opus's breach of contract claim related to the "self-scan" issue necessarily fails. *Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*, 931 F.2d 1112, 1116 (6th Cir. 1991) (explaining the broadness of the doctrine of impossibility under Michigan law, and that the doctrine is a "valid defense…when performance is impossible").

### 3.    AirPro did not Breach the Provision of the New EULA Regarding Statements About its Services.

Lastly, Opus claims that AirPro breached the New EULA by supposedly making statements regarding the capabilities of the Giotto software as compared to OEM diagnostic systems. But the provision at issue only prohibits a licensee from making "statements that diagnostic services performed using Software are equivalent to the OE diagnostic system." *See* ECF No. 1-4, PageID 31-32. Thus, to establish liability on this claim, Opus must present evidence of AirPro claiming, after December 1, 2020, that services provided using the Giotto were "equivalent to" services provided using OEM diagnostic systems. Opus can do no such thing.

First, the bulk of Opus's complaints relate to the use of phrases like "OEM sourced" and "OEM compliant." *See* Ex. L, Herron Corp. Rep. Dep. Tr. at 12:17-25; 13:1-3. Not only, as explained below, are those phrases truthful and perfectly appropriate, but they do not implicate the actual language of the New EULA. Indeed, Opus has yet to come forward with any representation by AirPro after December 1, 2020 in which AirPro claimed that its services were "equivalent to" OEM diagnostic systems. As such, Opus has no tenable breach of contract claim.

In truth, Mr. Herron conceded that his real issue was not with any particular statement made by AirPro, but rather with what he viewed as a "lack of transparency" by AirPro with respect to its services. *See* Ex. E, Herron Dep. Tr. at 190:4-7 ("There was no -- I felt there was no effort on AirPro's part to be transparent

20

with their customers that what they were purchasing and receiving was not an OEM scan."). According to Mr. Herron, the term "OEM compatible" would have been "the right way" to describe the software. *See* Ex. E, Herron Dep. Tr. at 109:23-110:3.

But feeling like AirPro was not being transparent enough, or AirPro using phrases like "OEM sourced" or "OEM compliant" does not equate to a breach of the specific provision of the New EULA that prohibits only certain, specific statements during a particular time frame. Accordingly, Opus cannot sustain its claim for breach of contract with respect to that provision.

But even if Opus could otherwise prove a breach by AirPro, its complete lack of damages dooms its breach of contract claim. In Michigan, "[d]amages are an element of a breach of contract claim, and <u>if there are no damages, then there can be no breach of contract action</u>[.]" *Consol. Rail Corp. v. Grand Trunk W.R. Co.*, 853 F. Supp. 2d 666, 670 (E.D. Mich. 2012) (emphasis added).

Notably, nowhere in any statement relied on by Opus is there mention of the brand of software used by AirPro. In fact, AirPro does not disclose to anyone the software that is encompassed in its device. *See* Ex. B, Margol Dep. Tr. at 146:16-19. Mr. Herron even admits that it is not "generally known" that AirPro uses AutoEnginuity software to perform its scans. *See* Ex. E, Herron Dep. Tr. at 116:4-6. Because no one knew that AirPro was using AutoEnginuity's Giotto software,

21

coupled with the fact that AirPro never mentioned or disclosed its use of AutoEnginuity to any customer or in any marketing material, it is impossible for Opus to have been harmed as a result of any alleged statement by AirPro about its services.

And while Opus claims it was concerned about <u>potential</u> third party liability due to a faulty scan, Opus was never sued on that basis, and Mr. Herron confirmed that he is in fact only aware of a single lawsuit being brought for this reason, but with respect to someone else. *See* Ex. E, Herron Dep. Tr. at 162:19-22; 163:1-4.

Finally, to the degree that Opus's damages claim related to the alleged statements originally seeks recovery for lost sales, lost profits, lost customers or harm to reputation or goodwill,[2] Opus has since abandoned that claim. During his corporate representative deposition, Mr. Herron testified that Opus's damages for lost revenue, lost sales, lost profits, and lost customers would be measured as follows:

> I believe what we are doing is taking just an overall average customer value and, you know, multiplying that by the number of customers that were moved to AirPro, because we don't have, frankly, a better way to do it or specific records to be able to be more precise.

*Id.* at 23:15-21. Mr. Herron also claimed, generically, that Opus's reputation and goodwill had been harmed by AirPro's alleged statements. *See* Ex. L, Herron Corp.

---

[2] ECF No. 21, PageID.435 at ¶ 75.

Rep. Dep. Tr. at 31:17-24.

However, Mr. Herron then went on to admit that that Opus cannot identify a single customer who left Opus to conduct business with AirPro instead because of AirPro's alleged conduct, nor could he point to any actual harm to Opus's reputation. *See id.* at 20:20-21:3, 22:5-7; 31:17-24.  Just as importantly, counsel for Opus has since conceded both prior to and in connection with the parties' Rule 7.1 conferral conference, that Opus will not be seeking any relief at trial with respect to these categories of damages.  This is an independent basis on which summary judgment should be granted to AirPro with respect to this claim.

### B. AIRPRO IS ENTITLED TO SUMMARY JUDGMENT ON OPUS'S UNFAIR COMPETITION CLAIM.

AirPro has not breached the New EULA.  Similarly, nothing that AirPro has been accused of doing constitutes unfair competition, such that summary judgment should be entered in its favor on that claim as well.

Unfair competition under Michigan state law is defined as follows:

Unfair competition ordinarily consists of the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to its competitor.  The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby appropriate to himself the value of the reputation which the other has acquired for his own product or merchandise.

*Passalacqua Corp. v. Restaurant Management II, Inc.*, 885 F. Supp. 154, 156 (E.D. Mich. 1995); *see also Dura Global Techs., Inc. v. Magna Donnelly Corp.*, Case No. 07-10945, 2009 WL 3032594, at *4 (E.D. Mich. 2009) ("The common-law cause of action for unfair competition prohibits a party from engaging in unfair and unethical trade practices that are harmful to his or her competitors or to the general public.") (citing *A & M Records, Inc. v. MVC Distrib. Corp.*, 574 F.2d 312, 313 (6th Cir.1978)); *Clairol, Inc. v. Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1118 (6th Cir. 1979)).

As a threshold matter, the simple fact of the matter is that AirPro's descriptions of the services it offers, using such terms as "OEM sourced" and "OEM compliant" were 100% truthful, a fact established by the circumstances surrounding the manner in which aftermarket scan tools are created.

On this issue, Chuck Olsen testified about the role of ETI in housing OEM data for use in aftermarket scan tool creation, his conversation with Mr. Potter about the accuracy of the phrase "OEM-sourced," and his reasonable reliance on Mr. Potter's advice. *See* Ex. C, Olsen Dep. Tr. at 58-60; 61. ETI, along with the Autocare Association and the Automotive Aftermarket Suppliers Association, issued a statement that addresses this issue, and which further supports Mr. Olsen's conclusion:

24

**Industry Position on Scan Tools**

> In response to recent industry commentary touting that shops should only use OE diagnostic tools, ETI, its Members, and the respected industry associations undersigned below want to state the industry position on practices and standards in common diagnostic processes.
>
> ***
>
> • ETI members have been licensing and incorporating OEM diagnostic data, service information, and repair procedures into the development of millions of aftermarket scan tools used by both professional mechanical and collision repair customers for more than two decades. Much of this data is currently held by ETI in a secure, cloud-based repository.
>
> • State Right to Repair laws and industry agreements, along with the Magnuson Moss Warranty Act, support the use of both OE-specific and multi-brand tools.
>
> • Current Environmental Protection Agency (EPA) and California Air Resources Board (CARB) service information regulations, as well as the Right to Repair Memorandum of Understanding (MOU), <u>require that data be made available to tool manufacturers for the purpose of developing multi-brand diagnostic tools with equivalent capabilities of the automaker's dealership tool</u>, less Immobilizer systems.

*See* Ex. E, Herron Dep. Tr. at Exhibit 20 (emphasis added).

Thus, the "competition" that Opus now claims is "unfair" is the very competition contemplated by the R2R legislation and the MOU. Indeed, as reflected in the above industry position statement, the entire purpose of the R2R legislation and the MOU was to create an equivalent, and competitive, service to that of the OEMs' franchised dealerships. *See* ECF No. 1, PageID.3 at ¶¶10, 12. One key to enabling this competition was to require that the OEMs provide scan tool

manufacturers and their developers with the equivalent diagnostic information as is provided to the OEMs' dealerships. *See* Ex. D, R2R Agreement at §2(b)(ii). Even Lothar Geilen of Opus conceded that he "wouldn't doubt" that the goal of this law was the creation of aftermarket scan tools with equivalent capabilities of automaker dealership tools. *See* Ex. F, Geilen Dep. Tr. at 85:24-86:5.

In the end, AirPro represented its products and operated pursuant to a system designed to promote the creation of "OEM sourced" diagnostic software. As such, there is no basis for Opus to assert that AirPro's operation, and its statements regarding its services, are somehow "unfair" to Opus.

In addition, even if Opus could establish that AirPro's conduct was unfair in some way, Opus's unfair competition claim must fail because the fact remains that Opus cannot in any way tie AirPro's alleged statements or other conduct to any harm Opus suffered, either logically or by reference to actual losses. With regard to any alleged harm that would be measured by a direct loss suffered by Opus, there is no evidence in this case to establish that any of AirPro's statements caused any such harm. Opus cannot and has not pointed to any customer who has ever raised any issues with AirPro's statements or claims to have left Opus for AirPro because of the statements and conduct at issue. *See, e.g.,* Ex. E, Herron Corp. Rep. Dep. at 22:5-7. Nor can Opus point to any actual evidence that its reputation or goodwill have been harmed in any way by AirPro's statements or conduct. *See* Ex. L, Herron Corp. Rep.

Dep. Tr. at 31:17-24.  And, in any event, Opus has disclaimed any right to pursue any damages for harm allegedly suffered directly by it.  Accordingly, summary judgment as to any such damage claims is required.

That leaves Opus to argue that it should be granted disgorgement of AirPro's profits.  But even that theory is fatally flawed, for several reasons.  First, Mr. Herron confirmed that Opus is not asserting any categories of damages other than what he testified to in his corporate representative deposition.  *See* Ex. L, Herron Corp. Rep. Dep. Tr. at 40:8-41:6.  Mr. Herron never even mentioned, let alone provided substantive testimony about, disgorgement damages, nor did he attempt to quantify such damages.  *See id.*  Opus should not be allowed to do so now.

Second, there is no evidence to establish causation with respect to the profits that Opus apparently now seeks to disgorge.  "Michigan common law requires causation as an element of any tort action: 'In a tort action, an injured party may seek damages for an injury caused by the breach of a legal duty.'"  *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 484–85 (6th Cir. 2023).  Opus's theory appears to be that the statements allegedly made by AirPro allowed AirPro to generate all of its profits over the years.  The problem for Opus is that <u>there is absolutely zero evidence to support that claim</u>.  It is rank speculation without any factual basis.  That is not sufficient to establish causation or damages under Michigan law.  *See Harvey Invs., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 166 F.3d 1213 (6th Cir. 1998) (citing *Home*

*Ins. Co. v. Commercial and Indus. Sec. Servs., Inc.*, 57 Mich. App. 143, 225 N.W.2d 716, 719 (Mich. Ct. App. 1975) (explaining that by both contract and tort standards, "uncertainty as to the fact . . . of damage caused by the breach of contract is fatal")). Thus, to the extent Opus is now seeking disgorgement damages, such a claim is unsustainable.

Finally, given the factual background recounted above, Opus should be precluded from pursuing disgorgement.  This Court has specifically held that disgorgement is an equitable remedy.[3]  As such, the doctrine of unclean hands is implicated.  *See Rautu v. U.S. Bank*, 557 Fed. Appx. 411, 413 (6th Cir. 2014) (barring plaintiff from equitable remedy due to unclean hands).  As set forth in detail above, it was Defendants, not AirPro, that engaged in unfair competition when they violated their duties under the MPAs, wrongfully took information from AirPro to establish a competing business, then -- once Opus controlled the software on which AirPro relied -- changed the governing EULA to target AirPro and try to drive it out of business, including on grounds that Opus now admits were without any basis (i.e the New EULA's Geographic Restriction).  These inequitable actions preclude Opus from obtaining the equitable remedy of disgorgement.

---

[3] *See Auto Konnect, LLC v. BMW of North America, LLC*, No. 18-14019, 2022 W.L. 1724497, *5 (E.D. Mich. May 27, 2022) ("Disgorgement is an equitable remedy that looks to the defendant's gains for recovery.").

V.    <u>**CONCLUSION**</u>

Based on the foregoing, AirPro respectfully requests that this Court grant its

motion for summary judgment and dismiss Opus's counterclaim in its entirety.

                                          Respectfully submitted,

Dated:  February 18, 2025          By:    */s/ Adam J. Brody*
                                          Adam J. Brody (P62035)
                                          Ziyad I. Hermiz (P72236)
                                          Francesca L. Parnham (P87300)
                                          VARNUM LLP
                                          Bridgewater Place
                                          333 Bridge St. NW, Suite 1700
                                          P.O. Box 352
                                          Grand Rapids, MI 49501-0352
                                          Tel: (616) 336-6000
                                          ajbrody@varnumlaw.com
                                          zihermiz@varnumlaw.com
                                          flparnham@varnumlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the date below, I electronically filed **Plaintiff's Motion for Summary Judgment and Brief in Support of Plaintiff's Motion for Summary Judgment** and this **Certificate of Service**, with the Clerk of the District Court using its CM/ECF System, which will then electronically notify ECF participants registered to receive notice via the CM/ECF electronic filing system.

Dated:  February 18, 2025

*/s/ Adam J. Brody*_____
       Adam J. Brody (P62035)
       Ziyad I. Hermiz (P72236)
       Francesca L. Parnham (P87300)
       VARNUM LLP
       Bridgewater Place
       333 Bridge St. NW, Suite 1700
       P.O. Box 352
       Grand Rapids, MI 49501-0352
       Tel: (616) 336-6000
       ajbrody@varnumlaw.com
       zihermiz@varnumlaw.com
       flparnham@varnumlaw.com

26908068.2

30