:UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

**AIRPRO DIAGNOSTICS, LLC**, a
Florida limited liability company,

       Plaintiff,

v.

**DREW TECHNOLOGIES, INC**., a
Michigan corporation, **OPUS IVS,
INC**., a Delaware corporation,
**AUTOENGINUITY, LLC**, an
Arizona limited liability corporation,
and **BRIAN HERRON**, an individual,

       Defendants.
and

OPUS IVS, INC.

       Defendant/Counter-Plaintiff,

v.

AIRPRO DIAGNOSTICS, LLC

       Plaintiff/Counter-Defendant.

Case No. 22-12969-LVP-EAS

Honorable Linda V. Parker

Magistrate Judge: Elizabeth A. Stafford

---

| VARNUM LLP | HOOPER HATHAWAY, PC |
|---|---|
| Adam J. Brody (P62035) | William J. Stapleton (P37339) |
| Ziyad I. Hermiz (P72236) | Rachel N. Hanson (P82828) |
| Francesca L. Parnham (P87300) | 126 S. Main Street |
| Bridgewater Place | Ann Arbor, MI 48104 |
| 333 Bridge Street NW, 17th Floor | (734) 662-4426 |
| P.O. Box 352 | wstapleton@hooperhathaway.com |
| Grand Rapids, MI 49501-0352 | rhanson@hooperhathaway.com |
| (616) 336-6000 | Attorneys for Defendants |

| | |
|---|---|
| ajbrody@varnumlaw.com | **WYRICK ROBBINS LLP** |
| zihermiz@varnumlaw.com | Samuel A. Slater (#43212) |
| flparnham@varnumlaw.com | T. Nelson Hughes, Jr.  (#59342) |
| Attorneys for Plaintiff | 4101 Lake Boone Trail, Suite 300 |
| | Raleigh, NC 27607 |
| | (919) 781-4000 |
| | sslater@wyrick.com |
| | nhughes@wyrick.com |
| | Attorneys for Defendants |

## <u>PLAINTIFF'S RESPONSE IN OPPOSITION TO<br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES...................................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................v

COUNTER-STATEMENT OF ISSUES PRESENTED ..........................................vi

I.    INTRODUCTION ......................................................................1

II.   FACTS ...................................................................................1

      A.    AirPro's Response to Defendants' Statement of Purportedly
            "Undisputed" Material Facts ................................................1

III.  LAW AND ARGUMENT................................................................19

      A.    Standard of Review. ..........................................................19

      B.    AirPro's Breach of Contract Claim. .....................................20

            i.     AirPro Disclosed Confidential Information Pursuant to the
                   MPAs...................................................................20

            ii.    AirPro was Not Required to Reduce to Writing Any
                   Disclosures. ..........................................................21

            iii.   Defendants Used AirPro's Confidential Information in the
                   Development of Their Own Products. ..........................22

            iv.    AirPro Did Not Waive its Claim for Breach of Contract. ........24

      C.    AirPro's Tortious Interference Claim ...................................205

            i.     Opus was Not Justified and Had No Legitimate Business
                   Reason to Terminate AirPro's Software License .....................25

            ii.    Defendants Engaged in Wrongful Acts. ...................................29

            iii.   AirPro Suffered Damages as a Result of Defendants'
                   Misconduct...........................................................31

            iv.    The Economic Loss Doctrine Does Not Apply. .......................32

i

D.   AirPro's Unfair Competition Claim. .................................................33

E.   Opus is not Entitled to Summary Judgment as to Liability on its Breach of Contract Claim....................................................................34

IV.   CONCLUSION.............................................................................................35

# INDEX OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970).......................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................ 19, 25

*ClassicStar Mare Lease Program*,
    727 F.3d 473 (6th Cir.2013) ................................................................ 19, 27

*Hall v. Trivest Partners, L.P.*,
    No. 22-12743, 2023 WL 5941729,  (E.D. Mich. Sept. 12, 2023), motion to
    certify appeal granted, No. 22-12743, 2024 WL 660172 (E.D. Mich. Feb. 16,
    2024) ............................................................................................................33

*Hardin v. Pitney-Bowes Incorp.*,
    451 U.S. 1008 (1981)........................................................................... 19, 27

*Neibarger v. Universal Cooperatives, Inc.*,
    439 Mich. 512 (1992) ..................................................................................33

*People v. Gates*,
    434 Mich. 146, 452 N.W.2d 627, 630, cert. denied, 497 U.S. 1004, 110 S.
    Ct. 3238, 111 L.Ed.2d 749 (1990)................................................................28

*Plymouth United Church of Christ (Congregational) v. Philadelphia Indem. Ins.*
    *Co.*,
    740 F. Supp. 3d 594 (E.D. Mich. 2024) ......................................................22

*Primary Ins. Agency Grp., LLC v. Nofar*,
    No. 320039, 2015 WL 1227767, (Mich. Ct. App. Mar. 17, 2015) ..............33

*QSI-Fostoria D.C., LLC v. Gen. Elec. Cap. Bus. Asset Funding Corp.*,
    389 F. App'x 480 (6th Cir. 2010) ................................................................24

*Rodriguez v. Tennessee Laborers Health & Welfare Fund*,
    89 F. App'x 949 (6th Cir. 2004) ..................................................................29

*Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust Dated June 27, 2002*,
    410 F.3d 304 (6th Cir. 2005) ..........................................................................28

*Sutherland v. Michigan Dept. of Treasury*,
    344 F.3d 603 (6th Cir. 2003) ..........................................................................19

*United States v. Dominguez*,
    359 F.3d 839 (6th Cir.), cert. denied, 543 U.S. 848, 125 S. Ct. 261, 160
    L.Ed.2d 78 (2004) ..........................................................................................28

*Wiley v. United States*,
    20 F.3d 222 (6th Cir. 1994) ............................................................................27

## **Rules**

FED. R. CIV. EVID. 801(c) .......................................................................................27

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

*Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008 (1981).

*Hall v. Trivest Partners, L.P.*, No. 22-12743, 2023 WL 5941729, at *8 (E.D. Mich. Sept. 12, 2023), motion to certify appeal granted, No. 22-12743, 2024 WL 660172 (E.D. Mich. Feb. 16, 2024).

*In re ClassicStar Mare Lease Program*, 727 F.3d 473 (6th Cir.2013).

*QSI-Fostoria D.C., LLC v. Gen. Elec. Cap. Bus. Asset Funding Corp.*, 389 F. App'x 480, 487 (6th Cir. 2010)

*Quality Products and Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003)

*Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603 (6th Cir. 2003).

*Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

## <u>COUNTER-STATEMENT OF ISSUES PRESENTED</u>

1. Are Defendants entitled to summary judgment with respect to AirPro's claim for breach of the Mutual Party Agreement, where the parties have presented directly conflicting evidence on what information was provided by AirPro, how that information was used by Defendants, and whether AirPro waived its right to bring a claim for breach of that agreement?

   AirPro Answer:    No.

2. Are Defendants entitled to summary judgment with respect to AirPro's claim for tortious interference, where the evidence establishes Defendants' wrongful conduct in secretly amending the parties' End User License Agreement ("EULA") to specifically target AirPro's business and where Defendants otherwise had no right to terminate the EULA for the software on which AirPro's entire business model was based?

   AirPro Answer:    No.

3. Are Defendants entitled to summary judgment with respect to AirPro's claim for unfair competition, where such a claim is inherently a fact driven inquiry as to whether Defendants engaged in "fair play," and where the evidence establishes that Defendants wrongfully targeted AirPro by secretly amending the parties' EULA and otherwise terminating that license based on pretextual "concerns," all so that it could eliminate AirPro as a competitor?

   AirPro Answer:    No.

## I.   INTRODUCTION

The claims asserted by Plaintiff/Counter-Defendant, AirPro Diagnostics, LLC ("AirPro"), for breach of contract, tortious interference, and unfair competition, are all factually intensive, with myriad questions to be resolved regarding the information shared by AirPro, Defendants' use of that information, and, perhaps most importantly, Defendants' motives and intent in taking the actions they did, which unquestionably harmed AirPro.   Rather than showing an entitlement to summary judgment, the motion filed by Defendants simply highlights that it is the jury, not this Court on a motion, that must resolve those conflicting issues and decide AirPro's claims.   Accordingly, Defendants' motion must be denied.

## II.   FACTS

In their brief, Defendants set forth a statement of purportedly "undisputed" material facts. But many of those alleged "facts" are very much disputed.

### A.   AIRPRO'S RESPONSE TO DEFENDANTS' STATEMENT OF PURPORTEDLY "UNDISPUTED" MATERIAL FACTS

**Purported Fact 1**:   Defendant Opus IVS (into whom Defendants AutoEnginuity, LLC ("AutoEnginuity") and Drew Technologies, Inc. ("Drew") have merged) and Plaintiff Airpro Diagnostics, LLC ("AirPro") are providers of remote scanning, diagnostics, calibration and programming services within the automotive repair industry and are competitors.

**AirPro's Response**:   Unlike Defendants, AirPro does not sell access to software or software use.  AirPro's offering is "a service, and the AirPro [is] a conduit for [AirPro] to deliver that service with the ability to utilize OEM applications and what [AirPro] referred to…as OEM-sourced information of scan tools."  *See* **Ex. A**, Olsen Dep. Tr. at 50:20-24.  Mr. Olsen described AirPro's offerings as: "We don't sell scans, we sell service."  *Id.* at 91:4-5.

**Purported Fact 7**:  After execution of the MPA, Mr. Herron, Lonnie Margol, CEO of AirPro ("Mr. Margol"), and Charles Olsen, Vice President of AirPro ("Mr. Olsen"), "toss[ed] around some ideas."

**AirPro's Response**:  In making this assertion, Defendants selectively cite <u>one</u> phrase used <u>one</u> time in thousands of pages of deposition testimony in this case.  Mr. Olsen testified regarding what exactly was disclosed to Defendants, and how it was much more than "tossed around ideas."  Among other things, as described herein, AirPro disclosed in detail to Defendants the methods of its processes including the use of separate VCIs and multiple OEM diagnostic applications in addition to the Giotto software.  *See* Ex. A, Olsen Dep. Tr. at 37-40.

**Purported Fact 10**:  At the time of Project Waterfall, Drew was already providing remote diagnostic services to the automotive collision repair market.

**AirPro's Response**:  This is not accurate.  Drew was selling interfaces to collision repair shops, not providing remote diagnostic services, with an aim to get

into the collision repair market to assist in programming.  *See* Ex. A, Olsen Dep. Tr. at 43:4-12.  Similar to Drew, AutoEnginuity also did not "have any intent to go there" because AutoEnginuity was not interested in "do[ing] any business with anybody else in remote." *Id*. at 130:10-19.  However, after AirPro disclosed its entire business model, methods and operation, Drew and AutoEnginuity were both aiming to get into the collision repair market to assist in programming as Drew's RAP or Cardaq could not effectively provide comprehensive diagnostic services.  *See* **Ex. B,** Margol Dep. Tr. at 57:7-12; 65:14-66:17.

**Purported Fact 13:**  "Basic stuff" about AirPro's business was discussed at the March 2017 Meeting; Mr. Margol could not "remember all the details, but it was some high-level stuff about what [AirPro] w[as] doing."

**AirPro's Response**:  Again, this is an example of Defendants cherry picking one general phrase to describe what has otherwise been explained in more detail. First, Mr. Margol's testimony reveals that he "can't remember all the details" but that AirPro discussed "high-level" information about AirPro's business at the time at a "whiteboard meeting" at AirPro's office with Brian Herron and Lothar Geilen.  *See* Ex. B, Margol Dep. Tr. at 61:20-62:1.

Further, the information exchanged "depended really on…what [Drew and AutoEnginuity] were looking for" and "their approach to [AirPro]." *See id.* at 64:18-65:9.  Mr. Margol stated that "they wanted to come talk to us and explore

3

possibilities of partnering, working together, possible acquisition" and that "they

were very interested in what we were doing. They knew we were in the collision

repair space. We were a big customer -- I think we were a pretty big customer at the

time to Drew Technologies. We were buying their CarDAQs." *Id.* at 57:7-12; 65:14-

66:1.  Stating further:

> They, you know, wanted to talk to us about the collision
> space and -- because they weren't really in the collision
> space in spite of what they may have said or claimed. The
> RAP -- I had seen the RAP device and I realized that it
> wasn't really an effective tool in collision by any means.
> And was in no way, you know, comparable to what we
> were doing with our AirPro. But I didn't know what to
> expect until they came and they started to ask us questions
> about certain things.

*Id.* at 66:7-17.

Mr. Olsen confirmed the magnitude of the amount of confidential information

that was disclosed to AutoEnginuity and Drew during this time.  For example:

"[AirPro's] use of AE and working with AE, providing software log reports and

assisting AE with continued development of tool capabilities using available OEM-

licensed software application data and/or TekNet Library information available from

ETI." *See* Ex. A, Olsen Dep. Tr. at 195:2-13.  Mr. Olsen testified in detail regarding

AirPro's "recommendations for continuous improvement" that it disclosed to

AutoEnginuity, including "continuous web reporting, comparison of the

functionality and capabilities of an OEM diagnostic application, compared to what

was available within AE, and continued suggestions for AE for certain functionality

that they had not put into the Giotto software that was beneficial for collision repair

customers." *See id.* at 196:20-197:1.  He further stated:

> <u>We disclosed our entire process</u> of how we put together
> the different applications to effectively deliver
> diagnostics, along with expanding beyond programming
> events of the tool, how we put those together, and how we
> managed the OEM software applications of when they
> were used and when they were not used. Of -- and let me
> kind of rephrase that. Multiple OEM applications -- and
> this was a big question, and I've been challenged on this
> by our other competitors. There's no way that you can use
> multiple OEM applications on a single tool because they
> won't comply. They don't -- you can't load them all on the
> same tool at the same time.
>
> We developed a process where we could unload and
> offload OEM applications to eliminate the conflicts of
> multiple applications being on the same tool. Because
> applications -- different applications --… -- will not all run
> at the same time. So if you have that -- because they share
> resources of the computer. So in order to be able to do that,
> you have to very quickly offload one application and
> onload another so that the application will work properly
> without any conflicts. <u>That was something unique that we</u>
> <u>figured out, and we did share … in verbal -- verbal</u>
> <u>conversations when -- … Brian and Lothar visited</u>
> <u>[AirPro]</u>, and also how we switch from one vehicle
> communication interface to another, how we manage that.
> <u>That was very unique. That had never happened before.</u>

*See id.* at 110:13-22 (emphasis added).

AirPro also used its comprehensive knowledge of "the collision workflow of

what was needed in th[e] development" of the Giotto software to "create[] APIs to

improve efficiencies between…the Giotto software and [AirPro's] Orion system."

*See id.* at 133:6-24.   AirPro disclosed such confidential information to AutoEnginuity and Drew pursuant to the MPA: "we felt like they were straight up with us.   There was mutual opportunities, and we were continuing to…purchase CARDAQ and put things together."  *Id.*

**Purported Fact 14:**   The lone document designated by AirPro as "confidential" under the MPA was "a confidential proforma" containing projections for AirPro's business in 2017.

**AirPro's Response:**   The parties maintained a good working relationship during this time and most confidential information that was disclosed pursuant to the MPA was in person at meetings at AirPro's facility, or verbally through phone calls. *See* Ex. A, Olsen Dep. Tr. at 112:1-113:19; Ex. B, Margol Dep. Tr. at 61:4-22.   Mr. Olsen and Mr. Herron alone had "multiple phone conversations" where Mr. Olsen explained to Mr. Herron the relationship between what AirPro does and what Opus does:

> [AirPro is] the diagnostician, [AutoEnginuity] is the tool maker or the expert. And I compared it to a gun maker and sharpshooter. You make great guns, we have great sharpshooters. It would be beneficial for us to work together because of the method that we were able to develop to deliver a very fast, very effective service to meet the collision repairs needs and requirements beyond what they had ever experienced before.

*See id.* at 112:7-113:1.   Both AirPro and Drew provided information to the other party under the MPA without reducing it to writing and without a formal

"confidential" designation, including sensitive financial and other commercial information.  *See, e.g.,* **Ex. C**, Decl. of Lonnie Margol at ¶ 6.

**Purported Fact 16:**  AirPro discloses its pricing to its customers with no non-disclosure agreement or other protection in place, and AirPro's pricing even varies from customer to customer.

**AirPro's Response:**  This is oversimplified. Though some customers were aware of AirPro's pricing as it pertains to what the customer paid, AirPro maintained multiple pricing structures which it shared with Opus in a meeting that AirPro's individual customers would never be aware of.  *See* **Ex. D**, Decl. of Chuck Olsen at ¶ 6.

**Purported Fact 21:**  The idea to run the Giotto Software through "a single J2534 interface" has been publicly available information since 2013: An interview of Mr. Horak is publicly available on Youtube from 2013 wherein Mr. Horak discussed his plan to port the Giotto Software over to a J2534 VCI.

**AirPro's Response:**  Both Mr. Horak and Mr. Herron confirmed to Mr. Olsen in separate conversations that it was not feasible to run the Giotto software through a single J2534 interface, as the functionality of the Giotto software would be limited from its then current state.  Mr. Olsen described multiple "early" conversations that he had with Mr. Horak and Mr. Herron during the term of the MPA where they objected to this very idea:

I had multiple discussions with Jay Horak about the multiple interfaces, and he had objections to this as well, because I was using his Proline interface which had different -- had additional protocol functionality that a J2534 did not have.

But I had made the ask that --… could he adjust or make changes to a software so it would be compatible through J2534 so it could be done through a single device? So that was something that [AirPro] had been seeking to do that I shared -- shared specifically with Jay Horak.

He objected to that. He didn't want to do that because he felt like it would reduce the functionality, especially on some older vehicles, by doing that, switching to a J2534. I pressed him further on that, that, "Well, these vehicles are getting older. [AirPro is] servicing specifically collision vehicles. I don't think that [AirPro is] going to need these because these vehicles are going to be totaled. And those older -- those older protocols are dying away from attrition, and I think it would be beneficial if we worked together so that it could run through a single J2534 interface."

And I believe that's eventually what had happened and -- with Opus, that they went forward and developed that … same suggestion. And that application or that iteration of Giotto software had never been made available to us.

I also shared some of that same information of going forward with J2534 with Brian Herron as well, which J2534 for that application runs for that single device. That was our concept, to improve the functionality and more streamline the service delivery to a collision repair shop.

Ex. A, Olsen Dep. Tr. at 117:23-119:23 (emphasis added).

**Purported Facts 30 and 31:**  Neither Mr. McFarlin nor Mr. Olsen made any

"complaints or statements" to Drew/Opus IVS during this "friendly visit" that they

8

could not compete with AirPro or otherwise provide remote scanning diagnostic services to the collision repair market in late 2019.

Yet AirPro contends now that "signing [the MPA] prohibited [Drew] from competing with AirPro in the collision space . . . That [Drew] would not build a device or get into competing with [AirPro] in the collision repair space."

**AirPro's Response:**  The MPAs at issue provide:

> For a period of three (3) years following the expiration of this Agreement, <u>Recipient agrees not to prepare or attempt to prepare any works derived, whether in whole or in part, from the Information received from the Disclosure without the prior written consent of the Discloser.</u> If at any time the Recipient produces works or products related to the Information, the Recipient shall have the burden of proving through competent evidence the independent development of such works by Recipient's employees having no access to the Discloser's Information. ECF No. 1-2, PageID.22-25, ¶ 7; 1-3, PageID.26-29, ¶ 7.

Throughout the term of the MPA, AirPro was pursuing a potential partnership with AutoEnginuity and Drew and was establishing a working relationship where AirPro would be the party providing the remote services.  Opus's abrupt termination of AirPro's EULA and immediate push to establish itself in a market AirPro had been in for years made it clear that Opus had been using AirPro's disclosures to develop its product to compete with AirPro, rather than to combine efforts, as was AirPro's intention.  Mr. Herron was masking his devised competition scheme with prospects of a fruitful partnership between the parties.  Despite Mr. Herron's repeated promises

9

that Opus would entertain a partnership, Opus never delivered, and instead, integrated AirPro's disclosed proprietary information into its own operation. *See* **Ex. C**, Decl. of Lonnie Margol at ¶ 7.

Mr. Olsen specifically spoke with Mr. Herron during discussions pursuant to the MPA about the "possibility of working together" in the collision space, as Defendants were not operating in that space at the time. *See* Ex. A, Olsen Dep. Tr. at 119:15-23. Mr. Olsen explained the parties' potential to Mr. Herron using "the analogy of the gun maker and the sharpshooter" and "shared some of that same information of going forward with J2534…which J2534 for that application runs for that single device. That was our concept, to improve the functionality and more streamline the service delivery to a collision repair shop." *See id.*

**Purported Fact 36:**  AirPro chose to misrepresent the Giotto Software as OEM software instead of aftermarket because it considered "aftermarket" to be a "dirty word", a "bad word" in the collision repair industry associated with "inferior[ity]."

**AirPro's Response:**  It is impossible for AirPro to have mispresented the Giotto software because AirPro does not disclose and had never disclosed via advertising or otherwise to its customers or to the public, the tools and software encompassed in its device, including the Giotto product. *See* Ex. B, Margol Dep.

10

Tr. at 146:16-19; 160:18-20.  AirPro's use of Giotto was only publicly revealed in pleadings as part of the Ford-AirPro lawsuit.

**Purported Fact 37:**   OEM software has significant advantages over aftermarket software.

**AirPro's Response:**  While OEM software may have advantages for certain functions and is used by AirPro for those functions as needed, aftermarket software has advantages, especially when used for routine tasks.  *See* Ex. A, Olsen Dep. Tr. at 98:9-101:4.

**Purported Fact 39:**  Each of AirPro's scan reports from June 2018-September 2021 – which were provided to AirPro's customers after every scan performed by AirPro – contained the following statement prominently displayed at the top of the Certificate of Scan: "*AirPro utilizes embedded OEM software with OEM compliant interfaces which meet or exceed OEM requirements*."

**AirPro's Response:**   AirPro embeds properly licensed OEM software (software that is OEM compliant) into the J2534, which is designated to run the OEM software.  AirPro never represented that *every* scan completed by the J2534 used that OEM software, as the software was only used as necessary.  Nonetheless, AirPro removed that statement from its scan reports immediately following any alleged voiced concern.  *See* Ex. D, Decl. of Chuck Olsen at ¶ 7.

**Purported Facts 40, 41 and 42**:   Ford's trademark infringement claim against AirPro in the Ford-AirPro Lawsuit was based on AirPro's use of "precise replicas of Ford's trademarks to pass off [AutoEnginuity's] aftermarket software as Ford Diagnostic Software [e.g., as OEM software]."

In granting partial summary judgment as to liability on Ford's trademark infringement claim on December 20, 2022, Judge Steeh concluded: "At a minimum, AirPro's use of the Ford marks was intended to cause confusion as to the source of the software it uses."

Judge Steeh also determined that "AirPro had sought to portray itself as using only OEM software on its scan tools."

**AirPro's Response**:   These purported "facts" represent a few cherry picked phrases out of a 37-page Opinion and Order.  In truth, as is evident from Judge Steeh's Opinion, the first two of the above statements were nothing more than a discussion of what Ford was arguing, not what Judge Steeh concluded. *See* **Ex. E**, Opinion and Order, Case 2:20-cv-10518-GCS-APP (Dec. 20, 2022), at p. 2, 30. What's worse, the third purported "finding" by Judge Steeh was just a passing comment in which he found issues of fact existed sufficient to deny AirPro's motion for summary judgment, not grant summary judgment in favor of Ford.  *Id.* at p. 35. And finally, Judge Steeh's finding in the Ford-AirPro lawsuit related to the appearance of the Ford logo on AirPro's website, and was not related to any alleged

customer confusion based on statements like "OEM sourced." *Id.* at 7.   The foregoing, coupled with the fact that the Order was an interim one that was not a final judgment, renders that lawsuit irrelevant here.

**Purported Fact 50:**  Another consideration in Opus' decision to update the EULA was to protect Opus from being drawn into the then-pending Ford-AirPro Lawsuit.

**AirPro's Response:**   This contention is unsupported by the facts and circumstances surrounding the timing and content of the EULA changes. Instead, the evidence indicates that Opus leveraged the ongoing litigation as a pretext to justify unilateral contractual changes that were commercially advantageous to Opus and detrimental to AirPro. Opus was aware of AirPro's business model and how it utilized the Giotto Software long before the Ford-AirPro litigation began. Opus licensed the software to AirPro with full knowledge of AirPro's practices, and there was no prior indication from Opus that AirPro's use of the software presented any liability concerns.  The sudden "concern" about third-party litigation, conveniently arising only after years of profitable licensing, casts doubt on Opus's purported justification.

The timing of Opus's EULA update also strongly suggests that it was not driven by legitimate litigation risk mitigation but rather by strategic business interests aimed at limiting competition.  Opus only updated the EULA after its

acquisition of AutoEnginuity, at a time when Opus was already competing directly with AirPro.  Opus's actions coincided with its entry into the remote diagnostics market, raising substantial questions about its real motivations: namely, to eliminate or disadvantage a competitor rather than avoid genuine litigation risks.

Opus also did not provide AirPro with notice or an opportunity to meaningfully negotiate or discuss the purported liability concerns or alternate ways of addressing such alleged risks.  For example, in September 2021, Mr. Margol sent an email with specific proposed language to Mr. Herron.  *See* Ex. J, Herron Dep. Tr Ex. 24.  Notably, Mr. Horak - the founder of AutoEnginuity - conceded in sworn testimony that Mr. Margol's September 2021 proposed language would be accurate, meaning that it would adequately address the alleged "concerns" raised by Opus.  *See* **Ex. F**, Horak Dep. Tr. at 69:1-70:1.  Despite this, Opus moved forward with its "termination" of the parties' EULA a month later.

**Purported Fact 57:** Mr. Herron sent a March 11, 2020 letter to AirPro expressing Opus's concerns.  AirPro has no record of receiving that letter.

**AirPro's Response:**  In May 2021, Ford submitted as an exhibit to a filing a letter purportedly sent by Mr. Herron to Mr. Margol on March 11, 2020 related to AirPro's alleged conduct.  *See* **Ex. H**, Herron Dep. Tr. Ex. 15.  Mr. Herron could never come up with proof that he had actually sent this letter to Mr. Margol.  *See id.* at 171:6-12.  Both Mr. Olsen and Mr. Margol confirmed that AirPro never received

14

the letter.  *See* Ex. A, Olsen Dep. Tr. at 205:21-206:3; Ex. B, Margol Dep. Tr. at 184:5-23.

**Purported Fact 58:** In addition to various conversations from March 2020 to August 2021 in which Opus expressed its concerns to AirPro, Opus sent multiple other letters to AirPro explaining Opus' concerns about AirPro's marketing and use of the Giotto software.

**AirPro's Response:**  Representatives from AirPro attempted multiple times to address Opus's alleged concerns about AirPro's marketing and use of the Giotto software after Opus secretly amended the EULA.  *See* Ex. A, Olsen Dep. Tr. at 206:25-209:4.  Mr. Olsen testified about AirPro's multiple attempts to resolve Mr. Herron's alleged concerns. *See id.*

Mr. Olsen also had discussions with Mr. Horak about Opus's alleged issue with concurrent users.  *See* Ex. A, Olsen Dep. Tr. at 208:1-14.

Time and time again, Mr. Olsen had phone calls with Defendants' representatives in which he expressed, "What do we need to do next? What can we do?" We never got any reply. When we sent some of the other things, we didn't get another reply.  He just didn't answer."  *See id.* at 208:22-209:54. And again, Mr. Margol proposed language in September 2021 that was - by Mr. Horak's own admission - accurate, yet Mr. Herron rejected it out of hand and moved forward with the termination of the EULA.  *See* Ex. F, Horak Dep. Tr. at 69:1-70:1.

15

**Purported Fact 59:** Opus sent these additional notices to AirPro because Opus continued to see that, through the documents made public in the Ford-AirPro lawsuit, AirPro's website, and AirPro's scan reports ("Certificates of Scan"), that AirPro was continuing to inaccurately represent the Giotto Software as OEM software.

**AirPro's Response:**  Opus was not aware at the time it terminated AirPro's license the contents of AirPro's Certificates of Scan, as those scan reports were disclosed in discovery in the present case.  Accordingly, Opus could not have relied on AirPro's scan reports as a reason for terminating AirPro's license in October 2020.  Additionally, AirPro never represented its tool as an OEM tool or one that exclusively used OEM software.  AirPro's descriptions of the services it offers, using such terms as "OEM sourced" and "OEM compliant" were 100% truthful, a fact established by the circumstances surrounding the manner in which aftermarket scan tools are created.  On this issue, Mr. Olsen testified about the role of ETI in housing OEM data for use in aftermarket scan tool creation, his conversation with Greg Potter of ETI about the accuracy of the phrase "OEM-sourced," and his reasonable reliance on Mr. Potter's advice.  *See* Ex. A, Olsen Dep. Tr. at 58-60; 61.  ETI, along with the Autocare Association and the Automotive Aftermarket Suppliers Association, issued a statement that addresses this issue, and which further supports Mr. Olsen's conclusion.  *See* Ex. I, Herron Dep. Tr. at Exhibit 20 (explaining that

16

2016 legislation "require[d] that data be made available to tool manufacturers for the purpose of developing multi-brand diagnostic tools with equivalent capabilities of the automaker's dealership tool").

**Purported Fact 61:**  Opus' potential liability as a result of AirPro's actions was "the core issue" Opus had with AirPro's misrepresentations of the Giotto Software.

**AirPro's Response:**  Opus claims it was concerned about <u>potential</u> third party liability due to a faulty scan, but Opus was never sued on that basis, and Mr. Herron confirmed that he is in fact only aware of a single lawsuit being brought for this reason, but with respect to someone else, which undermines its position.  *See* Ex. J, Herron Dep. Tr. at 162:19-22; 163:1-4.  *See also* AirPro's Response to Purported Fact Nos. 50, 58.

**Purported Fact 62:**  AirPro understood Opus' valid concerns and believed Opus' concerns to be legitimate.

**AirPro's Response:**   Mr. Olsen stated clearly that he "understood" that interpretations may differ, not that he found them to be legitimate.  In fact, Mr. Olsen addressed Mr. Herron's alleged concern *in real time* and attempted to resolve it:

> [W]hen you're talking in a layman's term, people inaccurately change the word "software," "data," and other things. And that's what I  explained to Brian. I'm like, "Brian, …I can understand that because that could be interpreted by somebody else that you're copying the software. I understand that. I will get it addressed to get it

> changed. "I didn't write this, and so -- and I believe…that
> I addressed that error of the reference. So with Brian being
> high skilled in engineering and engineering things, he
> understands the difference of those terms clearly. When
> we have somebody else that may be a lawyer, somebody
> in marketing, to them, software, data, scan tool, it's all the
> same thing. And the words get inaccurately transposed in
> different sentences for different people a lot of times. So I
> can understand his concern there, and I attempted to
> resolve it.

*See* Ex. A, Olsen Dep. Tr. at 209:19-210:15.

**Purported Fact 68:** In an October 21, 2021 letter ("October 21 Letter"), Opus indicated it was terminating AirPro's license to and right to use the Giotto Software effective October 25, 2021.

**AirPro's Response:** AirPro does not dispute that Opus claimed to have terminated AirPro's access to software updates. The license to the Giotto software is a perpetual license and thus continued use of existing software versions already purchased and installed could not be terminated. Indeed, the New EULA contains no terms that trigger a right of termination. *See* ECF No. 1-2, PageID.22-25; 1-3, PageID.26-29.

**Purported Fact 73:** As of late 2024, AirPro still had descriptions of its business presented to customers where it described its offerings as "Remote Provider of True OEM Diagnostics, Calibration & Programming Services" despite the fact that AirPro "generally" still "use[s] aftermarket every time" for its diagnostic scans.

**AirPro's Response:**  AirPro uses "aftermarket" versions along with OEM applications as needed, for comparative purposes.  *See* Ex. D, Decl. of Chuck Olsen at ¶ 8.  The referenced statement is entirely accurate.  *See id.*

## III.   LAW AND ARGUMENT

### A.   STANDARD OF REVIEW.

"[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party."  *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603 (6th Cir. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (holding that moving party must foreclose all reasonably possible factual disputes in order to succeed on summary judgment).

In addition, when questions of intent and motivation are central to the claims at issue, summary judgment is not appropriate.  *See Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008–09 (1981) ("It has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment."); *In re ClassicStar Mare Lease Program*, 727 F.3d 473, 484 (6th Cir.2013) (explaining that

19

claims involving intent may be determined on summary judgment only "when the evidence is 'so one-sided that no reasonable person could decide the contrary'").

**B.    AIRPRO'S BREACH OF CONTRACT CLAIM.**

Defendants claim that AirPro cannot establish its claim for breach of the MPA, for several reasons, none of which ultimately holds water.  Rather, as set forth below, there remain numerous issues of fact for the jury to decide at trial with respect to this claim.

**i.    AirPro Disclosed Confidential Information Pursuant to the MPAs.**

The parties entered into the MPAs because both parties were expecting to share confidential information.  *See* Ex. B, Margol Dep. Tr. at 57:7-16.  Indeed, the mere fact that the parties entered into the MPAs at all necessarily demonstrates that confidential information was expected to be shared.  In fact, Opus "wanted to come talk to [AirPro]."  *See id*. at 65:9. As such, AirPro entered the MPAs open-minded, and disclosure of information "depended really on…what they were looking for" and "their approach to [AirPro]."  *See id.* at 64:18-65:9; 57:7-12; 65:14-66:17; AirPro's Response to Purported Fact 13.

Ultimately, during the course of the MPA, AirPro disclosed significant confidential information.  Defendants conveniently leave out many categories in their brief.  As set forth above, representatives for AirPro, in fact, testified to disclosing significant confidential information.  *See e.g.* Ex. A, Olsen Dep. Tr. at

195:2-13, 196:20-197:1, 110:13-22.  That testimony precludes summary judgment in favor of Defendants.

### ii. AirPro was Not Required to Reduce to Writing Any Disclosures.

Defendants also argue that the information AirPro disclosed is not confidential under the MPA because it was not reduced to writing. However, the MPA does <u>not</u> say that failure to reduce confidential information to writing means that the information is no longer confidential, and as such, Defendants have no justification for their use of AirPro's confidential information.

Moreover, even if the MPA did specifically say that, the parties' conduct is sufficient to establish a modification of that agreement to do away with any such alleged requirement.  Under Michigan law, modification of a contract can be established through the parties' course of conduct.  *See Quality Products and Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003) ("[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied").  Here, the parties' course of conduct indicates that the parties mutually abandoned this provision.  Defendants themselves often disclosed information without reducing it to writing and marking it as confidential.  *See* Ex. C, Decl. of

Lonnie Margol at ¶ 8.   Both AirPro and Defendants continued this practice throughout the entire term of the MPA.  *See id*. at ¶ 9.

Because the parties consistently performed under the MPA without insisting on strict compliance with the terms of that contract regarding the reduction of verbally-provided information to writing, there is, at a minimum, a question of whether the MPA was modified (if needed to be at all).  *See Plymouth United Church of Christ (Congregational) v. Philadelphia Indem. Ins. Co.*, 740 F. Supp. 3d 594, 599 (E.D. Mich. 2024) (explaining that the intent of the parties is a question of fact for the jury).

### iii.   Defendants Used AirPro's Confidential Information in the Development of Their Own Products.

At the outset, it is critical to note that the burden is on Defendants to "prov[e] through competent evidence" that they did not use the information disclosed by AirPro, in whole or in part, but instead developed their own works independently. ECF No. 1-2, PageID.22-25, ¶ 9; 1-3, PageID.26-29, ¶ 9. The evidence recounted above demonstrates that Defendants cannot meet that burden, certainly not to an extent sufficient to entitle them to summary judgment on AirPro's claim for breach of the MPA.

As detailed above, and unbeknownst to AirPro, Opus was actively assessing the confidential information that AirPro had disclosed and was using it to enhance and develop its own offering.  Despite Opus's claim that its remote scanning service

22

was developed in partnership with General Motors, Drew actually developed its RAP product after discussions with Scotty West and Steve Casella, founders of CompuFlash, and pursuant to the MPA. *See* Ex. D, Decl. of Chuck Olsen at ¶ 9. CompuFlash discussed with Opus in detail the way that it was using the device that it was ordering from Drew. *Id.* at ¶ 10. Meanwhile, at the time, the RAP product incorporated General Motor's OEM software for its transmission programming services on the transmission programming services. *Id.* at ¶ 11. Drew was actively seeking an alternative solution because Drew was experiencing challenges with licensing the General Motors software. *Id.* at ¶ 12. As a result, Drew began developing its product leveraging the confidential information disclosed by AirPro. *Id.* at ¶ 13.

Specifically, AirPro shared detailed proprietary information regarding its business model, including: remote technician dispatching methodology, service pricing structure, integration of AutoEnginuity Giotto software with the Cardaq interface, and use of ORION (AirPro's proprietary diagnostic management software). *Id.* at ¶ 14. Through the course of the MPA, AirPro demonstrated how this proprietary combination of hardware and software enabled efficient remote diagnostic services, invoicing, and reporting for collision repair shops. *Id.* at ¶ 15. These details were extensively shared during in-person meetings and phone discussions, during which AirPro outlined planned service enhancements

exclusively to its business operations.   At the time of these disclosures, the combination of these tools and processes was unique in the industry and Drew/Opus **did not** have an established process or toolset to effectively serve the collision repair segment.  *See* Ex. B, Margol Dep. Tr. at 57:7-12; 65:14-66:17.

The foregoing evidence clearly establishes at least a genuine issue of fact as to whether Defendants have carried their burden of proving that their products and services were developed without the use of information provided by AirPro.

### iv.   **AirPro Did Not Waive its Claim for Breach of Contract.**

"'Waiver' is defined as the 'voluntary relinquishment of a known right.'" *QSI-Fostoria D.C., LLC v. Gen. Elec. Cap. Bus. Asset Funding Corp.*, 389 F. App'x 480, 487 (6th Cir. 2010).  "A waiver must be intentional, with full knowledge of all the facts."  *Id.*  "Although a waiver may be effected by express words or by conduct, mere silence will not amount to a waiver unless there is a duty to speak."  *Id.*  "The party seeking to prove waiver bears the burden of showing clear and unequivocal evidence of such a purpose."  *Id.*

As a threshold matter, AirPro was not aware that Opus had breached the parties' MPA until Opus terminated its license.   Further, even if AirPro was somehow aware that Opus was breaching the MPA (it was not), AirPro's continued business relationship with Opus does not constitute a waiver of its breach of contract claim.   And regardless, whether AirPro waived its breach of contract claim (it did

not), is fact dependent and is therefore for the jury decide, not this Court on summary judgment.  *See Anderson*, 477 U.S. at 255.

      **C.**    **AirPro's Tortious Interference Claim.**

Defendants also assert that AirPro cannot establish its claim for tortious interference, on various grounds.  But none of the purported bases for dismissal advanced by Defendants is sufficient to warrant summary judgment.

      **i.**    **Opus was Not Justified and Had No Legitimate Business Reason to Terminate AirPro's Software License.**

Opus first claims that it had two legitimate business reasons to terminate AirPro's software license - an alleged concern over potential third-party liability and alleged customer confusion.  The first problem with this argument is that it ignores the fact that AirPro's claim is based on more than the actual "termination" of the EULA.  To the contrary, it relates just as much, if not more, to the surreptitious changes that Defendants made to the previous iteration of the EULA, which were targeted at driving AirPro out of business.  As detailed above, Opus became a direct competitor of AirPro when it acquired AutoEnginuity.  *See* Ex. B, Margol Dep. Tr. at 41:8-10.  What followed was Opus taking affirmative steps to modify its EULA to target AirPro and effectively cut off AirPro's source of software to drive it out of business so Opus could absorb that customer base.  Opus took these steps despite numerous attempts by AirPro to remedy Opus's alleged concerns, including multiple proposed business solutions and communications that went unanswered.  *See* Ex. A,

Olsen Dep. Tr. at 236:12-237:10.  The fact that Defendants' motion totally ignores this basis for AirPro's tortious interference claim mandates the denial of their motion as to this claim.

But even if the focus were only on Defendants' actual termination of the EULA, summary judgment would still be inappropriate.

First, Opus claims it was concerned about <u>potential</u> third party liability created by AirPro's alleged misrepresentations: liability that would result from a faulty scan. But to the extent Opus claims it relies on AirPro's Certificates of Scans as a basis for its concern, the undisputed fact is that Opus only learned about the contents of those Certificates through discovery <u>in the present case</u>.  *See* **Ex. K**, sample of Certificate of Scan produced.  Having never seen those documents until recently, Defendants cannot now claim that they formed the basis of their decision back in 2021.  In addition, Opus was never actually sued or held liable for any faulty scan, and Mr. Herron confirmed that he is in fact only aware of a single lawsuit ever being brought for this reason, with respect to someone else.  *See* Ex. J, Herron Dep. Tr. at 162:19-22; 163:1-4.  And finally, Mr. Margol proposed a solution in September 2021 which, by Mr. Horak's own admission, would have addressed the issue completely.  *See* Ex. F, Horak Dep. Tr. at 69:1-70:1.  Yet Mr. Herron terminated the EULA anyway.  Given all of the foregoing, this claimed concern appears to be mere pretext for what was otherwise a campaign to drive AirPro out of business, and it is thus for the jury

to pass judgment on Defendants' true motivation. *See Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008–09 (1981); *In re ClassicStar Mare Lease Program*, 727 F.3d 473, 484 (6th Cir.2013).

Second, Opus claims that AirPro's customers "mistakenly believed…that AirPro only provided OEM scans" both in 2021 and in the present. ECF No. 53, PageID.1666. Yet this assertion is based entirely on inadmissible hearsay. "[H]earsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Under Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. CIV. EVID. 801(c). Defendants offer a Facebook post and an alleged customer survey to prove the truth of the matter asserted - that AirPro's misrepresentations caused customer confusion - yet they have not even offered an argument as to why this hearsay is admissible. Thus, it cannot be considered by the Court in deciding Defendants' motion.

Defendants' last-ditch effort to defeat AirPro's tortious interference claim is to assert that AirPro is supposedly collaterally estopped from "relitigating the issue of whether it misrepresented the Giotto Software as OEM software," based on an Opinion and Order issued in December 2022. *See* ECF No. 53, PageID.1666. Defendants do not explain, however, how that December 2022 Opinion could

27

possibly have informed, and justified, their decision in 2021 to terminate AirPro's license.  In addition, collateral estoppel simply does not apply to Judge Steeh's interim Opinion and Order.  Under Michigan law, collateral estoppel only "precludes relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was ... actually litigated, and ... necessarily determined."  *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust Dated June 27, 2002*, 410 F.3d 304, 310 (6th Cir. 2005) (quoting *People v. Gates*, 434 Mich. 146, 452 N.W.2d 627, 630, cert. denied, 497 U.S. 1004, 110 S. Ct. 3238, 111 L.Ed.2d 749 (1990)).  "[T]he party asserting preclusion bears the burden of proof."  *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir.), cert. denied, 543 U.S. 848, 125 S. Ct. 261, 160 L.Ed.2d 78 (2004).

Here, Defendants cannot establish the foregoing elements, most notably because the present issue of "whether AirPro misrepresented the Giotto software as OEM software" was not litigated in the context of the summary judgment motions decided in the Ford-AirPro lawsuit.  Rather, Judge Steeh's Opinion related to AirPro's use of the Ford logo in the context of Ford's trademark claim, and was not about alleged customer confusion based on statements like "OEM sourced."  *See* Ex. C, Opinion and Order, Case 2:20-cv-10518-GCS-APP (Dec. 20, 2022).  In fact, the only facts Judge Steeh addressed were AirPro's statements made in 2018-2019,

28

including a marketing deck and a Facebook post, none of which could form the basis of a claim that AirPro was violating the New EULA in 2020 and beyond. *Id.* And regardless, the Court's interlocutory summary judgment ruling is not a valid, final judgment. *See Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (explaining that interlocutory orders may be reconsidered "before entry of a final judgment…'to afford such relief from [interlocutory orders] as justice requires'"). As such, Judge Steeh's Opinion and Order has no impact on the present case.

### ii. Defendants Engaged in Wrongful Acts.

Defendants further argue that they did not engage in any wrongful act sufficient to support AirPro's tortious interference claim, purportedly because AirPro agreed to be bound by the New EULA and because AirPro committed a material breach that allowed Defendants to terminate the EULA. Not only does this argument once again ignore the fact that AirPro's claim is based not just on Defendants' termination of the New EULA, but also their secret amendment of the prior EULA to target AirPro's business (in and of itself a wrongful act sufficient to support this claim), but it also cannot form the basis of a grant of summary judgment.

In arguing that AirPro "manifested its assent to the terms of the New EULA," Defendants blatantly ignore the fact that AirPro packaged the software such that the terms of the New EULA were not presented to the user (AirPro) in each instance of

use. *See* Ex. A, Olsen Dep. Tr. at 133:25-134:3. *See* Ex D, Olsen Decl. at ¶ 16. Plus, Defendants do not explain how an AirPro technician checking a box supposedly indicating assent somehow absolves Defendants of liability for their wrongful conduct, particularly where the New EULA did not contain any provision allowing Opus to terminate it.

Perhaps recognizing that it had no contractual right to terminate the New EULA, Opus asserts that it rightfully terminated AirPro's license because of AirPro's alleged material breach. *See* ECF No. 53, PageID.1668-69. The first way in which Opus claims AirPro materially breached the New EULA was allowing its customers to perform so-called "self-scans," where a collision shop employee who would normally work in tandem with an AirPro technician to address a repair would instead work solely on his or her own, using the AirPro device. *See* ECF No. 21, PageID. 432-33 at ¶60-64. But, as detailed in the brief in support of AirPro's own motion for summary judgment, which is incorporated herein by reference, that practice does <u>not</u> constitute a breach of the actual terms of the New EULA. ECF No. 1-2, PageID.22-25; 1-3, PageID.26-29.

Second, Opus claims that AirPro breached the New EULA by supposedly making statements regarding the capabilities of the Giotto software as compared to OEM diagnostic systems. In making this claim, Opus relies on AirPro's alleged misrepresentations "in 2021," claiming that AirPro was "held liable for doing so in

the Ford-AirPro lawsuit through Ford's trademark infringement claim."  ECF No.

53, PageID.1669.  But the alleged "misrepresentations" at issue in the Ford-AirPro

lawsuit related to statements made in the years 2018-2019, before the New EULA

was in effect.  *See* Ex. E, Opinion and Order, Case 2:20-cv-10518-GCS-APP (Dec.

20, 2022).  Thus, these supposed "judicially determined misrepresentations" could

not have given Defendants the right to terminate the New EULA in 2021.

### iii.   AirPro Suffered Damages as a Result of Defendants' Misconduct.

Defendants also argue that "AirPro cannot show any recoverable damages

from the license termination because AirPro continued to use" the software it had

purchased, and because AirPro was not entitled to receive additional annual updates.

See ECF No. 53, PageID.1670.   Again, as an initial matter, this argument

misapprehends the nature and extent of AirPro's claim, which also relates to the

targeting of AirPro's entire business model through the secret EULA amendments.

But the fact also remains that the termination of the New EULA did harm AirPro.

Defendants claim that AirPro does not have recoverable damages because of

its continued use of the Giotto software.  But AirPro's use of the Giotto product after

the October 2021 purported "termination" was <u>minal,</u> as AirPro was focused on

switching to an alternative software provider, in large part because it knew it would

no longer have access to updates, which are critical in the industry, because they

allow a company like AirPro to service newer vehicles.  *See* Ex. A, Olsen Dep. Tr.

31

at 133:25-134:3, 133:25-10.  AirPro suffered significant damages as a result, including but not limited to replacement costs, OEM subscriptions, loss of technician efficiency as a result of being forced to hire and train additional staff and pivot to manual entry of many formerly automated operations, loss of business, including customers and profits, and the loss of acquisition opportunities.  *See* Ex. B, Margol Dep. Tr. at 11:3-15;9:14-22); *see also* Ex. A Olsen Dep. Tr. at 257:20-258.

### iv.   <u>The Economic Loss Doctrine Does Not Apply.</u>

Finally, Defendants argue that AirPro's tortious interference claim is barred by the economic loss doctrine.  Defendants are wrong.  Not only is this argument premised on the faulty notion that an alleged breach of contract is the only basis for AirPro's tortious interference claim (as opposed to Defendants' numerous other wrongful acts), but in any event, that doctrine has no application here.  As this Court has noted:

> The economic loss doctrine provides that '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses.' <u>It applies to 'transactions involving the sale of goods</u> for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.'

*Hall v. Trivest Partners, L.P.*, No. 22-12743, 2023 WL 5941729, at *8 (E.D. Mich. Sept. 12, 2023), motion to certify appeal granted, No. 22-12743, 2024 WL 660172

(E.D. Mich. Feb. 16, 2024) (citing *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 520(1992)) (internal citations omitted) (emphasis added).

Here, AirPro does not sell access to software or software use, or "scans." *See* Ex. A, Olsen Dep. Tr. at 91:4-5. AirPro "sells service" and "the AirPro [is] a conduit for [AirPro] to deliver that service with the ability to utilize OEM applications and what [AirPro] referred to…as OEM-sourced information of scan tools." *See id.* at 50:20-24. Accordingly, even if AirPro's tortious interference claim were based solely on an alleged breach of contract, which it is not, this doctrine has no application here.[1]

### D.   AIRPRO'S UNFAIR COMPETITION CLAIM.

As Defendants concede in their own briefing, "the essence of unfair competition law is fair play." *See* ECF No. 53, PageID.1672 (quoting *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 17, 2015)). AirPro could not agree more. Where the parties differ, however, is with respect to whether Defendants violated this notion of fair play. The evidence recounted above shows that they clearly did. But, at best for Defendants, there is a question of fact on this issue for the jury to decide.

Once again, Defendants ignore the facts alleged by AirPro related to the secret

---

[1] For the same reasons, the economic loss doctrine does not bar AirPro's unfair competition claim.

amendment of the EULA in December 2020, which was done in an effort to target AirPro's business and eliminate AirPro as a competitor after Opus acquired AutoEnginuity in early 2020, thus giving it control of the very software on which AirPro's entire business was based.  While Mr. Herron repeatedly assured AirPro that this acquisition would not affect the parties' relationship and that it would be "business as usual" (*See* Ex. A, Olsen Dep. Tr. at 131:7-132:13; 132:24-134:3; 134:24-135:9), that was clearly a lie.  Those facts alone establish unfair competition under Michigan law.  In addition to those facts, the evidence establishes Defendants' wrongful use of AirPro's information shared under the MPA, as well as their wrongful "termination" of the New EULA.  Taken together, there is more than a sufficient basis for the jury to conclude that Defendants never played fairly when it came to AirPro.  As such, summary judgment on this claim must be denied.

### E.     OPUS IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON ITS BREACH OF CONTRACT CLAIM.

Finally, Opus claims that it is entitled to summary judgment as to liability only on its claim for breach of the New EULA.  But as is explained more fully in AirPro's own summary judgment brief (which is incorporated herein by reference), it is AirPro, not Opus, that is entitled to judgment on that claim, because Opus cannot establish any breach of the terms of the New EULA.[2]

---

[2] *See Prestige Capital Corp. v. Michigan Gage and Mfg., LLC*, 722 F.Supp.2d 837, 842 (E.D. Mich. 2010) ("When the moving party also bears the ultimate burden

IV.    **CONCLUSION**

Based on the foregoing, AirPro respectfully requests that this Court deny

Defendants' motion for summary judgment.


                                      Respectfully submitted,


Dated:  March 11, 2025          By:    */s/ Adam J. Brody*
                                       Adam J. Brody (P62035)
                                       Ziyad I. Hermiz (P72236)
                                       Francesca L. Parnham (P87300)
                                       VARNUM LLP
                                       Bridgewater Place
                                       333 Bridge St. NW, Suite 1700
                                       P.O. Box 352
                                       Grand Rapids, MI 49501-0352
                                       Tel: (616) 336-6000
                                       ajbrody@varnumlaw.com
                                       zihermiz@varnumlaw.com
                                       flparnham@varnumlaw.com

---

of persuasion, the movant's affidavits and other evidence not only must show the
absence of a material fact issue, they also must satisfy that burden.").

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the date below, I electronically filed the foregoing paper with the Clerk of the District Court using its CM/ECF System, which will then electronically notify ECF participants registered to receive notice via the CM/ECF electronic filing system.

Dated:  March 11, 2025

By:  _/s/ Adam J. Brody_
Adam J. Brody (P62035)
Ziyad I. Hermiz (P72236)
Francesca L. Parnham (P87300)
VARNUM LLP
Bridgewater Place
333 Bridge St. NW, Suite 1700
P.O. Box 352
Grand Rapids, MI 49501-0352
Tel: (616) 336-6000
ajbrody@varnumlaw.com
zihermiz@varnumlaw.com
flparnham@varnumlaw.com

27002862.2