UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AIRPRO DIAGNOSTICS, LLC,

        Plaintiff,

v.

DREW TECHNOLOGIES, INC.,
OPUS IVS, INC., AUTOENGINUITY, LLC,
and BRIAN HERRON,

        Defendants.

and

OPUS IVS, INC.,

        Counter-Plaintiff,

v.

AIRPRO DIAGNOSTICS, LLC,

        Counter-Defendant.

_____/

Case No. 22-cv-12969
Honorable Linda V. Parker

## **OPINION AND ORDER**

This case involves a scan tool used to perform remote diagnostic and

calibration services for motor vehicles, which was designed by AirPro Diagnostics,

LLC ("AirPro") and utilized software created by and licensed from AutoEnginuity,

LLC and an interface produced and distributed by Drew Technologies ("Drew").  It

also arises from events occurring after Drew and Opus IVS, Inc. merged and Opus

IVS acquired AutoEnginuity.  Defendant Brian Herron is President of Opus IVS, and was affiliated with AutoEnginuity and Drew for years before the merger.

On December 8, 2022, AirPro initiated the lawsuit by filing a Complaint against AutoEnginuity, Drew, Opus IVS, and Herron (collectively "Defendants"). (ECF No. 1.)  In the Complaint, AirPro alleges that Drew breached the parties' contract (Count I), and that Defendants engaged in unfair competition (Count II) and tortiously interfered with AirPro's business expectancies (Count III).  Opus IVS filed a Counter-Complaint against AirPro alleging breach of contract (Count I) and unfair competition (Count II).

The matter is currently before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (ECF Nos. 53, 54.)  Defendants seek summary judgment on AirPro's claims, and argue that Opus IVS is entitled to partial summary judgment as to liability on its breach of contract counterclaim.  (ECF No. 53.)  AirPro seeks summary judgment as to Opus IVS' counterclaims.  (ECF No. 54.)  The motions have been fully briefed.  (ECF Nos. 61-64.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.     Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, the rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.   Factual Background

### A.   Scan Tools and Automotive Diagnostic Software Generally

A scan tool is a device loaded with automotive diagnostic software designed to service and repair automotive vehicles in accordance with the warranty repair guidelines set by Original Equipment Manufacturers ("OEMs"). The scan tool is connected directly to a vehicle's diagnostic port to extract current and historical information from the vehicle to identify issues necessary or advisable to address in repairing the vehicle.

The software used with scan tools can be classified as OEM or aftermarket. Aftermarket automotive diagnostic software is created by third parties. OEM software is specific to a particular manufacturer's line of vehicles, covers functions available for the manufacturer's models, and meets warranty repair guidelines as

4

set by the OEM.  OEMs create diagnostic software specific to their line of

vehicles.  Historically, this limited the choices consumers had as to where and how

to have their vehicles serviced, forcing them to use OEM dealerships.

In 2013, Massachusetts passed right to repair, or "R2R," legislation with the

goal of giving customers the ability to have their vehicles serviced and repaired

outside OEM dealerships.  In 2014, a Memorandum of Understanding ("MOU")

related to the R2R legislation was executed by the OEMs, which effectively

extended the legislation beyond Massachusetts and made it national.  Pursuant to

the MOU, OEMs agreed to provide diagnostic repair information to each

aftermarket scan tool company . . . for the sole purpose of building aftermarket

diagnostic tools[.]"  The OEMs also were required to "provide access to their

onboard diagnostic and repair information system[.]"  The Equipment and Tool

Institute ("ETI"), the leading trade association in the scan tool aftermarket, is the

designated depository of the R2R information from all OEMs.  The information is

maintained in ETI's Tek-Net library.

### B.    AirPro

In 2016, AirPro was formed to distribute a new device designed to offer

multi-vehicle, remote diagnostic and calibration capabilities ("AirPro device").

AirPro distributed the AirPro device primarily to collision repair shops, but also to

mechanical or other specialty repair shops, and provided skilled remote diagnostic and calibration services to all shops.

The AirPro device used an interface known as J2534, which was produced and distributed by Drew, and aftermarket scan tool diagnostic software, known as "Giotto," which was created by AutoEnginuity.  AutoEnginuity licensed the Giotto software to users through an End User License Agreement ("EULA").  AirPro selected the Giotto software in part because of its wider vehicle coverage and because it was derived from the OEM data and instructions in the ETI Tek-Net library.

### C.    Drew and its Merger Discussions with AirPro

Drew, which has been in existence since 1998, manufactured collision and mechanical repair scan tools, automotive diagnostic tools, and J2534 devices, and provided remote diagnostics.  (ECF No. 53-2 at PageID.1680 ¶ 7.)  Drew had been performing remote diagnostics as early as 2003.  (*Id*. at PageID1682 ¶ 15.)  Herron was President of Drew from 2015-2020.

In early 2017, Drew and AirPro began discussing a possible merger.  (*See* ECF No. 54-3 at PageID.2085.)  As part of the discussions, they executed a "Mutual Party Agreement" ("MPA") in early February 2017.  (ECF No. 1-2.)

The MPA reflects the parties' "desire to enter into confidential discussions" to facilitate a "Purpose"—that being "[e]valuations, discussions, and potential

partnerships [between the parties] relating to the areas of automotive products."

(*Id.* at PageID.23 §§ 1, 5.)  Section 2 of the MPA provides that, "to facilitate the

Purpose," Drew and AirPro, "may disclose to each other certain information,

documents, business strategies, pricing, techniques, computer programs, methods,

drawings, formulas, specifications, software, or other data of a business or

technical nature" orally, electronically, or in writing.  (*Id*. at PageID.23 §§ 1-2.)

Section 2 further provides:

> Each party considers all such information disclosed to the
> other Party to have value as its confidential and/or
> proprietary property (hereinafter referred to collectively
> as "Information").  The parties intend that this Agreement
> govern the rights and obligations concerning the use and
> protection of Information which one Party (the
> "Discloser") discloses to the other Party (the
> "Recipient") . . .

(*Id*. § 2.)

Section 3 of the MPA provides a non-exhaustive list of "[t]he Information

which [Drew] may disclose hereunder"; while section 4 contains a non-exhaustive

list of "[t]he Information which [AirPro] may disclose . . .."  (*Id*. §§ 3, 4.)  AirPro's

potential disclosures are identified as including, but not being limited to:

> Confidential financial proprietary information,
> proprietary hardware and software design and know-how,
> confidential product information (including but not
> limited to AIRPRO's flash and programming tools,
> applications, and derivative products), confidential
> business and market information, and other proprietary
> confidential or non-public information furnished in oral,

7

> visual, written and/or other tangible form.  Information
> shall include but not be limited to operating
> specifications, product specifications, strategic marketing
> and price information.

(*Id*. § 4.)  Later, in section 10 of the MPA, the parties agreed to "mark any

documentary or tangible information considered confidential or proprietary as

'Confidential' or 'Proprietary' at the time of disclosure."  (*Id*. at PageID.24 § 10.)

For verbally disclosed Information, section 10 reads: "the disclosing Party

identifying such Information as confidential and proprietary under this Agreement

at the time of disclosure and [sic] will reduce such Information to writing within

forty-five (45) days of the date of disclosure."  (*Id*.)

The MPA requires the parties, during a three-year period, to "hold in

confidence" and neither disclose nor authorize or assist in the disclosure of

Information, except as permitted in the agreement.  (*Id*. § 7.)  The parties further

agreed that, during the three year period, the Recipient could not prepare or attempt

to prepare any works, in whole or in part, from Information received without prior

written consent of the Discloser.  (*Id*. at PageID.24 § 9.)  These restrictions did not

apply to Information that:

> (a)  Is shown to be in the public domain in one integrated
> document at the time of receipt hereunder;
>
> (b)  Subsequently enters the public domain without
> breach . . . by the Recipient or a third party who has a
> duty of confidentiality to the Recipient;

8

(c)  Is independently developed by Recipient without access to or knowledge of the Confidential Information. The Recipient shall have the burden of proving through competent evidence that independent development of the subject information by Recipient's employees having no access to the Discloser's Information; or

(d)  Is required to be produced pursuant to a valid order, law, or regulation . . ..

(*Id*. § 12.)  Lastly, the MPA states that its terms shall be governed by Michigan law and could be modified only "by written amendment" signed by both parties.  (*Id*. at PageID.25 §§ 19, 22.)

Representatives from Drew and AirPro met in person at AirPro's Florida offices in early March 2017.  Drew then sent a draft Letter of Intent ("LOI") to AirPro on March 16, 2017.  Merger discussions eventually fell apart around May 2017, when Drew and AirPro were unable to reach an agreement on critical issues.

AirPro maintains that it made substantial proprietary and confidential verbal disclosures to Drew during the merger discussions.  (ECF No. 54-2 at PageID.2076 ¶ 11; ECF No. 54-3 at PageID.2088; ECF No. 54-4 at PgeID.2097-98, 2099.) During those discussions, AirPro identified a single document as "confidential." (*See* ECF No. 53-16.)  This document contained projections for AirPro's business in 2017.  Drew sent AirPro several documents which it identified as confidential. (ECF No. 63-2.)

### D.   Defendants' Merger

Opus Inspection, Inc. acquired Drew in 2015.  (ECF No. 53-2 at

PageID.1682 ¶ 13.)  After the acquisition, Herron led efforts within Opus

Inspection to build a diagnostics and remote services platform, which led to the

creation of Opus IVS.  (*Id*. ¶ 14.)  In mid-2016, Drew launched its "Remote

Assistance Programming" ("RAP") "Crash" tool.  (*Id.* at PageID.1686 ¶ 24.)

In 2017, Opus IVS acquired two companies, Autologic Diagnostics

("Autologic") and Farsight, which had built remote diagnostic tools and had been

performing remote services.  (*Id*. at PageID.1682 ¶ 14.)  In 2019, Opus IVS also

acquired Bluelink Diagnostics ("Bluelink"), which had developed patented and

unique remote technology.  (*Id*.)  Opus IVS acquired AutoEnginuity in 2020.  (*Id.*)

Drew and Opus IVS merged on December 31, 2020.  (*Id.* ¶ 13.)

### E.   The Ford Lawsuit

In February 2020, Ford Motor Company and a related entity (collectively

"Ford") filed a lawsuit against AirPro ("Ford Lawsuit").  *See* Compl., *Ford Motor*

*Co. v. AirPro Diagnostics LLC*, No. 20-cv-10518 (E.D. Mich. filed Feb. 27, 2020),

ECF No. 1.  Ford alleged that AirPro violated the terms of the End User License

Agreement governing the use of Ford's diagnostic software ("Ford EULA"), and

that AirPro improperly used Ford's trademarks to promote AirPro's goods and

services.  *See generally id*.; *see also Ford Motor Co. v. AirPro Diagnostics LLC*,

10

632 F. Supp. 3d 753, 757 (E.D. Mich. 2022).  On December 20, 2022, the

Honorable George Caram Steeh granted partial summary judgment to Ford on

several of its claims.

First, Judge Steeh found that AirPro violated the terms of the Ford EULA

because Ford's diagnostic software was not being used on AirPro's—i.e., the

licensee's—premises; rather, it was used at the repair facilities of AirPro's

customers.  632 F. Supp. 3d at 762-63.  Judge Steeh further found a breach of the

Ford EULA because, although AirPro's technicians remotely access the diagnostic

information, AirPro's customers connected the scan tool to the vehicle at the

customers' facility to extract information necessary or advisable for the customer

to repair the vehicle.  *Id*. at 763.  Thus, the software was not being use "*by the*

*licensee* only for *its* internal use and only for the *direct repair* of a vehicle."  *Id.*

(emphasis added).  Lastly, Judge Steeh found that AirPro violated the Ford EULA's

terms which prohibited the licensee from "assign[ing], sell[ing], leas[ing],

loan[ing] or otherwise transfer[ring]" the software to a third party, when it

transferred the software from one scan tool used by one customer to another scan

tool used by a different customer.  *Id*. at 764.

Judge Steeh also held that AirPro violated the law by using Ford's

trademarks with the "inten[t] to cause confusion as to the source of the software

[AirPro] uses."  632 F. Supp. 3d at 768.  Specifically, Judge Steeh found that

AirPro used Ford's trademarks "to identify Ford, as well as other OEMs, as the source of the software that can be used on its scan tool" and "to convey[] the false message that it uses Ford's genuine software rather than aftermarket software[,]" although AirPro admitted "to using third-party diagnostic software for 96-98% of its scans . . .." *Id*. at 768-69.  According to Judge Steeh, "AirPro has sought to portray itself as using only OEM software on its scan tools." *Id*. at 770.

### F.     The Updated Giotto Software EULA

In December 2020, while the Ford Lawsuit was pending and after Opus IVS acquired Autologic and AutoEnginuity, the decision was made to modify the Giotto software EULA.  (ECF No. 53-23 at PageID.1841.)  According to Defendants, one of the key reasons for the modification was that the two companies had different EULAs, both of which needed updating, and Defendants wanted there to be only one agreement.  (*See* ECF No. 53-23 at PageID.1841.)  Defendants believed the current EULAs lacked a number of industry standard terms and conditions.  (*See id.* at PageID.1841-42.)  The concerns raised by Ford in its lawsuit against AirPro was another key reason for the EULA's modification.  (*See* ECF No. 53-14 at PageID.17890.)

Section 3.1 of the modified EULA (hereafter "New EULA") states:

> AutoEnginuity hereby grants to you a non-exclusive, nontransferable, perpetual license to use the Software for your own internal business operations.  Each individual license for the Software provides a license for one copy

12

>of the Software that may be installed on only one
>computer or PC at a time and used by a single user (i.e.,
>multiple users are not allowed to concurrently use a copy
>installed on a single computer); . . . Each licensed copy
>of the Software may be used solely to provide diagnostic
>services on vehicles located under the same roof (and
>within 500 feet) of the computer on which the Software
>is installed. . . .

(ECF No. 1-4 at PageID.31.)  Section 3.2 provides that the licensee may not, and

may not permit a third party to:

>* * *
>(iii)  lend, lease, sublicense, or redistribute the Software
>to any third party;
>
>* * *
>
>(v)  make statements that diagnostic services performed
>using [the] Software are equivalent to the OE diagnostic
>system; or
>
>(vi) use the Software on any computer that is not under
>the same rooftop (and within 300 ft.) as the vehicle the
>software is being connected to for diagnostics.

(ECF No. 1-4 at PageID.32 § 3.2.)  Herron explained that this latter provision was

added because diagnostic companies were "tak[ing] one scan tool license to fulfill

an entire customer base across an entire country" and because the software had not

been validated to be run remotely over a cloud connection.  (ECF No. 53-23 at

PageID.1841-42.)  According to Herron, Defendants had concerns about the

software's accuracy when used through the cloud, and that precluding remote use

is "an industry standard term for most diagnostic applications now."  (*Id.*)

13

Notice of the New EULA, which was effective on December 1, 2020, was provided through major software updates to the Giotto Software.  (ECF No. 53-4 at PageID.1734-35 ¶ 30.)  During the software installation process, a dialog box appeared, instructing the user to read the license agreement, which was contained in the box.  (*Id.*)  The beginning of the New EULA states:

> IN ORDER TO USE THE SOFTWARE YOU MUST ACCEPT ALL OF THE TERMS OF THIS AGREEMENT.  AFTER READING THE TERMS, IF YOU AGREE TO THEM, PLEASE INDICATE YOUR DECISION BY CLIKING ON "I AGREE" ON THE SERVICE REGISTRATION PAGE.  IF YOU DO NOT AGREE, YOU WILL NOT BE ALLOWED TO PURCHASE A LICENSE TO USE THE SOFTWARE OR ANY PRODUCT ON WHICH THE SOFTWARE IS INSTALLED.

(*Id.*; *see also* ECF No. 1-4 at PageID.31.)  The first update to the Giotto Software with the New EULA, titled "Giotto (19.0)," was issued on December 24, 2020. (ECF No. 53-4 at PageID.1736 ¶ 36.)  In 2021, there were three additional major software updates to the Giotto Software, which included the New EULA: "Giotto (19.1)"; "Giotto (19.2)"; and "Giotto 19.3".  (*Id.* ¶¶ 35, 38.)  AirPro assented to the New EULA by installing versions 19.0 through 19.2.[1]  (*See* ECF No. 53-22 at PageID.1831.32.)

---

[1] AirPro seems to challenge its assent to the New EULA's terms based on a technician simply checking the box reflecting agreement to its terms when upgrading the software.  (*See* ECF No. 62 at PageID.2522.)  There is no dispute,

14

### G.     The Termination of AirPro's License

Between March 2020 and August 2021, AirPro and Opus IVS "had

continued conversations" relating to Opus IVS' concerns that AirPro was violating

the Giotto licensing agreement.  (ECF No. 53-23 at PageID.1839; ECF No. 62-2 at

PageID.2546.)  In May 2021, Ford submitted as an exhibit in the Ford Lawsuit a

letter authored by Herron and addressed to Lonnie Margol at AirPro, dated March

11, 2020.  (ECF No. 1-5.)  In that letter, Herron raised concerns about AirPro's use

of the Giotto software in light of Ford's allegations in the Ford Lawsuit.  (*See id*.)

AirPro claims it never received this letter.  (ECF No. 53-7 at PageID.1761; ECF

No. 62-2 at PageID.2545.)

AirPro does not dispute that Opus IVS sent an additional letter on August

25, 2021, outlining Opus IVS' concerns about AirPro's violation of the New

EULA.  (*See* ECF No. 1-7.)  Specifically, Opus IVS raised AirPro's use of an

---

however, that AirPro used the upgraded versions of the Giotto software that were
subject to the New EULA, which first required clicking the "I agree" box,
reflecting assent to those terms.  (ECF No. 53-22 at PageID.1831-32.)  There also
is no dispute that the terms of the New EULA were prominently displayed on the
program user's computer screen before the software could be installed.  Courts
unanimously find that this conduct manifests assent.  *See Zantaz Enter. Archive
Sols., LLC v. MidMich. Health*, No. 23-cv-10932, 2024 WL 1283784, at *7 (E.D.
Mich. Mar. 26, 2024) (collecting caselaw and other sources reflecting that clicking
"I agree" to a "clickwrap" agreement before installing or using software provides
manifest assent sufficient to form a contract, regardless of whether the customer
actually reads the agreement).

individual scan tool for multiple users and its representations to customers and potential customers that a scan performed using an AutoEnginuity tool or product is originating from "OEM Scantool Software" and that a scan performed using the Giotto software is "an OE Scan or equivalent to an OE scan." (*Id.*)  In the letter, Opus IVS warned AirPro that its continued misrepresentation of the Giotto software would leave Opus with "no choice but to terminate AirPro's software license[.]" (*Id.*)

AirPro responded to Opus IVS' communications, attempting to resolve Opus IVS' concerns.  (ECF No. 62-2 at PageID.2546-47; *see also* ECF Nos. 1-7, 1-8.) However, by October 21, 2021, Opus IVS concluded that AirPro was continuing to violate the terms of its license based on its statements in the Ford Lawsuit and the filings therein and AirPro's representations on its website.  (*See* ECF No. 1-10.)  As a result, on that date, Opus IVS sent AirPro a letter terminating AirPro's license to the Giotto software effective October 25, 2021.  (*Id.*)  In the letter, as justification for the termination, Opus IVS referred to AirPro's continuing representations that it utilizes OEM software and only uses OEM licensed software, even though 96% of its scans use the AutoEnginuity Giotto products.  Opus IVS also referred to its discovery that AirPro "(a) was using a single user scantool license for multiple users and (b) was allowing its customers to perform 'self-directed scans' in violation of the license agreement." (*Id.*)

16

What was terminated, however, was AirPro's access to further updates to the Giotto software, not its continued use of the software already purchased and downloaded.  (*See* ECF No. 53-26; ECF No. 53-27.)  Without access to updates, however, AirPro was forced to transition to new diagnostic software and hardware vendors.

## IV.    Applicable Law and Analysis

### AirPro's Complaint

### A.    Breach of Contract Against Drew

In Count I of its Complaint, AirPro alleges that Drew breached the MPA by using confidential information disclosed by AirPro to develop Drew's competing RAP products.  Under Michigan law, a plaintiff alleging breach of contract must show: (1) the terms of a contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff from the breach.  *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citation omitted).  Defendants assert several arguments in support of their motion for summary judgment with respect to AirPro's breach of contract claim.

Defendants argue first that, during the merger discussions between AirPro and Drew, AirPro never designated any verbally disclosed information as "confidential" and "proprietary," as required under section 10 of the MPA.  AirPro marked only one document as confidential, but its breach of contract claim is not premised on the information in that document.  AirPro responds that the parties did

17

not need to designate verbally disclosed information as "proprietary" or "confidential" in writing to render it confidential and subject to the MPA's protections.  Alternatively, AirPro argues that the parties' conduct establishes a modification of that requirement.

Defendants next argue that the disclosures on which AirPro bases its claim were not in fact confidential, either because the information was publicly known or made known to Defendants outside the merger discussions or did not come within the MPA's definition of "Information" to be protected.  To the extent any information was "confidential" or "proprietary," Defendants maintain that they did not use that information to develop their own products.  Lastly, Defendants assert that AirPro waived any purported breach by failing to assert a claim until years later, after Opus IVS terminated AirPro's license.

### 1. Whether AirPro Triggered the MPA's Confidentiality Provision without Designating Information as "Confidential" or "Proprietary"

AirPro's breach of contract claim stands or falls on whether the MPA protected only verbally shared information subsequently designated in writing as "confidential" or "proprietary."  In other words, did the MPA protect from disclosure of all information, as defined by the agreement, or only that which was identified, in writing, as being "confidential" or "proprietary."

18

Under Michigan law, "the cardinal rule" in contract interpretation is to determine the parties' intent. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (citation omitted). To ascertain intent, courts read the agreement as a whole, according to its plain and ordinary meaning. *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 667 (Mich. Ct. App. 2000); *see also Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). If a contract contains two, irreconcilable provisions, the contract's language is ambiguous. *Klapp v. United Ins. Grp. Agency*, 663 N.W.2d 447, 453 (Mich. 2003). A court cannot simply ignore a portion of the contract to avoid finding ambiguity or to declare an ambiguity. *Id.* "Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable." *Id.* (internal quotation marks and citations omitted).

Where a contract is subject to two or more reasonable interpretations or is inconsistent on its face, it is ambiguous. *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984). In that case, its interpretation is "a question of fact that must be decided by the jury." *Klapp*, 663 N.W.2d at 454 (citation omitted). Nevertheless, "'if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.'" *City of Grosse Pointe*, 702 N.W.2d at 114 n. 8 (quoting *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982)).

19

Relying on *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F. Supp. 2d 808 (E.D. Mich. 2000), Defendants maintain that there can be no dispute that the MPA unambiguously required AirPro to reduce verbally disclosed information to a writing and mark it as "confidential" or "proprietary" to claim its protection. However, the nondisclosure agreement in *Rainbow Nails* is distinguishable in key respects.  First, the agreement in that case defined the relevant information "as restricted solely to 'written confidential or proprietary information.'"  93 F. Supp.2d at 816.  Further, the provision requiring verbally disclosed information to be reduced to a writing and designated with the required confidentiality language was included in the section of the agreement defining the information protected from disclosure.  *See id.* (explaining that "the Agreement defines the relevant 'Information' as restricted solely to 'written confidential or proprietary information'" and "then sets forth the steps Plaintiff was required to take in order to trigger [Defendant]'s confidentiality obligations[,]" which included reducing verbal communications to a writing).

Here, section 2 of the MPA defines the protected "Information" broadly as "information, documents, business strategies, pricing, techniques, computer programs, methods, drawings, formulas, specifications, software, or other data of a business or technical nature, in oral, electronic, *and/or* written format."  (ECF No. 1-2 at PageID.23 § 2 (emphasis added).)  This paragraph provides that "[e]ach

20

Party considers *all such information disclosed to the other Party* to have value as

its confidential and/or proprietary property (hereinafter referred to collectively as

'Information')." (*Id.*) This language reflects an intent to include any disclosures

during the parties' discussions within the categories set forth as confidential and/or

proprietary and thus protected by the MPA.

Even if the Court ignores the sloppy drafting or apparent error in the second

sentence of Section 10,[2] it does not plainly state that verbal disclosures must be

reduced to a writing and marked "confidential" or "proprietary" for the disclosure

to be considered protected "Information." For one thing, it does not say "shall."

Second, it refers to the verbal disclosure as "Information," not simply

"information," leading to the conclusion that it is intended to be protected

regardless of its form. Lastly, the provision is contained in several sections after

the section of the MPA defining what is protected by its terms.

Thus, the Court does not find that AirPro was required to reduce its oral

disclosures to a writing, marked "confidential" or "proprietary," to claim that

Drew's disclosure or use of that Information breached the MPA. At the very least,

---

[2] As set forth earlier, the sentence, as written, reads: "If Information is disclosed
verbally, the disclosing Party identifying such Information as confidential and
proprietary under this Agreement at the time of disclosure *and* will reduce such
Information to writing within forty-five (45) days of the date of disclosure." (ECF
No. 1-2 at PageID.24 § 10 (emphasis added).) For this sentence to make sense, the
italicized word must be omitted.

there is an ambiguity as to whether a writing was required, which would be a question for a jury if Defendants' other arguments do not support summary judgment in their favor on this claim.

> **2.    Whether AirPro's Disclosures are Otherwise Excepted from the MPA and, if Protected, Were Used by Drew**

AirPro's Complaint and briefing reflects that its breach of contract claim is premised on Defendants' purported use of the following disclosed information to develop Defendants' products and services: "[AirPro's] business model, including: remote technician dispatching methodology, service pricing structure, integration of AutoEnginuity Giotto software with the Cardaq interface, and use of ORION (AirPro's proprietary diagnostic management software)."  (ECF No. 62 at PageID.2515; ECF No. 1 at PageID.8-9 ¶ 40-41.)  Defendants argue that some of this information was excepted from the MPA's protections because it was known by the public or Defendants before the MPA's execution or does not come within the categories listed in section 4 of the MPA.

The Court is not persuaded by the latter argument, as section 4 of the MPA is expressly non-exhaustive.  Nevertheless, AirPro does not effectively refute Defendants' evidence that some of the information on which the claim is based (e.g., customer pricing information; running the Giotto software through a single J2534 interface, unloading and offloading OEM applications) was publicly known or known by Defendants before the MPA's execution.  More significantly, however,

AirPro offers mainly vague, summary references to categories of information and offers nothing beyond mere speculation that what was disclosed within those broad categories was "used" in violation of the MPA.  In other words, AirPro does not specifically identify what information was used or how it was used by Defendants (except to say generically in the development and enhancement of their own products); and, most importantly, AirPro does not offer any facts from which one could draw the inference that the information was used.  Defendants cannot be expected to present evidence of independent development if AirPro has not first identified the information disclosed and how it specifically relates to Defendants' products or services.

In short, AirPro fails to present evidence to create a genuine issue of material fact with respect to Drew's purported breach of the MPA.  Therefore, the Court concludes that Drew is entitled to summary judgment on AirPro's breach of contract claim.

## B.     Tortious Interference with Business Expectancy Against Defendants

In Count III of the Complaint, AirPro alleges that Defendants tortiously interfered with AirPro's business expectancy with respect to its customer and potential customers by amending the terms of the EULA for the Giotto software and then terminating AirPro's license based on a violation of those terms.  Under

Michigan law, to prevail on a claim of tortious interference with a business

relationship or expectancy, the plaintiff must prove:

> (1) the existence of a valid business relationship or
> expectancy that is not necessarily predicated on an
> enforceable contract, (2) knowledge of the relationship or
> expectancy on the part of the defendant interferer, (3) an
> intentional interference by the defendant inducing or
> causing a breach or termination of the relationship or
> expectancy, and (4) resulting damage to the party whose
> relationship or expectancy was disrupted.

*Courser v. Allard*, 969 F.3d 604, 620-21 (6th Cir. 2020) (citing *Health Call of*

*Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich.

Ct. App. 2005)).

Defendants seek summary judgment, contending that AirPro cannot satisfy

the third element of its claim because Opus IVS had a legitimate business reason

for terminating, and contractual right to terminate, AirPro's license to the Giotto

software. Defendants also argue that AirPro was not entitled to updates of the

Giotto software and continued to use the then-current version of the software after

the license termination. Lastly, Defendants argue that AirPro's claim is barred by

the economic loss rule because it is based solely on alleged breaches of contract.

### 1.   Economic Loss Doctrine

The Court quickly dispenses with Defendants' last argument. Michigan

courts "invoke[] the economic loss doctrine in appropriate cases where conflict

arises from the disparate goals of tort and contract law." *Neibarger v. Universal*

24

*Coops., Inc.*, 486 N.W.2d 612, 617 (Mich. 1992).  The doctrine precludes a party to a contract from bringing tort claims against another party to the contract that are indistinguishable from breach of contract claims.  *See Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 240-41 (6th Cir. 1994); *DBI Inv., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2014) (citing *Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991)).

There are recognized exceptions to the doctrine, however, including "for a select group of intentional torts."  *See Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995) (collecting cases recognizing exceptions).  One of those torts is tortious interference with a business relationship or expectancy, because such claims are based on a duty which generally exists beyond those represented by a contract between the parties—that being, to refrain from interfering with the other party's other business relationships.  *See Sunrise Foods Int'l, Inc. v. Agridient, Inc.*, No. 24-cv-10212, 2025 WL 1643741, at *11 (E.D. Mich. Jan. 24, 2025) (collecting cases recognizing the exception); *see also Huron Tool*, 532 N.W.2d at 371.  Thus, the Court finds that the economic loss doctrine does not preclude AirPro's tortious interference claim.

## 2.   Whether Opus IVS' Termination of AirPro's License Constituted "Intentional Interference"

As indicated, to prevail on its tortious interference with business expectancy claim, AirPro must show that Defendants intentionally interfered with AirPro's

25

business relationships. "Intentional interference 'requires more than just purposeful or knowing behavior on the part of the defendant.'" *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 441 (6th Cir. 2014) (quoting *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003)). AirPro must show that Defendants "interference was either (1) a *per se* wrongful act or (2) a lawful act done with malice *and* unjustified in law for the purpose of invading the business relationship of another.'" *Id*. (second emphasis added; ellipsis removed) (quoting *Wausau*, 323 F.3d at 404); *see also Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 716 (6th Cir. 2018) (citations omitted).

"A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Auburn Sales*, 898 F.3d at 716 (quoting *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 679 F. App'x 319, 326 (6th Cir. 2014)). "[I]f the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id*. (quotation marks and citation omitted). Put differently, "the 'improper' nature of an interference is shown by proving either (1) conduct that is inherently wrongful, or (2) conduct that is inherently legitimate, but which becomes wrongful in the context of the defendant's actions and malice." *Id*. at 716-17 (footnote omitted). "But either way, 'the interference must be both

26

intentional and improper.'" *Id*. at 717 (quoting *Weitting v. McFeeters*, 304 N.W.2d 525, 529 (Mich. Ct. App. 1981)).

Where a party's actions are motivated by legitimate business reasons, its actions generally do not constitute improper interference. *See Saab Auto AB*, 770 F.3d at 442 (quoting *Wasau Underwriters*, 323 F.3d at 404); *see also BP Clinical Laboratories v. Blue Cross & Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996). Nevertheless, "in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests," so simply identifying a business reason does not, alone, "weave a broad and impenetrable blanket of immunity from liability for those actions." *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462 (Mich. Ct. App. 1989). "[T]he defendant's motive is but one of several factors which must be weighed in assessing the propriety of the defendant's actions." *Id.* at 463. Other factors include "(1) the nature of the conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Id.*; *see also Auburn Sales*, 898 F.3d at 717 n.3 (citations omitted).

Defendants' modification of the terms of the EULA governing the Giotto software and termination of AirPro's license for violating those terms were not per se wrongful—that is, "an act that is inherently wrongful or one that is never

27

justified under any circumstances." *Saab Auto. AB*, 770 F.3d at 441-42 (internal

quotation marks and citation omitted); *see also Auburn Sales*, 898 F.3d at 716

(citation omitted).  Nothing precluded Defendants from amending the EULA's

terms or terminating the licenses of licensees violating those terms.  The earlier

EULA did not preclude modifications and neither that EULA nor the New EULA

guaranteed licensees a right to upgrades.

AirPro has not refuted Defendants' evidence that the EULA was modified to

conform to industry standard terms and conditions and to deter licensees from

exposing Defendants to potential liability by claiming that the Giotto software was

OEM software or equivalent to OEM software.  Notably, some of the claims in the

Ford Lawsuit concerning AirPro's breach of the terms of the EULA governing

Ford's diagnostic software relate to some of the same terms Defendants added to

the New EULA.  Further, as the Ford Lawsuit also showed, a claim that software

was OEM software, when it was not, or that it was OEM equivalent, raised the risk

of being sued by the OEMs.

The undisputed evidence also demonstrates that AirPro violated the terms of

the New EULA.  AirPro's scan reports represented that the software used was

equivalent to or exceeded OEM software.  (ECF No. 53-19.)  AirPro's website

from December 1, 2020 through August 2021 contained a statement that its "scan

tool uses *only* licensed OEM information *and software*."  (ECF No. 61-5.)  But

regardless of whether Defendants were justified in amending the terms of the EULA and whether AirPro breached those terms, what is most significant is that nothing required Defendants to continue providing AirPro with updates to the Giotto software.

AirPro's claim that Defendants' actions were taken for the sole purpose of competition—although phrased in more nefarious terms—is not enough to show improper interference. *See Knight Enters., Inc. v. RPF Oil Co.*, 829 N.W.2d 345, 349 (Mich. Ct. App. 2013) (quoting *Wood v. Herndon & Herndon Investigations, Inc.*, 465 N.W.2d 5, 9 (Mich. Ct. App. 1990)) ("It generally does not constitute improper interference . . . if a defendant simply takes 'the initiative to gain an advantage over the competition'").  Defendants had a "lawful" right to discontinue licensing their software to AirPro.  *See Feldman v. Green*, 360 N.W.2d 881, 887-89 & n.1 (Mich. Ct. App. 1984) (reviewing case law distinguishing actionable and nonactionable conduct).  As the caselaw discussed in *Feldman* reflects, where a defendant simply exercises its "lawful right to discontinue its source of supply at any time" as "a mere incident of competition," it "is *damnum absque injuria*"— that is, a loss or harm that is incurred from something other than a wrongful act and occasions no legal remedy.  *See id*.; *see also* Black's Law Dictionary (12th ed. 2024).

For these reasons, the Court concludes that Defendants are entitled to summary judgment on AirPro's tortious interference claim as well.

### C.   Unfair Competition Against Defendants

"Michigan follows the general law of unfair competition." *Primary Ins. Agency Grp., LLC v. Nofar*, No. 320039, 2015 WL 1227767, at *5 (Mich. Ct. App. Mar. 7, 2014) (quoting *Clairol, Inc. v. Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1118 (6th Cir. 1979)).  While, originally, the tort related to "the palming off of one's goods as those of a rival trader," today "the essence of unfair competition is fair play."  *Id*. (quoting 54A Am. Jur. 2d Monopolies & Restraints of Trade § 1039) (footnotes removed)); *see also* 1 McCarthy on Trademarks & Unfair Competition § 1:9 (5th ed. 2023) (offering "synonyms for unfair competition" such as "the rule of fair play"; "acts that are 'contrary to good conscience'"; "a level of rascality that would raise an eyebrow"; and "the decent thing to do in trade"). AirPro's claim of unfair play is based on the same conduct as its tortious interference claim.  For the reasons discussed with respect to that claim, the Court finds Defendants entitled to summary judgment on AirPro's unfair competition claim.

**Opus IVS' Counter-Complaint**

**D.      Breach of Contract**

AirPro seeks summary judgment on Opus IVS' counter-claim for breach of
the New EULA.  Opus IVS seeks partial summary judgment as to liability, only,
with respect to this claim.  The New EULA is governed by Arizona law.

The elements of a breach of contract claim under Arizona law are the same
as those under Michigan law.  *See First Am. Title Ins. Co v. Johnson Bank*, 372
P.3d 292, 297 (Ariz. 2016) (citing *Graham v. Asbury*, 540 P.2d 656, 657 (Ariz.
1975)).  AirPro challenges Opus IVS' ability to prove two elements: (1) AirPro's
breach and (2) damages resulting from any breach.  Opus IVS argues that there is
no genuine issue of material fact that AirPro breached the New EULA.  The Court
finds no evidence of damages arising from any breach.

First, "self-scans" by AirPro's customers did not constitute an impermissible
lending, leasing, sublicensing, or redistribution of the Giotto software to the
customers.  The software was housed on *AirPro*'s scan tool.  In any event, it is pure
speculation that if self-scans were prohibited, AirPro's customers would have
licensed the software themselves.  With respect to AirPro's statements concerning
the Giotto software's OEM equivalency, Opus IVS does not argue in response to
AirPro's motion, much less present admissible evidence to show, that it suffered
any resulting damages.

31

Defendants nevertheless argue that Arizona law provides for an award of nominal damages for breach of contract.  (ECF No. 61 at PageID.2223 n.25.) While true that nominal damages may be appropriate where there is proof of loss resulting from the defendant's breach but the amount of the loss is indefinite and cannot be estimated, *see, e.g., Edward v. Anaconda Co.*, 565 P.2d 190, 194 (Ariz. Ct. App. 1977), there still must be evidence of an injury or harm to prevail, *see Paul Johnson Drywall Inc. v. Sterling Grp. LP*, No. CV-21-01408, 2025 WL 553001, at *41 & n.31 (D. Ariz. Feb. 19, 2025).

For these reasons, the Court grants AirPro's motion for summary judgment and denies Defendants' motion for summary judgment as to Opus IVS' breach of contract claim.

### E.    Unfair Competition

Opus IVS claims that AirPro engaged in unfair competition by falsely advertising its services as offering OEM or OEM-equivalent software.  Opus IVS claims that this false advertising has resulted in significant marketplace confusion and deception and entitles it to the equitable remedy of disgorgement.  Opus IVS alternatively seeks nominal damages.

Disgorgement is not an appropriate remedy, however, in the absence of some proof that Opus IVS lost sales or profits, or AirPro gained them, due to AirPro's alleged unfair play.  *See Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d

683, 695 (6th Cir. 2000).  Opus IVS offers no evidence that it lost business to AirPro as a result of AirPro's statements concerning the Giotto software.  While Opus IVS attaches a list of customers who purportedly left Opus IVS for AirPro in 2021, there is nothing to tie those customers to anything AirPro said or did.  (*See* ECF No. 61-8.)  The declaration of AirPro's former customer, Chris Herron of Big Chris Collision, does not connect AirPro's representations to his confusion as to whether or not the scans were done with OE software.  (*See* ECF No. 61-10.)  Nor does the declaration suggest that he chose AirPro's scan tool over any competitor's product because of a misrepresentation by AirPro.  (*Id.*)

The telephone "survey" of AirPro shops conducted by or for Opus IVS, where a list of questions were posed to some unidentified individual who answered the call, is pure hearsay, unlikely to be admissible at trial in any admissible form.  (*See* ECF No. 61-9); *see also Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (stating that "hearsay evidence cannot be considered on a motion for summary judgment").  Moreover, the survey fails to demonstrate that the person surveyed—or more importantly the business contacted—believed that AirPro offered OE scans based on any statements by AirPro or chose AirPro over Opus IVS based on those statements.

Thus, the Court concludes that disgorgement is not an available remedy. Without any evidence of confusion or some other injury to Opus IVS, the Court

also finds nominal damages inappropriate. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."); *see also Digital Filing Sys., LLC v. Aditya Int'l*, 323 F. App'x 407, 419-20 (6th Cir. 2009) (quoting *Story Parchment*, 282 U.S. at 563).

For these reasons, the Court concludes that AirPro is entitled to summary judgment on Opus IVS' unfair competition counterclaim.

## V.     Conclusion

In summary, the Court holds that Defendants are entitled to summary judgment with respect to AirPro's breach of contract, tortious interference, and unfair competition claims.  The Court further holds that AirPro is entitled to summary judgment with respect to Opus IVS' breach of contract and unfair competition counter-claims.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment and for partial summary judgment is **GRANTED IN PART AND DENIED IN PART** in that the Court holds that Defendants are entitled to summary judgment with respect

to AirPro's claims against them but are not entitled to summary judgment as to Opus IVS' breach of contract counter-claim against AirPro.

**IT IS FURTHER ORDERED** that AirPro's motion for summary judgment is **GRANTED** in that it is entitled to summary judgment as to Opus IVS' counter-claims.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: September 29, 2025

35